1    Jo E. Mettenburg (KS Bar # 19423)
     Anthony C. Biagioli (DC Bar # 996654)
2    Attorneys for Plaintiff
     COMMODITY FUTURES TRADING COMMISSION
3    4900 Main Street, Suite 500
     Kansas City, MO  64112
4    Telephone: (816) 960-7700
     jmettenburg@cftc.gov
5    abiagioli@cftc.gov

**FILED**

**Jun 15, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

# SEALED

6                      **UNITED STATES DISTRICT COURT**

7                      **EASTERN DISTRICT OF CALIFORNIA**

8                          **SACRAMENTO DIVISION**

9    COMMODITY FUTURES TRADING
     COMMISSION,
10
                      Plaintiff,
11                                                  Civil Action No.   2:20-cv-1184 TLN AC
          v.
12
     FINANCIAL TREE dba FINANCIAL
13   TREE TRUST; FINANCIAL SOLUTION
     GROUP dba FINANCIAL SOLUTION
14   GROUP TRUST; NEW MONEY              **COMPLAINT FOR INJUNCTIVE RELIEF,**
     ADVISORS, LLC; THE LAW FIRM OF      **CIVIL MONETARY PENALTIES,**
15   JOHN GLENN, P.C.; JOHN D. BLACK     **RESTITUTION, DISGORGEMENT**
     aka JOHN BARNES; CHRISTOPHER        **AND OTHER EQUITABLE RELIEF**
16   MANCUSO; JOSEPH TUFO; and JOHN
     P. GLENN,
17
                      Defendants;
18
     SUISSE GROUP (USA) LLC; JMC
19   INDUSTRIES LLC; LANDES CAPITAL
     MANAGEMENT, LLC; KINGDOM
20   TRUST LLC; HERBERT CASWELL;
     ANNE MANCUSO; and TYLER
21   MANCUSO,

22                    Relief Defendants.

23
24        Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and

25   through its attorneys, alleges as follows:

26
27
28
                                      - 1 -

1

## I.   SUMMARY

2

      1.      Since January 2015, Defendants John D. Black ("Black") and his affiliated entities

3

Financial Tree ("Financial Tree"), Financial Solution Group ("Financial Solution"), and New

4

Money Advisors, LLC ("New Money"); Chris Mancuso ("Mancuso"); Joseph Tufo ("Tufo"); and

5

John Glenn ("Glenn") and his law firm The Law Firm of John Glenn, P.C. ("Glenn Law Firm")

6

(collectively, "Defendants") have engaged in a fraudulent scheme to solicit and misappropriate

7

money deposited with Defendants for the purported purpose of trading binary options and retail

8

foreign currency ("forex") contracts in commodity pools.  Between June 15, 2015 and the present

9

(the "Relevant Period"), Defendants fraudulently solicited at least approximately $14.5 million

10

from members of the public ("pool participants") to trade binary options and forex in two

11

commodity pools—the Financial Tree Pool (the "FT Pool") and the Financial Solution Group

12

Pool (the "FSG Pool") (collectively, the "Black Pools").  During the Relevant Period, at least

13

fifty-three (53) U.S. residents deposited over $6 million in this scheme, and at least an additional

14

thirty-eight (38) non-U.S. residents deposited over $8 million in the scheme.  Defendants have

15

traded only a small portion of funds in binary options or forex.  Instead, Defendants

16

misappropriated the majority of pool funds and, to conceal their misappropriation, made Ponzi

17

payments, issued false account statements and/or lulled pool participants with material

18

misrepresentations and omissions.

19

      2.      In the course of their fraudulent scheme and during the Relevant Period, certain

20

Defendants made material misrepresentations to pool participants, including that:  (1) pool funds

21

would be held in a fiduciary-protected, separate bank account and used to establish lines of credit

22

to trade binary options and/or forex on pool participants' behalf, which would yield 10-70%

23

monthly returns; (2) 85% of Defendants' trades were successful; and (3) Defendants' trading of

24

pool funds was overseen by a respected accounting firm.  Defendants omitted to tell pool

25

26

27

28

participants, among other things, that the California Department of Business Oversight ("California DBO") had issued a Desist and Refrain Order to Financial Solution, Black, and Mancuso relating to their solicitations for the Black Pools.

3.      Instead of trading, as promised, the Defendants have misappropriated the vast majority of pool funds.  Of the approximately $14.5 million Defendants received from pool participants during the Relevant Period, Defendants deposited only $10,000 into U.S. trading accounts in the name of the Black Pools.  At least some of those funds were lost trading forex. Financial Solution and Financial Tree, by and through Black, transferred approximately $254,280 overseas to possible binary options or forex trading firms but received back only approximately $59,239.  Defendants misappropriated at least approximately $5.1 million to make Ponzi payments to other pool participants and at least an additional approximately $6.3 million for unauthorized personal or business expenses.  Financial Solution and/or the Glenn Law Firm transferred at least $800,000 to Relief Defendants Suisse Group (USA) LLC ("Suisse Group") and JMC Industries LLC ("JMC"), and over $1 million to Relief Defendant Kingdom Trust LLC ("Kingdom"), none of whom provided legitimate services to the Black Pools or pool participants.

4.      To conceal Defendants' misappropriation, Financial Solution, by and through Black, created and issued false account statements that inflated and misrepresented trading returns and the value of pool participants' interests in the Black Pools.  When pool participants requested return of their funds, Defendants provided bogus excuses attempting to explain delays, including, for example, false representations that Europeans' summer vacations delayed return of funds, that storms in the Bahamas had delayed transaction processing, and that unspecified additional obstacles were preventing return of funds.  Additionally, Defendants continued to solicit and/or accept new pool funds, even after it was clear that Financial Solution and New Money were failing to repay existing pool participants.

5.     The fraud is ongoing.  A pool participant contributed funds to the scheme at least as recently as January 29, 2020.  Defendants made fraudulent excuses for failure to return funds at least as recently as February 26, 2020.  Defendants still have not returned all funds owed or delivered profits to the vast majority of pool participants.

6.     By virtue of this conduct and the conduct further described herein, Defendants—either directly or as controlling persons—have engaged, are engaging, or are about to engage in acts and practices in violation of Sections 4b(a)(2)(A)-(C), 4c(b), 4k(2), 4m(1), 4o(1)(A)-(B), and 2(c)(2)(C)(iii)(I)(cc) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6c(b), 6k(2), 6m(1), 6o(1)(A)-(B), and 2(c)(2)(C)(iii)(I)(cc) (2018), and Commission Regulations ("Regulations") 4.20(a)(1), (b)-(c), 4.21, 4.22, 5.2(b)(1)-(3), 5.3(a)(2), and 32.4, 17 C.F.R. §§ 4.20(a)(1), (b)-(c), 4.21, 4.22, 5.2(b)(1)-(3), 5.3(a)(2), and 32.4 (2019).

7.     Unless restrained and enjoined by this Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

8.     Accordingly, the Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and 7 U.S.C. § 2(c)(2)(C) to enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act and the Regulations promulgated thereunder, and to enjoin them from engaging in any commodity-related activity.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement from Defendants and Relief Defendants, rescission, pre- and post-judgment interest, and such other and further relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

9.      The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (2018) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (providing that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), authorizes the Commission to seek injunctive and other relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder.  Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2018), subjects the forex solicitations and transactions at issue in this action to, *inter alia*, Sections 4b, 4c(b), and 4*o* of the Act, 7 U.S.C. §§ 6b, 6c(b), 6*o* (2018), as further described below.

10.      Venue lies properly in this Court pursuant to 7 U.S.C. § 13a-1(e) because Defendants transacted business in this District and certain transactions, acts, practices, and courses of business in violation of the Act and the Regulations occurred, are occurring, or are about to occur in this District, among other places.

## III.     THE PARTIES

**A.  Plaintiff**

11.      Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Regulations promulgated thereunder.  The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street NW, Washington, D.C. 20581.

**B. Entity Defendants**

12.     Defendant **Financial Tree** is a "Pure Trust Organization in Common Law" doing business as Financial Tree and Financial Tree Trust.  In April 2014, John Black, Trustee, executed Financial Tree's Articles of Trust.  Financial Tree's mailing address is 13389 Folsom Boulevard, Suite 300-122, Folsom, CA 95630—a UPS store.  Defendant Black is Financial Tree's Trustee.  During the Relevant Period, Financial Tree operated as a commodity pool operator ("CPO") by accepting and receiving funds from pool participants for participation in the Black Pools.  In addition to operating as a CPO, during the Relevant Period, Financial Tree also operated as a commodity pool itself—the FT Pool—because it owned a trading account in its name that traded pool funds in forex.  Financial Tree has never been registered with the Commission in any capacity.

13.     Defendant **Financial Solution Group** is a "Pure Trust Organization in Common Law" formed in April 2015 doing business as Financial Solution Group and Financial Solution Group Trust.  Financial Solution's mailing address is 13389 Folsom Boulevard, Suite 300-113, Folsom, CA 95630—the same UPS store Financial Tree utilizes for its mailing address.  Defendant Black is Financial Solution's Trustee.  During the Relevant Period, Financial Solution operated as a CPO by soliciting, accepting, and receiving funds from pool participants for participation in the Black Pools.  In addition to operating as a CPO, during the Relevant Period, Financial Solution also operated as a commodity pool itself—the FSG Pool—because it owned a trading account in its name that traded pool funds in forex.  Financial Solution has never been registered with the Commission in any capacity.

14.     Defendant **New Money Advisors, LLC** is a Nevada limited liability company formed in December 2017.  New Money's address is 1400 South Linda Street, Pahrump, Nevada 89048.  New Money's Officers are Black and Financial Tree, which Black controls.  During the

Relevant Period, New Money operated as a CPO by soliciting funds from pool participants for participation in the Black Pools.  New Money has never been registered with the Commission in any capacity.

15.     Defendant **The Law Firm of John Glenn, P.C.** is a Colorado law firm with its principal place of business at 155 East Boardwalk Drive, Suite 400, Fort Collins, CO 80525.  Glenn is the Managing Partner of the Glenn Law Firm.  During the Relevant Period, the Glenn Law Firm operated as a CPO by soliciting, accepting, and receiving funds from pool participants for participation in the Black Pools.  The Glenn Law Firm has never been registered with the Commission in any capacity.

**C.  Individual Defendants**

16.     Defendant **John D. Black** is a resident of Folsom, California.  Black is also known as John Barnes.  Black created and controls Financial Tree, Financial Solution, and New Money.  During the Relevant Period, Black acted as an Associated Person ("AP") for CPOs Financial Tree, Financial Solution, and New Money by soliciting pool participants for participation in the Black Pools and supervising individuals so soliciting.  Black has never been registered with the Commission in any capacity.

17.     Defendant **Christopher Mancuso** is a resident of Irvine, California.  During the Relevant Period, Mancuso acted as an AP for CPOs Financial Tree, Financial Solution, and New Money by soliciting pool participants for participation in the Black Pools.  Mancuso has never been registered with the Commission in any capacity.

18.     Defendant **Joseph Tufo** is a resident of Antioch, California.  During the Relevant Period, Tufo acted as an AP for CPOs Financial Tree, Financial Solution, and New Money by soliciting pool participants for participation in the Black Pools.  Separate from this Complaint's allegations, in 1999, the Securities and Exchange Commission issued an order against Tufo

relating to his role in the fraudulent offer and sale of securities to the public.  Similarly, in November 2015, Tufo pled guilty to criminal violations of the Alabama Securities Act for fraudulently soliciting investments in "no risk" gold trading programs where funds would purportedly be held in an attorney's trust account.  Tufo has never been registered with the Commission in any capacity.

19.     Defendant **John P. Glenn** is a resident of Fort Collins, Colorado.  During the Relevant Period, Glenn acted as an AP for CPOs Financial Tree, Financial Solution, New Money, and the Glenn Law Firm by soliciting at least one pool participant for participation in the Black Pools.  In addition, Glenn was the Managing Partner of the Glenn Law Firm.  Glenn directed and controlled the Glenn Law Firm's actions in all relevant respects, including the Glenn Law Firm's activities as a CPO soliciting, receiving, and accepting funds from pool participants for participation in the Black Pools.  Glenn used his Glenn Law Firm email address to communicate with pool participants.  Glenn has never been registered with the Commission in any capacity.

**D.  Relief Defendants**

20.     Relief Defendant **Suisse Group (USA) LLC** is a Delaware limited liability company with an address of 1650 Margaret Street, Suite 302-326, Jacksonville, Florida 32209—a UPS store.  Herbert Caswell ("Caswell") is the Director of and controls Suisse Group.  In June 2016, Financial Solution transferred $500,000 in pool funds to a Suisse Group bank account.  Suisse Group has no legitimate claim to pool funds and did not provide any services for the Black Pools or pool participants.

21.     Relief Defendant **JMC Industries LLC** is a Delaware limited liability company with an address of 1650 Margaret Street, Suite 302-326, Jacksonville, Florida 32209—the same UPS store address as Suisse Group's.  During the Relevant Period, Caswell was the Managing Member of and controlled JMC until April 2019.  In September 2016, Glenn transferred $300,000

in pool funds from a Glenn Law Firm bank account to JMC.  JMC has no legitimate claim to pool funds and did not provide any services for the Black Pools or pool participants.

22.     Relief Defendant **Landes Capital Management, LLC** ("Landes") is a Wyoming limited liability company with an address of 109 E. 17th Street #25, Cheyenne, Wyoming 82001.  In September 2016, JMC transferred $200,000 in pool funds to Landes.  Landes has no legitimate claim to pool funds and did not provide any services for the Black Pools or pool participants.

23.     Relief Defendant **Kingdom Trust LLC** is a Wyoming limited liability company with an address of 2123 Pioneer Ave., Cheyenne, Wyoming 82001.  Between March and October 2016, Financial Solution transferred approximately $1,050,000 in pool funds to Kingdom.  On September 30, 2016, the BBB Jabez Foundation—which Black controls—transferred approximately $25,000 in pool funds to Kingdom.  On October 3, 2016, Relief Defendant Tyler Mancuso ("Tyler Mancuso") transferred approximately $25,000 in pool funds to Kingdom.  Kingdom has no legitimate claim to pool funds and did not provide any services for the Black Pools or pool participants.

24.     Relief Defendant **Herbert Caswell** is a resident of Jacksonville, Florida.  During the Relevant Period, including in 2016 when Financial Solution and the Glenn Law Firm transferred funds to Suisse Group and JMC, respectively, Caswell controlled both entities as the lone Director of Suisse Group and the lone Managing Member of JMC, commingled his personal funds with Suisse Group and JMC Funds, and transferred Suisse Group and JMC funds to apparent relatives and acquaintances.  Suisse Group and JMC were the alter egos of Caswell.  In 2016, Suisse Group and JMC transferred at least $150,187.33 in pool funds to bank accounts owned by Caswell.  Caswell has no legitimate claim to pool funds and did not provide any services for the Black Pools or pool participants.

- 9 -
COMPLAINT

25.     Relief Defendant **Anne Mancuso** ("Anne Mancuso") is a resident of Newport

Beach, California.  Anne Mancuso was Chris Mancuso's wife.  During the Relevant Period,

Defendant Chris Mancuso transferred at least $252,874.93 in pool funds to Anne Mancuso.  Anne

Mancuso has no legitimate claim to pool funds and did not provide any services for the Black

Pools or pool participants.

26.     Relief Defendant **Tyler Mancuso** is a resident of San Diego, California.  Tyler

Mancuso is Chris Mancuso's son.  During the Relevant Period, Defendant Chris Mancuso

transferred at least $340,087.23 in pool funds to Tyler Mancuso.  Tyler Mancuso has no

legitimate claim to pool funds and did not provide any services for the Black Pools or pool

participants.

## IV.     FACTS

**A. Defendants Used Various Corporate Entities To Defraud Pool Participants, Misappropriate Funds, and Make Ponzi Payments.**

**1.  Black Created a Common Enterprise To Defraud Pool Participants.**

27.     To operate the fraudulent scheme, Black caused to be created, and controlled, three

entities—Financial Tree, Financial Solution, and New Money.  Black has used these entities to

operate and control the Black Pools (i.e., the FSG Pool and the FT Pool).  Financial Tree has

served in three roles in Defendants' fraud—as a CPO operating and controlling the Black Pools;

as one of the Black Pools itself (the FT Pool); and as an officer of New Money.  Similarly,

Financial Solution has had a dual role in Defendants' fraud—as a CPO operating and controlling

the Black Pools; and as one of the Black Pools itself (the FSG Pool).  Black is the only employee

of the three entities.  And the only business the three entities conducted was related to

Defendants' fraud.

28.     Through Financial Solution and New Money, Black and other APs solicited funds

from pool participants for participation in the Black Pools, in which pool participant funds were

purportedly to be held in a protected account and used as collateral to secure separate lines of credit to trade forex and binary options.  Pool participants could participate by entering into joint venture agreements ("Agreements") with Financial Solution or New Money.  The Agreements, however, did not direct pool participants to send funds directly to the Black Pools.  Instead, the Agreements required pool participants to send funds to a Glenn Law Firm "attorney escrow account," after which the Glenn Law Firm was to pass those funds along to the Black Pools.

**2.  Black Engaged the Glenn Law Firm To Accept Pool Funds To Clothe the Fraud with a Veil of Legitimacy.**

29.     In approximately August 2014, Mancuso contacted Glenn "to provide paymaster services for Mr. Black and his companies based upon his various joint ventures with his clients." Later that month, Black (on behalf of Financial Tree) and Glenn (on behalf of the Glenn Law Firm) signed a "Paymaster Agreement" providing that the Glenn Law Firm would accept funds from third parties and disburse such funds to Financial Tree in exchange for a fee.  In practice, the only service the Glenn Law Firm provided to the Black Pools was to accept and transfer pool funds.

30.     There was no legitimate business reason for pool participants to wire funds to the Glenn Law Firm, and for the Glenn Law Firm to then wire funds to Financial Tree (less Glenn's fee).  Pool participants could have just as easily wired money directly to Financial Tree.  Black engaged the Glenn Law Firm to provide a false veneer of safety and legitimacy to the Black Pools.  Glenn used his position as an attorney and Managing Partner of the Glenn Law Firm to deceive pool participants into believing that the Black Pools were legitimate and safe.

31.     During the Relevant Period, at least eighty-six (86) pool participants deposited at least $14.32 million in the Black Pools through at least 134 total wire transfers to the Glenn Law Firm's bank accounts.

32.     In addition, at least five pool participants deposited at least $190,793.73 through at least six wire transfers directly to Financial Tree or Financial Solution.

33.     Pool participants deposited funds for trading in the Black Pools at least as early as January 2, 2015, and at least as recently as January 29, 2020.

**3.  Defendants Engaged In Minimal Trading for Pool Participants.**

34.     Despite promising pool participants they would generate substantial profits trading binary options and forex, Financial Tree, Financial Solution, and New Money, in fact, engaged in only minimal trading during the Relevant Period, none of which was profitable.

35.     Specifically, on February 14, 2016, the FSG Pool, by and through Black, opened a forex trading account at Trading Firm A, a registered futures commission merchant ("FCM") and retail foreign exchange dealer ("RFED").  On March 18, 2016, Financial Solution transferred $5,000 into the FSG Pool's forex trading account at Trading Firm A.  No trading occurred in the account.  As of March 2020, the account was dormant.

36.     Likewise, on July 6, 2016, the FT Pool, by and through Black, opened a forex trading account at Trading Firm B.  On July 7, 2016, Financial Tree transferred $5,000 into the account.  The account engaged in limited forex trading, generating net losses.  On May 7, 2018, the FT Pool, at Black's direction, transferred the remaining $2,554.79 from the account, which is no longer active.

37.     In addition, during the Relevant Period, Financial Solution and Financial Tree, by and through Black and/or other employees or agents, transferred approximately $254,280 overseas to possible binary options and/or forex trading firms.  Financial Solution and Financial Tree received back only approximately $59,239.

COMPLAINT

**4.  Defendants Misappropriated the Vast Majority of Pool Funds To Make Ponzi Payments and for Personal Expenses.**

38.     Defendants Financial Solution and Financial Tree, by and through Black and/or other employees or agents, made approximately 257 payments totaling approximately $4.94 million (approximately 34% of pool funds) to certain pool participants during the Relevant Period.  These were not trading profits.  As described above, very little trading—and no profitable trading—occurred at all.  Instead, these were Ponzi payments made from funds newly received from other pool participants.  Generally, Defendants made Ponzi payments only after they received a fresh infusion of pool funds from pool participants.  During the Relevant Period, on average, Ponzi payments occurred within six days following Financial Solution's or Financial Tree's receipt of funds from other pool participants.

39.     Defendants also misappropriated funds to enrich themselves.  Of the approximately $14.5 million in pool funds, Defendants redirected approximately $6.3 million (approximately 43% of pool funds) to their business or personal bank accounts.

40.     Of the approximately $14.32 million transferred to the Glenn Law Firm's bank accounts in connection with the Black Pools, Glenn misappropriated at least approximately $285,438.24 by retaining such funds in those accounts and/or transferring such pool funds to other bank accounts Glenn owned and/or controlled.  Glenn had no legal right to these pool funds. Glenn spent such funds on, among other things, expenses related to his divorce and spousal support.

41.     Of the remaining pool funds that Glenn did not misappropriate for himself, Glenn transferred approximately $13.5 million to Financial Tree and Financial Solution; approximately $300,000 to Relief Defendant JMC; at least approximately $171,292.18 in apparent Ponzi payments to pool participants; and approximately $51,503.56 to an entity owned by Mancuso.

42.     Upon receipt, Financial Tree, Financial Solution, and New Money did not deposit pool funds into fiduciary-protected, separate bank accounts, and did not use pool funds as collateral to obtain lines of credit to trade binary options and forex on pool participants' behalf.

43.     Instead, between June 22, 2015 and the present, Financial Solution and Financial Tree, by and through Black and/or other employees or agents, transferred at least $1,809,117.56 of pool funds to business and personal bank accounts owned and/or controlled by Black.  Black withdrew in cash at least $367,408.57 in pool funds, and spent additional misappropriated funds on, among other things, personal travel, rent for his personal residence, legal fees, online gambling, multilevel marketing programs, food and dining expenses, and software and online advertising.

44.     Similarly, between June 22, 2015 and the present, Financial Solution and Financial Tree, by and through Black and/or other employees or agents, made at least 238 payments totaling at least approximately $3.98 million of pool funds to business and personal bank accounts owned and/or controlled by Mancuso.  Mancuso further misappropriated such funds, including by withdrawing at least approximately $1.3 million in cash, transferring at least approximately $593,000 to Relief Defendants Anne Mancuso and Tyler Mancuso, and spending additional such funds on, among other things, personal travel, limousine expenses, spa and haircare expenses, and home renovations.

45.     Likewise, between June 26, 2015 and the present, Financial Solution and Financial Tree, by and through Black and/or other employees or agents, made payments totaling at least approximately $228,000.01 in pool funds to business and personal bank accounts owned or controlled by, or affiliated with, Tufo.  Tufo further misappropriated pool funds by spending them on, among other things, automobile-related expenses, eating out, groceries, insurance premiums, office expenses, utilities, and miscellaneous household expenses.

**B.  The California DBO Issued a Desist and Refrain Order to Financial Solution, Black, and Mancuso.**

46.    On April 27, 2018, the California DBO issued a Desist and Refrain Order to Financial Solution, Black, and Mancuso finding they unlawfully sold unregistered securities in California and made material misrepresentations or omissions to a pool participant in connection therewith.  Financial Solution, Black, and Mancuso did not abide by the Desist and Refrain Order and continued soliciting for the Black Pools.

**C.  Defendants Made Material Misrepresentations, Omitted Material Facts, and/or Issued False Account Statements to Pool Participants.**

47.    Defendants did not disclose to pool participants any of the above conduct, including that they had traded very few pool funds in binary options or forex, that they were using pool funds to pay personal expenses and make Ponzi payments instead of keeping funds in a separate fiduciary-protected account, and that the California DBO had issued a Desist and Refrain Order to Financial Solution, Black and Mancuso.  Instead, Defendants made material misrepresentations when soliciting pool participants to participate in the Black Pools.  Financial Solution, by and through Black, issued false account statements to pool participants.  Defendants also made material misrepresentations and/or omitted material facts to pool participants when they asked for their funds to be returned or otherwise inquired about the status of their deposits in the Black Pools, and Defendants did this while continuing to solicit and/or accept funds from new pool participants.  During the Relevant Period, at least ninety-one (91) pool participants deposited at least approximately $14.5 million in the Black Pools, relying on the misrepresentations and omissions made or caused to be made by Defendants in deciding to participate, deposit more funds, and/or maintain their participation interests in the Black Pools.  Fraudulent lulling communications to existing pool participants, and fraudulent solicitations of new pool participants, are ongoing.

**1. Defendants Fraudulently Solicited for the Black Pools.**

48.     Defendants made material misrepresentations and omissions to prospective and actual pool participants, including in teleconference seminars, emails, and Agreements executed with pool participants.

49.     Defendants' representations to pool participants downplayed the risk associated with the pools while promising monthly returns between 10-70%.   These Defendants' fraudulent solicitations, as illustrated by the following representative examples, included, but were not limited to, material misrepresentations that:

    a.  all pool funds would be protected in a "no risk" separate account by a fiduciary-protected bank block and returned to pool participants on a schedule prescribed by the Agreements;

    b.  traders would secure separate lines of credit to trade binary options and/or forex for the benefit of pool participants;

    c.  pool participants would receive between 10% and 70% monthly returns on their deposits as profits, depending on participation level;

    d.  more than 85% of trades had been successful; and

    e.  the Black Pools' activities were overseen by a "globally renowned and highly respected fiduciary accounting firm."

50.     These fraudulent solicitations also included, but were not limited to, the material omissions that:

    a.  the California DBO had issued a Desist & Refrain Order against Financial Solution, Black, and Mancuso;

    b.  Defendants would pay themselves approximately 43% of pool fund principal received, prior to trading any funds;

    c.  Defendants would make Ponzi payments to other pool participants using an additional approximately 34% of pool fund principal received, prior to trading any funds;

    d.  Defendants would improperly transfer pool fund principal to other third parties, prior to trading any funds;

e.  Defendants would trade binary options and forex with, at most, 2% of pool fund principal received;

f.  binary options and forex trading involves significant risk of trading losses;

g.  Defendants had failed to return principal and deliver profits to other pool participants; and

h.  at least as early as December 2016, Defendants were *expressly communicating* to existing pool participants that Defendants were struggling to make profitable trades (which, itself, was a misrepresentation because Defendants were not in fact trading pool funds) and were not returning principal or delivering profits to pool participants as promised.

51.    As an example of these fraudulent solicitations, on May 19, 2015, Mancuso emailed potential pool participants with a subject line "EARN 10% A MONTH PLUS… NEW 10K ENTRY LEVEL…."  The email referenced "ATTORNEY ESCROW TRADE" and stated:

> WE JUST GOT PAID AGAIN FOR MAY…WE KEEP THE INVESTOR FUNDS IN A SEPARATE ACCOUNT.  THE TRADER SECURES HIS OWN LINE OF CREDIT TO DO THE TRADE… THIS IS ONE WAY THAT WE PROTECT THE INVESTOR FUNDS…**VERY SUCCESSFUL… MORE THAN 85% OF TRADES ARE SUCCESSFUL** . . . . PERFORMING PLATFORM PAYS 10% PER MONTH… FUNDS ARE WIRED TO AN ATTY. ESCROW AND FUNDS MUST STAY FOR AT LEAST 90 DAYS. CONTRACT IS FOR 1 YEAR.  Want To EARN 10% On Your Money each Month ?  THAT'S 120% PER YEAR."

52.    Likewise, in or around June 2015, Mancuso circulated a similar email to prospective pool participants making similar claims, adding "YOU WILL EARN A MINIMUM 10% on your money EVERY MONTH… Funds must be wired to the Escrow Attorney here in the USA."  Mancuso promised escalating monthly returns depending on the size of the deposit, up to 45% per month for deposits exceeding $1 million.  On approximately June 13, 2015, a pool participant ("Pool Participant A") responded to Mancuso requesting additional information regarding "the guarantee on your money."  Mancuso replied the next day, "[i]n this program the funds are blocked and the trader uses his credit for the trade.  So no risk to blocked funds."

53.     Prior to Pool Participant A's initial deposit in June 2015, Mancuso told Pool Participant A in person that the program had been a "godsend," that he had received his twelfth check, and that the program would provide "consistent, monthly income without putting your principal at risk."

54.     Similarly, on December 25, 2015, Mancuso emailed potential pool participants making similar claims, and increasing promised returns to 70% per month for deposits over $3 million.

55.     On approximately July 1, 2016, Black advised Pool Participant B that he could increase his return on deposits from 10% to 13% per month—but only if he deposited an additional $25,000 in addition to his previously deposited $25,000.

56.     In approximately January 2017, Tufo solicited potential pool participants, including Pool Participant F, via email, at a teleconference seminar, and in follow-up telephone discussions.  Tufo represented to pool participants, among other things, that they could deposit $100,000 in the Black Pools and receive back $600,000 in 120 days.  Tufo referred to the opportunity as "foolproof" and "a sure thing" and claimed to have placed clients who achieved similar returns.

57.     On approximately January 17, 2017, on a telephone call, Glenn told Pool Participant F that participating in the Black Pools would be a "good deal" for Pool Participant F and that Black and Mancuso were "great guys."  On January 18, 2017, Pool Participant F transferred $100,000 to the Glenn Law Firm.  Later that day, on a telephone call, Glenn told Pool Participant F that she would receive the full amount promised in the Agreement.

58.     In approximately June 2018, Pool Participant G spoke with Black, Mancuso, Tufo, and others on a teleconference call.  Mancuso communicated that Pool Participant G's money would be safe because "you're not paying us, you're paying an attorney."  Mancuso introduced

- 18 -

Tufo as the account manager who would be Pool Participant G's principal point of contact for the opportunity.  Prior to Pool Participant G's deposit of $150,000 on approximately July 9, 2018, Tufo communicated to Pool Participant G that Tufo knew many people who had successfully deposited funds with Defendants, that Pool Participant G's money would be safe, and if Pool Participant G ever wanted to cancel the Agreement, he could do so easily and would receive his money back.

59.     Throughout the Relevant Period, pool participants entered into Agreements with Financial Solution or New Money, signed by Black, containing representations that pool funds would be protected in a bank account and used only as collateral for trading binary options, forex, and other products, that pool participants would receive 10% or higher monthly returns and/or loan funding generated by trading profits, and that activities would be monitored by a global accounting firm.  The Agreements directed pool participants to wire their funds to a Glenn Law Firm "attorney escrow" bank account.

60.     For example, on approximately June 18, 2015, Pool Participant B entered into an Agreement with Financial Solution, signed by Black, that stated the following:

    a.   "Client funds . . . shall be placed on deposit in a specially created, private Managed Fund Account controlled and blocked by a Fiduciary . . . . Client funds . . . will enjoy principal protection through a Fiduciary-directed bank block."

    b.   "Although funds are blocked and thereby fully protected against loss of principal at all times, the Managed Fund Account shall still financially benefit from the execution of Binary Options, Forex, and other transactions within the international capital markets . . . ."

    c.   "These financial activities are closely monitored by a globally renowned and highly respected fiduciary accounting firm . . . ."

    d.   "FSG anticipates that Client shall start to receive monthly disbursements of the investment profit after 90 days directly from FSG in an amount not less than 10 percent (10%) of the Investment each month."

- 19 -

e.   "Client shall be permitted to withdraw all or part of its investment after 120 days only in the unlikely event that Client does not receive monthly profit distributions as outlined herein."

61.   As illustrative examples, pool participants entered into similar Agreements with Financial Solution or New Money (each signed by Black) dated approximately:

a.   June 28, 2015 ($75,000 deposit by Pool Participant A);

b.   July 7, 2015 (additional $25,000 deposit by Pool Participant A);

c.   October 26, 2015 (additional $15,000 deposit by Pool Participant B);

d.   October 27, 2015 ($10,000 deposit by Pool Participant C);

e.   October 27, 2015 (additional $35,000 deposit by Pool Participant A);

f.   July 7, 2016 (additional $25,000 deposit by Pool Participant B);

g.   January 13, 2017 ($100,000 deposit by Pool Participant F);

h.   May 23, 2018 ($150,000 deposit by Pool Participant D); and

i.   June 27, 2018 ($150,000 deposit by Pool Participant G).

62.   The above solicitations contained material misrepresentations and material omissions because, among other things, Defendants did not have a historical 85% success rate trading; did not segregate all pool funds in "no-risk" separate accounts protected by a Fiduciary-protected bank block; did not return pool funds to pool participants on Agreement-prescribed schedules; did not secure separate lines of credit to trade binary options and/or forex for the benefit of pool participants; did not have an accounting firm overseeing trading activities; traded, at most, only a small percentage of pool funds collected in binary options or forex; did not generate 10-70% monthly returns or turn a $100,000 deposit into $600,000 in four months; and misappropriated the vast majority of pool funds for unauthorized personal and business expenses and to make Ponzi payments.

**2. Financial Solution, By and Through Black, Issued False Account Statements.**

63. During the Relevant Period, Financial Solution, by and through Black and/or other employees or agents, provided false account statements to pool participants. For example, Pool Participant B received from Financial Solution and Black at least nine account statements covering the period July 2015 through December 2016 and reflecting "MO[NTHLY] PROFITS" of 10% or higher.

64. These account statements contained material misrepresentations. Financial Solution had not, in fact, generated any profits at all for Pool Participant B, as Financial Solution had not engaged in any profitable trading using pool funds.

65. Between October 2015 and March 2016, Black wrote six checks on behalf of Financial Solution to Pool Participant B totaling approximately $15,120.06. These were Ponzi payments which, combined with the false account statements and fraudulent communications from Black, incentivized additional deposits by Pool Participant B. On approximately July 7, 2016, Pool Participant B entered into a new Agreement, increasing his participation from $25,000 to $50,000.

**3. Defendants Lulled Pool Participants with Material Misrepresentations and/or Material Omissions After Pool Participants Demanded the Return of their Funds, But Continued To Fraudulently Solicit and/or Accept New Funds for the Black Pools.**

66. Despite making Ponzi payments to certain pool participants, Financial Solution and New Money failed to return principal plus profits as promised to most pool participants. Of the approximately $14.5 million in total pool funds accepted from all pool participants during the Relevant Period, Financial Solution and New Money, either directly to pool participants or through Financial Tree, the Glenn Law Firm, or other employees or agents, paid back only approximately $5.1 million, in the form of Ponzi payments.

67.     In light of these failures, pool participants began to complain.  In response, Defendants made bogus excuses regarding Financial Solution's and New Money's failures to return pool funds, all while soliciting additional funds and/or accepting pool funds from those very same pool participants as well as new pool participants.  Defendants continue to lull pool participants.

> **a.   Black and Mancuso Made Material Misrepresentations and Omissions to Pool Participants Regarding Their Failure To Return Funds While Continuing To Solicit New Pool Participants.**

68.     Black and Mancuso made extensive fraudulent excuses to pool participants regarding Defendants' failure to return funds, often in joint letters and communications from one copying the other.  They did so to lull pool participants into believing their funds were safe and would soon be profitable.  Despite these failures, they continued to solicit funds from new pool participants.

69.     For example, on approximately December 23, 2016, Black and Mancuso sent a letter to Pool Participant A, Pool Participant B, and others, stating that Financial Solution's

> trade group has held several meetings with their credit line bank in the past 2 weeks and the meetings have went ok but so far our status has not changed.  Our lead negotiator says although the talks have been productive and he believes we would ultimately get a successful resolution likely in January, but he cannot be sure of the timeline so they're taking the necessary steps to keep our process moving.  So out of an abundance of caution we have been advised to refund all the principal deposits starting in January 2017 and we are told this process should be completed by mid Feb 2017 . . . . [followed by] disbursement of the profits . . . .

70.     Yet in the very same letter, Black and Mancuso solicited for a "new program in the first qtr of 2017 with new banking relationships for those that wish to continue we'll have a path moving forward."

71.     On approximately April 4, 2017, Black and Mancuso sent a letter to Pool Participant A and others, writing,

- 22 -

We can't express the joy we feel now that the funds are actually flowing . . . .  The first wires went out last week and as of today a total of 25 wires have been processed to the initial investors who joined in 2014.  Presently 15 more wires will go out this week but will need to skip next week April 10th-14th due to Spring Break Staff Vacations . . . .

72.     Black and Mancuso's April 4, 2017 statements were false.  Three Ponzi payments, not twenty-five, occurred in the two weeks prior to April 4, 2017.

73.     On approximately November 15, 2017, Black sent a letter to Pool Participant B and others:  "We understand many of you are very frustrated & disappointed with the delay in payments as are we.  Let's be clear we're not in the business of taking clients' money with the intentions of not putting the money to work and not performing."  Black blamed "breach of contract and nonpayment from some of our previous banking sources" for the delays, but stated that through "putting in ridiculous hours," Financial Solution "hit the jackpot" by agreeing with a well-funded Private Trust and a Private Bank & Trust to fund Financial Solution's "projects."  Black claimed Financial Solution would repay pool participants between November 17, 2017 and ten banking days thereafter.

74.     On approximately December 29, 2017, Mancuso emailed Pool Participant B with a subject line "GREAT NEWS!!!", promising wiring of funds by January 8-10.  However, on January 11, 2018, Mancuso emailed that the "SBLC" that was purportedly essential to facilitate return of funds to Pool Participant B had arrived at a Bahamian bank, but storms and rain in the Bahamas had created connectivity issues delaying return of funds.

75.     On approximately September 25, 2018, Pool Participant C emailed Mancuso, copying Pool Participant B and others, noting "this matter has become exhausting, comical and nonsensical.  It borders on criminal.  Your last response that the matters would close in 15 days has per usual been nothing but . . . another lie.  I am sick to my core of your damn lies."  The next day, Mancuso replied,

No one has ever lied to you from our group not in the past not now or ever.  Period.  We are given dates and many times those dates do not come to fruition for many reasons... the latest date we have for funds is now the week of October 15th… That came from the bank !!!

76.     On approximately January 1, 2019, Pool Participant D emailed Black and others, expressing frustration at receiving "one story after the next" from Black, including "that funds were delayed in August because the European market had fluctuation and it was their summer vacations" and that "there was a legal issue as to why the funds did not transfer from Singapore to Hong Kong."

77.     On approximately May 17, 2019, Mancuso emailed Pool Participant D, Pool Participant G, Black, Tufo, and others, in response to complaints regarding delays, claiming "we can't take funds from clients and pay other clients not even our commissions !!!"

78.     On June 17, 2019, Mancuso claimed to Pool Participant D and others that the Desist & Refrain Order from the California DBO "WAS RESOLVED SOME TIME AGO… A CURRENCY PROGRAM THAT WAS NOT OUR SERVICE.  THIS CLIENT RECEIVED A REFUND BUT SOMETIMES IT'S HARD TO REMOVE ADMINISTRATIVE PROCEEDINGS FROM THE INTERNET…"

79.     When soliciting new pool participants, Black and Mancuso omitted the material facts that Financial Solution and New Money had failed to return funds as promised to other pool participants, and were expressly communicating with those pool participants regarding such failures.

**b.  Tufo Solicited New Pool Participants Knowing Financial Solution and New Money Failed To Return Funds to Earlier Pool Participants.**

80.     Tufo knew of Financial Solution's and New Money's failure to return pool funds and Black's and Mancuso's excuses for such failures.  While Tufo, on emails copying pool participants, claimed to be frustrated regarding such failures and that he was attempting to help

resolve them, Tufo continued soliciting new pool participants—and receiving payments—while omitting information regarding such failures and excuses.

81.     For example, on approximately December 7, 2017, Tufo emailed unspecified pool participants, including Pool Participant F, stating "I am so sorry for these never ending excuses. I've suggested several times that Chris and John sell everything they own to make you whole . . . ."

82.     On approximately May 29, 2018, a person who introduced pool participants to the Black Pools emailed Tufo, copying Mancuso, Black, and Glenn, writing "Dear Joe" and complaining regarding extensive delays returning funds to pool participants.  This person stated that he recommended the Black Pools to pool participants because of Tufo and had assumed Tufo knew well with whom he was working.

83.     On approximately June 5, 2018, a person emailed Tufo, Glenn, Black, and Mancuso on behalf of Pool Participant E, asserting the four were running a fraudulent business and threatening to report them to authorities.

84.     On approximately July 20, 2018, Tufo emailed an unspecified list of recipients that appears to include Pool Participant E regarding the Black Pools.  Tufo wrote, "John and Chris have been unresponsive when I inquire . . . ."

85.     On approximately January 26, 2019, following multiple complaints by Pool Participant D, Tufo wrote to Pool Participant D, copying Black and others, "I have repeatedly asked John Black and Chris Mancuso to fulfill the terms of the contract that you signed with John Black on behalf of your company.  The delays are unacceptable."  Similarly, on approximately March 1, 2019, Tufo emailed the same group plus Mancuso, telling Black to refund Pool Participant D's money and "[i]ssue a letter of apology" to Pool Participant D.  The same day, Tufo wrote, "I called John Black.  His voicemail is full, I sent an SMS text message.  I spoke with

Chris for you a minute ago.  He said that you asked for a refund and you're going to be given a refund."  Tufo then pasted a purported communication from Mancuso stating, "We have another client being paid this month and we can take his funds from there."  The same day, a person writing on behalf of pool participants replied, "Chris, You have another client being funded this month??  How about funding Kevin or Wes or the other clients . . . you are way pass due in funding ??????"  Tufo replied that he "agree[d] that . . . [Pool Participant D's] funding is long past due."

86.     On February 26, 2020, Tufo emailed Pool Participant D and others, "From Chris . . . I was leading our weekly Gideon's Prayer Breakfast as chaplain.  By the way, my dad is in hospice in Encinitas California.  THE FUNDS ARE ABOUT 2 TO 3 WEEKS FROM DISBURSEMENT."

87.     Despite the above correspondence, Tufo nevertheless continued soliciting pool participants and accepting commissions in connection with the fraudulent scheme.  From June 5, 2018 through at least January 31, 2020, an entity controlled by Tufo accepted at least nine transfers totaling at least $58,500 in pool funds from Financial Solution and Financial Tree, by and through Black and/or other employees or agents.

88.     When Tufo solicited and communicated with pool participants, he omitted the material facts that the SEC had found him liable for, and in a separate scheme he had pled guilty to, defrauding investors; that Financial Solution and New Money had failed to return funds as promised to other pool participants; and that Black, Mancuso, Tufo and others were expressly acknowledging such failures in communications with pool participants.

**c. Glenn Made Material Misrepresentations and Omissions to Pool Participants and Accepted Funds from New Pool Participants Knowing Financial Solution and New Money Had Failed To Return Funds to Earlier Pool Participants.**

89. In approximately May 2017, shortly after Financial Solution and New Money failed to deliver funds to Pool Participant F as the Agreements promised, Pool Participant F called Glenn requesting an update on her funds. Glenn, in his capacity as an attorney and as the Managing Partner of the Glenn Law Firm, told Pool Participant F that he was in possession of Pool Participant F's money and would transfer the $600,000 she was owed by the end of the week.

90. Glenn's May 2017 statements to Pool Participant F were false. At no time in May 2017 or otherwise did Glenn or the Glenn Law Firm possess the $600,000 Pool Participant F was owed under her Agreement. Defendants never paid Pool Participant F. When Pool Participant F subsequently attempted to call Glenn, he did not answer his phone or return her calls.

91. On approximately March 19, 2018, Glenn, in his capacity as an attorney from his Glenn Law Firm email address with his Glenn Law Firm signature block, emailed unspecified recipients regarding Pool Participant E's deposit, claiming that he had been trying to resolve with Financial Solution, Black, and Mancuso the issues returning funds. In this communication, Glenn omitted the material fact that Glenn, himself, had misappropriated a portion of Pool Participant E's funds.

92. On approximately April 22 and 23, 2019, and June 27, 2019, the Colorado Supreme Court, Attorney Regulation Counsel sent Glenn three separate bar complaints filed by individuals, including Pool Participant D, regarding Glenn's role in the fraud.

93. On approximately April 26, 2019, and July 1, 2019, Glenn contacted Black and Mancuso regarding the above complaints. On approximately May 13, 2019, Mancuso claimed

two individuals would soon receive their funds.  On approximately July 2, 2019, Mancuso wrote

to Glenn, referencing Pool Participant D,

> WE HAVE PAID DOZENS AND DOZENS OF CLIENTS
> SUCCESSFULLY OVER THE LAST 4 YEARS… SOMETIMES
> PROGRAMS RUN INTO PROBLEMS THAT DELAYS THE
> PAYOUTS.  WE CAN GET THE PRINCIPAL BACK AND WE
> HAVE ASKED FOR THIS CLIENTS MONEY AS WELL
> TYPICALLY TAKES 30 DAYS (MAYBE SOONER) TO GET THIS
> 150K RETURNED… WE ARE SORRY ABOUT THIS I HAD A
> FEELING THIS WOULD GENERATE MORE COMPLAINTS…

94.     On approximately August 3, 2019, Pool Participant D emailed Glenn, stating

Mancuso and Black "have absolutely no intention of returning our money."  On approximately

August 25, 2019, Pool Participant D forwarded Glenn correspondence regarding extensive delays,

stating, "These are the kind of people you have supported transferring our money into their

accounts for personal gains . . . . There are more victims."  On approximately September 9, 2019,

Glenn forwarded Pool Participant D from his Glenn Law Firm email account correspondence

with Black and Mancuso asserting that Pool Participant D would be paid "by month end."

95.     On approximately November 29, 2019, Pool Participant G emailed Glenn,

expressing concern regarding Glenn's involvement and that Glenn's "participation lended

credibility to . . . [Black's and Mancuso's] operation."

96.     After falsely communicating to Pool Participant F that he possessed the funds she

was owed and would pay her soon, and communicating with other pool participants and

Defendants regarding Financial Solution's and New Money's failure to return funds to pool

participants, Glenn nevertheless continued lending his name and status as an attorney—and the

credibility and safety that communicated to pool participants—to the fraudulent scheme,

accepting and misappropriating pool funds, and falsely purporting to be working with other

Defendants to facilitate return of funds.  For example, from March 19, 2018 through at least

January 29, 2020, the Glenn Law Firm accepted at least twenty-seven transfers totaling

approximately $3.2 million in pool funds, and misappropriated at least $68,406 in such funds.

**D. Defendants' Misappropriation, Misrepresentations, and Omissions Were Intentional or Reckless and Operated as a Fraud on Pool Participants.**

97.     Defendants knowingly or recklessly made statements to pool participants

containing material misrepresentations and/or omissions, and knowingly or recklessly

misappropriated pool funds.  At minimum, this conduct operated as a fraud on pool participants.

**1. Black, Financial Tree, Financial Solution, and New Money Knowingly or Recklessly Defrauded Pool Participants.**

98.     Black controlled Financial Tree, Financial Solution, and New Money and thus

controlled the disposition of pool funds received in the Financial Tree and Financial Solution

accounts.  Thus, Financial Tree, Financial Solution, and New Money, by and through Black,

knew, or were reckless in not knowing, that such funds did not remain protected as promised, that

Financial Tree, Financial Solution, and New Money did not trade funds as promised, and that the

Agreements and other communications with pool participants did not authorize Black to

misappropriate pool funds for himself or others or to use pool funds to make Ponzi payments to

other pool participants.

99.     Similarly, Financial Solution and New Money, by and through Black, knew, or

were reckless in not knowing, that Black's communications with pool participants and the

promises in the Agreements contained the material misstatements and omissions described above.

Binary options and forex trading involves significant risk.  Because Black controlled Financial

Tree, Financial Solution, and New Money, he knew that the entities he controlled lacked the

trading history claimed and had failed to protect and trade funds or generate profits.  Black further

knew that he had misappropriated funds, that return of principal and payment of profits from

trading were not imminent, and that he was communicating with pool participants regarding such

failures at the same time he was soliciting new pool participants.  Black was aware of the California DBO's Desist & Refrain Order prohibiting his, Financial Solution's, and Mancuso's fraudulent solicitations.

100.    At minimum, Black's misappropriation of pool funds and the material misstatements and omissions in his communications with pool participants operated as a fraud on pool participants.

**2.  Mancuso Knowingly or Recklessly Defrauded Pool Participants.**

101.    Mancuso knew, or was reckless in not knowing, that by accepting funds from Black-affiliated entities, he was misappropriating pool funds.  Mancuso himself had promised pool participants that pool funds would remain in a separate, protected account, but it was clear this did not occur.  Mancuso extensively communicated with pool participants regarding Black's, Financial Solution's, and New Money's failure to return principal and deliver profits, while simultaneously accepting commissions from Black-affiliated entities, and he continued to solicit pool participants and accept commissions thereafter.  Thus, there was no reasonable basis for Mancuso to believe that payments he received derived from trading profits or anywhere besides pool funds.

102.    Similarly, Mancuso knew, or was reckless in not knowing, that his communications with pool participants contained material misstatements and omissions described above.  Binary options and forex trading involves significant risk.  Mancuso did not analyze, and could not have analyzed, bank statements reflecting protection of pool funds or trading statements validating returns, because such records did not exist.  Mancuso communicated with pool participants regarding the failure to return principal and deliver profits at the same time he was soliciting new pool participants, and he continued soliciting new pool participants thereafter.

COMPLAINT

Mancuso was aware of the California DBO's Desist & Refrain Order prohibiting his, Financial Solution's, and Black's fraudulent solicitations.

103.    At minimum, Mancuso's acceptance of pool funds from Black and the material misstatements and omissions in his communications with pool participants operated as a fraud on pool participants.

**3.  Tufo Knowingly or Recklessly Defrauded Pool Participants.**

104.    Tufo knew, or was reckless in not knowing, that by accepting funds from Black- and Mancuso-affiliated entities, he was misappropriating pool funds.  Tufo communicated with pool participants regarding Black's, Financial Solution's, and New Money's failure to return principal and deliver profits, while simultaneously accepting commissions from Black- and Mancuso-affiliated entities, and he continued to solicit pool participants and accept commissions thereafter.  Thus, there was no reasonable basis for Tufo to believe that payments he received derived from trading profits or anywhere besides pool funds.

105.    Similarly, Tufo knew, or was reckless in not knowing, that his communications with pool participants contained material misstatements and omissions described above.  Binary options and forex trading involves significant risk.  Tufo did not analyze, and could not have analyzed, bank statements reflecting protection of pool funds or trading statements validating returns, because such records did not exist.  Tufo communicated with pool participants regarding the failure to return principal and deliver profits at the same time he was soliciting new pool participants, and he continued soliciting new pool participants thereafter.  Tufo was aware of the California DBO's Desist & Refrain Order prohibiting Financial Solution's, Black's, and Mancuso's fraudulent solicitations.

106.    At minimum, Tufo's acceptance of pool funds from Black and the material misstatements and omissions in his communications with pool participants operated as a fraud on pool participants.

**4.   Glenn and the Glenn Law Firm Knowingly or Recklessly Defrauded Pool Participants.**

107.    The Glenn Law Firm, by and through Glenn, knew, or was reckless in not knowing, that he was misappropriating pool funds and participating in a Ponzi scheme.  Glenn had reviewed the Agreements at the time he accepted pool funds.  The Agreements stated he would accept, protect, and pass along pool funds to Financial Solution and New Money in full and did not authorize him to retain a portion of pool funds for himself.  Further, Glenn knew about Financial Solution's and New Money's failure to return principal and deliver profits to pool participants through, among other means, his communications with pool participants regarding those failures and his receipt of three bar complaints from Colorado authorities.  Despite that knowledge, Glenn continued accepting pool funds, retaining his cut, and passing along the remainder to Financial Solution and Financial Tree.  As an attorney subject to the Colorado Rules of Professional Conduct—including rules prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation—Glenn should have been particularly sensitive to the need to avoid engaging in such conduct.

108.    Similarly, the Glenn Law Firm, by and through Glenn, knew, or was reckless in not knowing, that his communications with pool participants contained material misstatements and omissions described above.  Glenn did not analyze, and could not have analyzed, bank statements reflecting protection of pool funds or trading statements validating returns, because such records did not exist.  When Glenn wrote to Pool Participant F that he possessed the $600,000 she was owed and would transfer that amount to her shortly, Glenn did not possess Pool Participant F's funds; and when Glenn wrote to Pool Participant E that he was working with

Black and Mancuso to address failure to return funds, Glenn himself had misappropriated a portion of those funds, which Glenn omitted from his communication.  Glenn was aware of the California DBO's Desist & Refrain Order prohibiting Financial Solution's, Black's, and Mancuso's fraudulent solicitations.

109.   As an attorney, Glenn was uniquely positioned to comfort pool participants that their money was safe.  And Glenn's involvement did provide such comfort to pool participants. But rather than keeping pool funds safe, Glenn utilized his Glenn Law Firm accounts as revolving doors to receive pool funds and improperly pay them out to himself, other Defendants, and third parties.

110.   At minimum, Glenn's and the Glenn Law Firm's misappropriation of pool funds and the material misrepresentations and omissions in Glenn's communications with pool participants operated as a fraud on pool participants.

**E. Defendants Failed To Register with the Commission.**

111.   During the Relevant Period, Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm, by and through their officers, employees or agents, used the mails, electronic mails, wire transfers, websites, and other means or instrumentalities of interstate commerce, to solicit pool participants and prospective pool participants and/or to accept or receive funds or property from pool participants.

112.   In soliciting pool participants for the Black Pools, Defendants made no attempt to determine if they were eligible contract participants ("ECPs") as defined in Section 1(a)(18) of the Act, 7 U.S.C. § 1a(18) (2018)—i.e., individuals with $10,000,000 invested on a discretionary basis—and, upon information and belief, many, if not all, of the pool participants were not ECPs.

113.   During the Relevant Period, Financial Tree, Financial Solution, New Money, and the Glenn Law Firm acted as CPOs of the Black Pools because they were entities engaging in a

business that is of the nature of a commodity pool and, in connection with that business, solicited, accepted, and/or received pool funds for a pooled investment vehicle that engages in binary options transactions and/or that is not an ECP and that engages in transactions described in Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2018), other than on or subject to the rules of a designated contract market ("retail forex transactions").

114.    During the Relevant Period, Financial Tree, Financial Solution, New Money, and the Glenn Law Firm were never registered with the Commission as CPOs.

115.    During the Relevant Period, Financial Tree, Financial Solution, New Money, and the Glenn Law Firm were not statutorily exempt or excluded from registration as CPOs and never filed any electronic or written notice with the National Futures Association that they were exempt or excluded from registration as CPOs, as required by Regulations 4.5(c) and 4.13(b)(1), 17 C.F.R. §§ 4.5(c) and 4.13(b)(1) (2019).

116.    During the Relevant Period, Black, Mancuso, Tufo, and Glenn acted as APs of CPOs because they solicited funds or property for participation in a pooled investment vehicle that engages in binary options transactions and/or that is not an ECP and engages in retail forex transactions.

117.    During the Relevant Period, Black, Mancuso, Tufo, and Glenn were never registered with the Commission as APs of CPOs.

**F. Financial Tree, Financial Solution, and the Glenn Law Firm Failed To Comply with Regulations Relating to Pool Organization and Operation.**

118.    Defendants Financial Tree and Financial Solution, while acting as CPOs of the FT Pool and the FSG Pool, respectively, failed to operate the FT Pool and FSG Pool as legal entities separate from those of the CPOs and commingled pool funds with non-pool property by transferring pool funds into bank accounts controlled by Black, Mancuso, Tufo, and others which contained non-pool funds.

119.    Defendant Glenn Law Firm, while acting as CPO of the Black Pools, received and accepted pool funds into the Glenn Law Firm's attorney trust bank accounts, rather than accounts in the names of the Black Pools.  In addition, the Glenn Law Firm commingled pool funds with non-pool property by accepting pool funds into bank accounts that contained non-pool property.

**G. Financial Tree, Financial Solution, New Money, and the Glenn Law Firm Failed To Provide Pool Disclosures and Other Relevant Documents.**

120.    In addition, Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm, while acting as CPOs of the Black Pools, failed to provide pool disclosure documents, account statements presented and computed in accordance with generally accepted accounting principles and containing required information, and other documents required by Regulations 4.21 and 4.22, 17 C.F.R. §§ 4.21, 4.22 (2019), including but not limited to required cautionary statements, risk disclosures, fees and expenses incurred by the Black Pools, past performance disclosures, a statement that the CPO is required to provide all pool participants with monthly or quarterly account statements, as well as an annual report containing financial statements certified by an independent public accountant.

**H. Black and Glenn Controlled Relevant Entities.**

121.    During the Relevant Period, Black was a controlling person for Financial Tree and Financial Solution.  Black is the lone Trustee of Financial Tree and Financial Solution.  Financial Tree's and Financial Solution's Articles of Trust list Black as Trustee having exclusive control of Financial Tree and Financial Solution.  Black opened bank accounts for Financial Tree and Financial Solution and was the sole signatory on these accounts (including the bank accounts to which the Glenn Law Firm's bank accounts transferred funds).  Black signed Agreements between Financial Solution and pool participants.  Black did not act in good faith or knowingly induced Financial Tree's and Financial Solution's fraudulent acts.

122.    During the Relevant Period, Black was also a controlling person for New Money. Black is the Managing Director of New Money.  New Money's registration documents with the Nevada Secretary of State list Black and Financial Tree (which Black controls) as New Money's two managers.  Black opened bank accounts for New Money and was the sole signatory on these accounts.  Agreements between New Money and pool participants list Black as New Money's Managing Director with full authority to sign on New Money's behalf.  Black did not act in good faith or knowingly induced New Money's fraudulent acts.

123.    During the Relevant Period, Glenn was a controlling person for the Glenn Law Firm.  Glenn is the Managing Partner of the Glenn Law Firm, whose website does not list other attorneys as being members of the firm.  Glenn signed the August 25, 2014 "Paymaster Agreement" with Financial Tree on behalf of the Glenn Law Firm.  Glenn opened bank accounts for each Glenn Law Firm bank account to which pool participants contributed funds.  Glenn did not act in good faith or knowingly induced the Glenn Law Firm's fraudulent acts.

**I.  Suisse Group and JMC Were Alter Egos of Caswell.**

124.    When Financial Solution and the Glenn Law Firm transferred a total of $800,000 to Suisse Group and JMC in June and September 2016, Caswell controlled both entities as the lone Director of Suisse Group and the lone Managing Member of JMC.  Suisse Group and JMC share the same UPS store mailing address and the same email address— ctkholdingsfund@gmail.com.  Caswell operated Suisse Group and JMC to receive and dissipate ill-gotten funds for his personal benefit.

125.    In the three months prior to receiving the $500,000 transfer from Financial Solution in June 2016, the Suisse Group bank account that received the transfer maintained a balance of $12.15 or lower.  After receiving the $500,000 transfer, within two days, Suisse Group transferred approximately $55,000 to JMC (owned by Caswell), approximately $30,100 to a

personal bank account owned by Caswell, and additional funds to other entities and individuals. The next two days, Suisse Group transferred a total of approximately $415,000 to a TD Ameritrade securities account in the name of JMC, which in turn funded a TD Ameritrade forex trading account ("JMC Forex Account") in the same name.  After incurring approximately $50,000 in trading losses, the JMC Forex Account transferred the remaining approximately $365,000 to JMC from June to August 2016.  After dissipating the approximately $500,000 in pool funds, the balance in the Suisse Group account that received those funds was, at its highest, approximately $383.14, and closed in July 2016.

126.    After the JMC Forex Account transferred approximately $365,000 in pool funds to JMC in July and August 2016, Caswell transferred approximately $88,087.33 to a checking account Caswell controlled and otherwise dissipated the remaining funds on business and personal expenses having nothing to do with the Black Pools.  Similarly, within one week of the Glenn Law Firm transferring $300,000 to JMC in September 2016, Caswell transferred approximately $200,000 to Landes; withdrew approximately $1,500 in cash from this account; transferred approximately $32,000 to personal bank accounts owned by Caswell; transferred approximately $68,350 to various individuals including another person with the last name "Caswell;" and made payments from this account for massages, insurance premiums, and a mobile phone.  After dissipating the pool funds, in 2016, the balance in that account was, at its highest, approximately $155, and the account was overdrawn by December 2016.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### <u>COUNT ONE</u>

**Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.4, 17 C.F.R. § 32.4 (2019)**
**(Commodity Option Fraud by Misrepresentations, Omissions, False Statements, and Misappropriation)**

**(All Defendants)**

127.    Paragraphs 1 through 126 are re-alleged and incorporated herein by reference.

128.    7 U.S.C. § 6c(b) provides, in relevant part:

> No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

129.    17 C.F.R. § 32.4 provides:

> In or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person directly or indirectly:

> > (a) To cheat or defraud or attempt to cheat or defraud any other person;

> > (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or

> > (c) To deceive or attempt to deceive any other person by any means whatsoever.

130.    By reason of the conduct described above, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm, by and through their officers, employees and agents, and Defendants Black, Mancuso, Tufo, and Glenn, in connection with offers to enter into, entry into, or confirmation of the execution of commodity

- 38 -

option transactions, directly or indirectly, and knowingly or recklessly:  (1) cheated or defrauded or attempted to cheat or defraud pool participants; and (2) deceived or attempted to deceive pool participants by any means.

131.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm, by and through their officers, employees and agents, and Defendants Black, Mancuso, Tufo, and Glenn violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4(a) and (c).

132.    By reason of the conduct described above, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise), by and through Black and/or other officers, employees and agents, knowingly or recklessly made or caused to be made false account statements.

133.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise), by and through their officers, employees and agents, and Defendant Black violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4(b).

134.    The foregoing acts, misrepresentations, omissions, and failures occurred within the scope of Defendant Black's, Mancuso's, Tufo's, and Glenn's employment or office with Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and/or the Glenn Law Firm.  Therefore, Financial Tree, Financial Solution, New Money, and/or the Glenn Law Firm are liable for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4(a)-(c), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2019).

135.    Defendant Black controls Financial Tree, Financial Solution, and New Money, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Financial Tree's, Financial Solution's, and New Money's conduct alleged in this Count.

Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018), Black is liable for Financial Tree's, Financial Solution's and New Money's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4(a)-(c).

136.    Likewise, Defendant Glenn controls the Glenn Law Firm, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Glenn Law Firm's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Glenn is liable for the Glenn Law Firm's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4(a) and (c).

137.    Each misrepresentation, omission of material fact, false statement, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4(a)-(c).

## COUNT TWO

**Violations of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (2018), and Regulation 5.2(b), 17 C.F.R. § 5.2(b) (2019)**
**(Forex Fraud by Misrepresentations, Omissions, False Statements, and Misappropriation)**

**(All Defendants)**

138.    Paragraphs 1 through 126 are re-alleged and incorporated herein by reference.

139.    7 U.S.C. § 6b(a)(2)(A)-(C) makes it unlawful:

(2)    for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—

(A) to cheat or defraud or attempt to cheat or defraud the other person;

(B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the

disposition or execution of any order or contract, or in regard to
any act of agency performed, with respect to any order or contract
for or, in the case of paragraph (2), with the other person[.]

140.     Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi) (2018), defines an ECP,

in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate

of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage

the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or

incurred, by the individual.  7 U.S.C. § 1a(17) defines an eligible commercial entity ("ECE"), as

an ECP that meets certain additional requirements, both financially and in its business dealings.

141.     Pursuant to Section 2(c)(2)(C)(i)(I) and (iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(i)(I)

and (iv) (2018), 7 U.S.C. § 6b applies to forex transactions described herein "as if" they were a

contract of sale of a commodity for future delivery because they were "offered to, or entered into

with, a person that is not an" ECP.

142.     17 C.F.R. § 5.2(b) provides, in relevant part, that:

[i]t shall be unlawful for any person, by use of the mails or by any
means or instrumentality of interstate commerce, directly or indirectly,
in or in connection with any retail forex transaction:

(1)   To cheat or defraud or attempt to cheat or defraud any
person;

(2)   Willfully to make or cause to be made to any person any
false report or statement or cause to be entered for any
person any false record; or

(3)   Willfully to deceive or attempt to deceive any person by
any means whatsoever.

143.     By reason of the conduct described above, Defendants Financial Tree, Financial

Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm, by and

through their officers, employees and agents, and Defendants Black, Mancuso, Tufo, and Glenn,

by use of the mails or by any means or instrumentality of interstate commerce, directly or

indirectly, in connection with retail forex transactions, knowingly or recklessly:  (1) cheated or defrauded or attempted to cheat or defraud pool participants; and (2) deceived or attempted to deceive pool participants by any means.

144.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise), and the Glenn Law Firm, by and through their officers, employees and agents, and Defendants Black, Mancuso, Tufo, and Glenn violated 7 U.S.C. § 6b(a)(2)(A) and (C) and 17 C.F.R. § 5.2(b)(1) and (3).

145.    By reason of the conduct described above, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise), by and through Black and/or other officers, employees and agents, knowingly or recklessly made or caused to be made false account statements.

146.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise), by and through their officers, employees and agents, and Defendant Black violated 7 U.S.C. § 6b(a)(2)(B) and 17 C.F.R. § 5.2(b)(2).

147.    The foregoing acts, misrepresentations, omissions, and failures occurred within the scope of Defendant Black's, Mancuso's, Tufo's, and Glenn's employment or office with Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and/or the Glenn Law Firm.  Therefore, Financial Tree, Financial Solution, New Money, and/or the Glenn Law Firm are liable for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6b(a)(2)(A)-(C)  and 17 C.F.R. § 5.2(b)(1)-(3), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

148.    Defendant Black controls Financial Tree, Financial Solution, and New Money, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Financial Tree's, Financial Solution's, and New Money's conduct alleged in this Count.

Therefore, under 7 U.S.C. § 13c(b), Black is liable for Financial Tree's, Financial Solution's, and New Money's violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3).

149.    Likewise, Defendant Glenn controls the Glenn Law Firm, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Glenn Law Firm's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Glenn is liable for the Glenn Law Firm's violations of 7 U.S.C. § 6b(a)(2)(A) and (C) and 17 C.F.R. § 5.2(b)(1) and (3).

150.    Each misrepresentation, omission of material fact, false statement, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3).

## **COUNT THREE**

### **Violation of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B) (2018)**
### **(Fraud and Deceit by CPOs and APs of CPOs)**

### **(All Defendants)**

151.    Paragraphs 1 through 126 are re-alleged and incorporated herein by reference.

152.    Section 1a(11)(A)(i) of the Act, 7 U.S.C. § 1a(11)(A)(i) (2018), defines a CPO, in relevant part, as any person:

> engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—

> (I)   commodity for future delivery, security futures product, or swap; [or]

> (II)  agreement, contract, or transaction described in [S]ection 2(c)(2)(C)(i) [of the Act] or [S]ection 2(c)(2)(D)(i) [of the Act.]

153.    Pursuant to Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2019), and subject to certain exceptions not relevant here, any person who operates or solicits funds, securities, or

- 43 -

property for a pooled investment vehicle and engages in retail forex transactions is defined as a retail forex CPO.

154.    Pursuant to 7 U.S.C. § 2(c)(2)(C)(ii)(I), "[a]greements, contracts, or transactions" in retail forex and accounts or pooled investment vehicles in retail forex "shall be subject to . . . [7 U.S.C. §] 6o," except in circumstances not relevant here.

155.    During the Relevant Period, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm engaged in a business, for compensation or profit, that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including in relevant part transactions in futures and forex; therefore, Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm acted as CPOs, as defined by 7 U.S.C. § 1a(11).

156.    During the Relevant Period, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm solicited funds, securities, or property for a pooled investment vehicle and engaged in retail forex transactions; therefore, Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm acted as retail forex CPOs, as defined by 17 C.F.R. § 5.1(d)(1).

157.    During the Relevant Period, Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm were not registered with the Commission as CPOs or retail forex CPOs.

158.    Regulation 1.3, 17 C.F.R. § 1.3 (2018), defines an AP of a CPO as any natural person associated with:

> (3) A [CPO] as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]

159. Pursuant to 17 C.F.R. § 5.1(d)(2), any person associated with a CPO "as a partner, officer, employee, consultant or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves: (i) [t]he solicitation of funds, securities, or property for a participation in a pooled investment vehicle; or (ii) [t]he supervision of any person or persons so engaged" is an AP of a retail forex CPO.

160. During the Relevant Period, Defendants Black, Mancuso, Tufo, and Glenn were associated with a CPO and a retail forex CPO as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool, or the supervision of any person or persons so engaged. Therefore, Defendants Black, Mancuso, Tufo, and Glenn were APs of a CPO as defined by 17 C.F.R. § 1.3 and APs of a retail forex CPO as defined by 17 C.F.R. § 5.1(d)(2).

161. During the Relevant Period, Defendants Black, Mancuso, Tufo, and Glenn were not registered with the Commission as APs of a CPO or as APs of a retail forex CPO.

162. 7 U.S.C. § 6*o*(1) prohibits CPOs and APs of CPOs, whether registered with the Commission or not, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes or artifices to defraud any client or participant or prospective client or participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

163. By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise), the Glenn Law Firm, Black, Mancuso, Tufo, and

Glenn, through use of the mails or any means or instrumentality of interstate commerce:  (1) knowingly or recklessly employed devices, schemes or artifices to defraud pool participants and prospective pool participants, or (2) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon pool participants or prospective pool participants.

164.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise), the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn violated 7 U.S.C. § 6*o*(1).

165.    The foregoing acts, misrepresentations, omissions, and failures occurred within the scope of the individual defendants' employment or office with Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and/or the Glenn Law Firm.  Therefore, Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and/or the Glenn Law Firm are liable for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6*o*(1), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

166.    Defendant Black controls Financial Tree, Financial Solution, and New Money, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Financial Tree's, Financial Solution's, and New Money's conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b), Black is liable for Financial Tree's, Financial Solution's, and New Money's violations of 7 U.S.C. § 6*o*(1).

167.    Likewise, Defendant Glenn controls the Glenn Law Firm, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Glenn Law Firm's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Glenn is liable for the Glenn Law Firm's violations of 7 U.S.C. § 6*o*(1).

COMPLAINT

168.    Each misrepresentation, omission of material fact, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1).

**<u>COUNT FOUR</u>**

**Violation of Sections 2(c)(2)(C)(iii)(I)(cc), 4k(2), 4m(1) of the Act,
7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2), 6m(1) (2018),
and Regulation 5.3(a)(2), 17 C.F.R. § 5.3(a)(2) (2019)
(Failure To Register as a CPO and Retail Forex CPO
and AP of a CPO and AP of a Retail Forex CPO)**

**(All Defendants)**

169.    Paragraphs 1 through 126 are re-alleged and incorporated herein by reference.

170.    Subject to certain exceptions not relevant here, 7 U.S.C. § 6m(1) states that it shall be "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such . . . [CPO] . . . ."

171.    Subject to certain exceptions not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) states that a

>person, unless registered in such capacity as the Commission by rule, regulation, or order shall determine and a member of a futures association registered under section 21 of this title, shall not—
>
>. . . .
>
>(cc) operate or solicit funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with [retail forex agreements, contracts, or transactions].

172.    For the purposes of retail forex transactions, a CPO is defined in 17 C.F.R. § 5.1(d)(1) as any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an ECP, as defined in 17 U.S.C. § 1a(18), and who engages in retail forex transactions.

- 47 -

173.    Except in circumstances not relevant here, 17 C.F.R. § 5.3(a)(2)(i) requires those

that meet the definition of a retail forex CPO under 17 C.F.R. § 5.1(d) to register as a CPO with

the Commission.

174.    Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2) states that it shall

be

> unlawful for any person to be associated with a [CPO] as a partner,
> officer, employee, consultant, or agent . . . in any capacity that involves
>
>> (i)    the solicitation of funds, securities, or property for a
>>        participation in a commodity pool or
>>
>> (ii)   the supervision of any person or persons so engaged, unless
>>        such person is registered with the Commission under this
>>        chapter as an [AP] of such [CPO] . . . .

175.    For the purposes of retail forex transactions, an AP of a CPO is defined in 17

C.F.R. § 5.1(d)(2) as any natural person associated with a retail forex CPO as a partner, officer,

employee, consultant, or agent (or any natural person occupying a similar status or performing

similar functions) in any capacity that involves soliciting funds, securities or property for

participation in a pooled investment vehicle or supervising persons so engaged.

176.    Except in certain circumstances not relevant here, 17 C.F.R. § 5.3(a)(2)(ii) requires

those that meet the definition of an AP of a retail forex CPO under 17 C.FR. § 5.1(d) to register as

an AP of a CPO with the Commission.

177.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and

New Money (acting as a common enterprise) and the Glenn Law Firm engaged in a business, for

compensation or profit, that is of the nature of a commodity pool, investment trust, syndicate, or

similar form of enterprise, and in connection therewith, solicited, accepted, or received from

others, funds, securities, or property, either directly or through capital contributions, the sale of

stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests,

including retail forex transactions; therefore, Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm acted as CPOs, as defined by 7 U.S.C. § 1a(11).

178.    Likewise by reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm operated or solicited funds, securities, or property for a pooled investment vehicle from pool participants who were not ECPs, as defined by 7 U.S.C. § 1a(18), for the purpose of trading in retail forex transactions, as defined by 17 C.F.R. § 5.1(m); thus, Financial Tree, Financial Solution, New Money, and the Glenn Law Firm acted as CPOs engaged in retail forex transactions, as defined by 17 C.F.R. § 5.1(d)(1).

179.    Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm, while using the mails or means of interstate commerce in connection with their business as a CPO, were not registered with the Commission as a CPO or as a CPO engaged in retail forex transactions.

180.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm acted as unregistered CPOs in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc) and 6m(1), and 17 C.F.R. § 5.3(a)(2)(i).

181.    By reason of the foregoing, Defendants Black, Mancuso, Tufo, and Glenn associated with a CPO (as defined by 7 U.S.C. § 1a(11)) and a retail forex CPO (as defined in 17 C.F.R. § 5.1(d)) as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool and/or a pooled investment vehicle in retail forex or the supervision of persons so engaged; therefore, Defendants Black, Mancuso, and Tufo acted as APs of CPOs and CPOs engaged in retail forex transactions as defined by 17 C.F.R. §§ 1.3, 5.1(d)(2).

182.     By reason of the foregoing, Defendants Black, Mancuso, Tufo, and Glenn were not registered with the Commission as APs of a CPO or as APs of a CPO engaged in retail forex transactions; thus, Defendants Black, Mancuso, Tufo, and Glenn acted as unregistered APs of CPOs in violation of 7 U.S.C. § 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii).

183.     The foregoing acts, omissions, and failures occurred within the scope of Defendant Black's, Mancuso's, Tufo's, and Glenn's employment or office with Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and/or the Glenn Law Firm. Therefore, Financial Tree, Financial Solution, New Money and/or the Glenn Law Firm are liable for their acts, omissions, and failures in violation of 7 U.S.C. § 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

184.     Defendant Black controls Financial Tree, Financial Solution, and New Money, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Financial Tree's, Financial Solution's, and New Money's conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b), Black is liable for Financial Tree's, Financial Solution's, and New Money's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

185.     Likewise, Defendant Glenn controls the Glenn Law Firm, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Glenn Law Firm's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Glenn is liable for the Glenn Law Firm's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

186.     Each instance that Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm acted as a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

187.    Each instance that Defendants Black, Mancuso, Tufo, and Glenn acted as an AP of a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

### COUNT FIVE

**Violation of Regulation 4.20(a)(1), (b)-(c), 17 C.F.R. § 4.20(a)(1), (b)-(c) (2019)**
**(Failure To Operate Pool as Separate Entity; Failure To Receive Pool Participant Funds in Pool's Name; Commingling of Pool Funds)**

**(Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, and Glenn)**

188.    Paragraphs 1 through 126 are re-alleged and incorporated herein by reference.

189.    Regulation 5.4, 17 C.F.R. § 5.4 (2019), states that Part 4 of the Regulations, 17 C.F.R. pt. 4 (2019), applies to any person required to register as a CPO pursuant to Part 5 of the Regulations, 17 C.F.R. pt. 5 (2019), relating to forex transactions.

190.    17 C.F.R. § 4.20(a)(1) requires a CPO, whether registered or not, to operate its pool as a legal entity separate from that of the CPO.

191.    17 C.F.R. § 4.20(b) prohibits CPOs, whether registered or not, from receiving pool participants' funds in any name other than that of the pool.

192.    17 C.F.R. § 4.20(c) prohibits a CPO, whether registered or not, from commingling the property of any pool it operates with the property of any other person.

193.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise), while acting as CPOs for the FT Pool and the FSG Pool, failed to operate the FT Pool as a legal entity separate from Financial Tree, the CPO; failed to operate the FSG Pool as a legal entity separate from Financial Solution, the CPO; and commingled the property of the FT Pool and the FSG Pool with the property of others.

194.     By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) violated 17 C.F.R. § 4.20(a)(1), (c).

195.     By reason of the foregoing, Defendant Glenn Law Firm, while acting as CPO for the Black Pools, failed to receive pool participants' funds in the names of the Black Pools and commingled the property of the Black Pools with property of others.

196.     By reason of the foregoing, Defendant Glenn Law Firm violated 17 C.F.R. § 4.20(b)-(c).

197.     Defendant Black controls Financial Tree and Financial Solution, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Financial Tree's and Financial Solution's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Black is liable for Financial Tree's and Financial Solution's violations of 17 C.F.R. § 4.20(a)(1), (c).

198.     Defendant Glenn controls the Glenn Law Firm, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Glenn Law Firm's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Glenn is liable for the Glenn Law Firm's violations of 17 C.F.R. § 4.20(b)-(c).

199.     Each act of failing to operate a pool as a legal entity separate from that of the CPO, improperly receiving pool participants' funds, and commingling the property of the Black Pools with non-pool property, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.20(a)(1), (b)-(c).

1

## COUNT SIX

2

3

**Violation of Regulations 4.21 and 4.22, 17 C.F.R. §§ 4.21, 4.22 (2019)**
**(Failure To Provide Pool Disclosures And Other Required Documents)**

4

**(Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, and Glenn)**

5

6

200.    Paragraphs 1 through 126 are re-alleged and incorporated herein by reference.

7

201.    17 C.F.R. § 5.4 states that 17 C.F.R. pt. 4 applies to any person required to register

8

as a CPO pursuant to 17 C.F.R. pt. 5, relating to forex transactions.

9

202.    17 C.F.R. § 4.21(a)(1) provides that

10

11

each commodity pool operator registered or required to be registered under the Act must deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document for the pool prepared in accordance with §§ 4.24 and 4.25 by no later than the time it delivers to the prospective participant a subscription agreement for the pool . . . .

12

13

14

203.    17 C.F.R. § 4.22(a), (c) provides that

15

16

each commodity pool operator registered or required to be registered under the Act must periodically distribute to each participant in each pool . . . an Account Statement, which shall be presented in the form of a Statement of Operations and a Statement of Changes in Net Assets . . . . [and which] must be presented and computed in accordance with generally accepted accounting principles . . . . [and] must [also] distribute an Annual Report . . . .

17

18

19

20

204.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and

21

New Money (acting as a common enterprise) and the Glenn Law Firm failed to provide

22

prospective pool participants with pool disclosure documents in the form specified in Regulations

23

4.24 and 4.25, 17 C.F.R. §§ 4.24, 4.25 (2019).

24

205.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and

25

New Money (acting as a common enterprise) and the Glenn Law Firm violated 17 C.F.R. § 4.21.

26

27

28

206.   By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm failed to provide to pool participants Account Statements and Annual Reports required by 17 C.F.R. § 4.22.

207.   By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm violated 17 C.F.R. § 4.22.

208.   Defendant Black controls Financial Tree, Financial Solution, and New Money, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Financial Tree's, Financial Solution's, and New Money's conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b), Black is liable for Financial Tree's, Financial Solution's and New Money's violations of 17 C.F.R. §§ 4.21, 4.22.

209.   Defendant Glenn controls the Glenn Law Firm, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Glenn Law Firm's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Glenn is liable for the Glenn Law Firm's violations of 17 C.F.R. §§ 4.21, 4.22.

210.   Each failure to furnish the required disclosure documents and account statements and reports to prospective pool participants and pool participants, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. §§ 4.21, 4.22.

## VI.   RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to its own equitable powers:

A.   Find that Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn violated Sections 4b(a)(2)(A)-(C), 4c(b), 4k(2), 4m(1), 4o(1)(A)-(B), and 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6c(b),

6k(2), 6m(1), 6*o*(1)(A)-(B), 2(c)(2)(C)(iii)(I)(cc) (2018), and Regulations 4.20(a)(1), (b)-(c), 4.21, 4.22, 5.2(b)(1)-(3), 5.3(a)(2), and 32.4, 17 C.F.R. §§ 4.20(a)(1), (b)-(c), 4.21, 4.22, 5.2(b)(1)-(3), 5.3(a)(2), 32.4 (2019);

       B.      Enter an order of permanent injunction enjoining Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6c(b), 6k(2), 6m(1), 6*o*(1)(A)-(B), 2(c)(2)(C)(iii)(I)(cc), and 17 C.F.R. §§ 4.20(a)(1), (b)-(c), 4.21, 4.22, 5.2(b)(1)-(3), 5.3(a)(2), 32.4;

       C.      Enter an order of permanent injunction restraining and enjoining Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

          1)   Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

          2)   Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

          3)   Having any commodity interests traded on any Defendants' behalf;

          4)   Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019); and

7) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

D.    Enter an order directing Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

E.    Enter an order directing Relief Defendants Suisse Group, JMC, Landes, Kingdom, Caswell, Anne Mancuso, and Tyler Mancuso, including any third-party transferee, successors, and/or alter egos thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

F.    Enter an order requiring Defendants Financial Tree, Financial Solution, New

- 56 -

COMPLAINT

Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn, as well as any successors

thereof, to make full restitution to every person who has sustained losses proximately caused by

the violations described herein, including pre-judgment and post-judgment interest;

G.      Enter an order directing Defendants Financial Tree, Financial Solution, New

Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn, as well as any successors

thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and

agreements, whether implied or express, entered into between, with or among Defendants

Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, Mancuso, Tufo,

and/or Glenn and any of the pool participants whose funds were received by Defendants Financial

Tree, Financial Solution, New Money, the Glenn Law Firm, Black, Mancuso, Tufo, and/or Glenn

as a result of the acts and practices that constituted violations of the Act and Regulations as

described herein;

H.      Enter an order directing Defendants Financial Tree, Financial Solution, New

Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn to pay a civil monetary penalty

assessed by the Court, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-

1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act

Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see*

Regulation 143.8, 17 C.F.R. § 143.8 (2019), for each violation of the Act and Regulations, as

described herein;

I.      Enter an order requiring Defendants Financial Tree, Financial Solution, New

Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn to pay costs and fees as permitted

by 28 U.S.C. §§ 1920, 2413(a)(2) (2018); and

J.      Enter an order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.

COMPLAINT

Dated:  June 15, 2020

Respectfully submitted,

**COMMODITY FUTURES TRADING COMMISSION**

By:  /s/ Anthony C. Biagioli
Jo E. Mettenburg (KS Bar # 19423),
jmettenburg@cftc.gov
TRIAL COUNSEL
Anthony C. Biagioli (DC Bar # 996654),
abiagioli@cftc.gov
Attorneys for Plaintiff
COMMODITY FUTURES TRADING
COMMISSION
4900 Main Street, Suite 500
Kansas City, MO  64112
(816) 960-7700

COMPLAINT