UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> FINANCIAL TREE dba FINANCIAL TREE TRUST; FINANCIAL SOLUTION GROUP dba FINANCIAL SOLUTION GROUP TRUST; NEW MONEY ADVISORS, LLC; THE LAW FIRM OF JOHN GLENN, P.C.; JOHN D. BLACK aka JOHN BARNES; CHRISTOPHER MANCUSO; JOSEPH TUFO; and JOHN P. GLENN, <br><br> Defendants; <br><br> SUISSE GROUP (USA) LLC; JMC INDUSTRIES LLC; LANDES CAPITAL MANAGEMENT, LLC; KINGDOM TRUST LLC; HERBERT CASWELL; ANNE MANCUSO; and TYLER MANCUSO, <br><br> Relief Defendants. | No. 2:20-cv-01184-TLN-AC <br><br><br> **ORDER GRANTING STATUTORY RESTRAINING ORDER AND OTHER EQUITABLE RELIEF** |

Presently before the Court is Plaintiff Commodity Futures Trading Commission's

("CFTC") *ex parte* Motion for a Statutory Restraining Order and Other Equitable Relief ("SRO")

pursuant to Section 6c(a) of the Commodity Exchange Act ("Act"), 7 U.S.C. § 13a-1(a) (2018),

and Federal Rule of Civil Procedure ("Rule") 65, in which CFTC seeks an order freezing Assets,[1] allowing for the inspection of Records,[2] and permitting expedited discovery in advance of any hearing on the preliminary injunction.  (ECF No. 3.)  For the reasons set forth below, CFTC's Motion is GRANTED.

## I.   FACTUAL AND PROCEDURAL BACKGROUND[3]

The CFTC is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Commodity Exchange Act ("Act") and Commission Regulations ("Regulations").  (ECF No. 3 at 16.)  By way of the present Motion, CFTC asserts that, since January 2015, Defendants John D. Black ("Black"), Financial Tree ("Financial Tree"), Financial Solution Group ("Financial Solution"), New Money Advisors, LLC ("New Money"), Chris Mancuso ("Mancuso"), Joseph Tufo ("Tufo"), John Glenn ("Glenn"), and Glenn's law firm, The Law Firm of John Glenn, P.C. (the "Glenn Law Firm") (collectively,

/ / /

---

[1]   As used throughout CFTC's Motion and herein, "Assets" encompasses any legal or equitable interest in, right to, or claim to any real or personal property, whether individually or jointly, or directly or indirectly controlled, and wherever located, including but not limited to: chattels, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, mail or other deliveries, inventory, checks, notes, accounts (including, but not limited to, bank accounts and accounts at other financial institutions), credits, receivables, lines of credit, contracts (including spot, futures, options, or swaps contracts), insurance policies, retainers held by agents for the provision of professional or other services, and all funds, wherever located, whether in the United States or outside the United States.

[2]   As used throughout CFTC's Motion and herein, "Records" encompasses the terms "document" and "electronically stored information" ("ESI") as those terms are used in Federal Rule of Civil Procedure 34(a).  The term "Records" also refers to each and every such item in Defendants' and Relief Defendants' actual or constructive possession, including but not limited to: (i) all such items within the custody or control of any agents, employers, employees, or partners of the Defendants and Relief Defendants; and (ii) all items which Defendants and Relief Defendants have a legal or equitable right to obtain from another person.  A draft or non-identical copy is a separate item within the meaning of the term.  A Record also includes the file and folder tabs associated with each original and copy.

[3]   Unless otherwise noted, the following facts are derived from CFTC's brief and the supporting records and declarations of Elsie Robinson, an investigator for CFTC, and several individuals allegedly defrauded by Defendants.  (ECF Nos. 1, 3.)  A more detailed analysis of the evidentiary record appears in the discussion below.  For ease of reference, the Court will refer to the ECF pagination for the parties' attached exhibits.

1   "Defendants") have engaged in a fraudulent scheme to solicit and misappropriate money

2   deposited with Defendants in violation of the Act and Regulations.  (ECF No. 3 at 12.)

3        Starting in April 2014, Black created three entities — Financial Tree, Financial Solution,

4   and New Money — which are controlled solely by Black and in which Black is the only

5   employee.  (ECF No. 3 at 16, 21; ECF No. 3-11 at 4–5.)  Defendants used these business entities

6   exclusively to conduct the pooling operations that are the subject of this action.  (ECF No. 3 at

7   21; ECF No. 3-11 at 4–5, 22–23.)

8        In August 2014, Black (on behalf of Financial Tree) and Glenn (on behalf of Glenn Law

9   Firm) executed a "Paymaster Agreement" providing that the Glenn Law Firm would accept funds

10  from third parties and disburse such funds to Financial Tree in exchange for a fee.  (ECF No. 3 at

11  22; ECF No. 3-11 at 7–8; ECF No. 3-13 at 79–86.)  There was no legitimate business reason for

12  Pool Participants to wire funds to the Glenn Law Firm, and for the Glenn Law Firm to then wire

13  funds to Financial Tree (less Glenn's fee), as Pool Participants could have just as easily wired

14  money directly to Financial Tree.  (ECF No. 3 at 22; ECF No. 3-11 at 13–14, 17.)  Rather, CFTC

15  alleges Black engaged the Glenn Law Firm and Glenn used his position as an attorney and

16  Managing Partner of the Glenn Law Firm to deceive prospective Pool Participants into believing

17  the Black Pools were legitimate and safe.  (ECF No. 3 at 22; ECF No. 3-8 at 2; *see also* ECF No.

18  3-10 at 2 (Mancuso communicated that prospective client's money would be safe because "you're

19  not paying us, you're paying an attorney.").)

20       From approximately June 15, 2015, to the present (the "Relevant Period"), Defendants

21  fraudulently solicited over $14.32 million from at least 53 U.S. residents and 38 non-U.S.

22  residents ("Pool Participants") to trade binary options and retail foreign currency ("forex")

23  contracts in two commodity pools — the Financial Tree Pool and the Financial Solution Group

24  Pool (collectively, the "Black Pools").  (ECF No. 3 at 12, 22; ECF No. 3-11 at 15.)  Pool

25  Participants could participate by entering into joint venture agreements with Financial Solution or

26  New Money.  (ECF No. 3 at 21; ECF No. 3-7 at 1–15, 29–36; ECF No. 3-8 at 1–2, 11–15; ECF

27  No. 3-9 at 1–2, 6–11; ECF No. 3-10 at 1–2, 5–10; ECF No. 3-11 at 11–12.)  Through these

28  agreements, Pool Participants did not send money directly to the Black Pools, but to the Glenn

3

Law Firm's "attorney escrow account," after which the Glenn Law Firm was to pass those funds along to the Black Pools.  (*Id.*)

In soliciting money from the Pool Participants, Defendants made material misrepresentations to Pool Participants, such as: (1) pool funds would be held in a fiduciary-protected, separate bank account and used as collateral to establish lines of credit to trade binary options and/or forex on Pool Participants' behalf; (2) the pools would yield 10–70% monthly returns; (3) more than 85% of Defendants' trades were successful; and (4) Defendants' investment of pool funds was overseen by a "globally renowned and highly respected fiduciary accounting firm."  (ECF No. 3 at 26–30; ECF No. 3-7 at 1–2; ECF No. 3-8 at 1–3; ECF No. 3-9 at 1–3; ECF No. 3-10 at 1–2; ECF No. 3-11 at 11–12; ECF No. 3-13 at 138–143; ECF No. 3-14; ECF No. 3-15 at 1–6.)  The CFTC asserts each of these statements are false.

Defendants also omitted material facts during their solicitation of funds, such as: (1) Defendants had actually traded very few pool funds in binary options or forex; (2) binary options and forex trading involves significant risk of trading losses; (3) Defendants were using approximately 77% of the pool funds received to pay personal expenses and make Ponzi payments[4] prior to trading any funds; and (4) Defendants had failed to return principal investments or deliver profits to other Pool Participants.  (ECF No. 3 at 27–30; ECF No. 3-7 at 2; ECF No. 3-8 at 1; ECF No. 3-9 at 3; ECF No. 3-10 at 2; ECF No. 3-11 at 12; ECF No. 3-15 at 6.)  Importantly, Defendants failed to disclose the fact that, in 2018, the California Department of Business Oversight ("California DBO") issued a Desist and Refrain Order against Financial Solution, Black, and Mancuso, based on findings that these Defendants had unlawfully sold unregistered securities in California and made material misrepresentations or omissions to a Pool Participant in connection with the Black Pools.  (ECF No. 3 at 26–27, 33; ECF No. 3-7 at 2; ECF No. 3-8 at 2–3; ECF No. 3-9 at 3; ECF No. 3-10 at 2.)  Indeed, Defendants did not abide by the

---

[4]     A "Ponzi scheme" is a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments."  *Black's Law Dictionary* (10th ed. 2014).  In ordinary operation (and as used herein), a "Ponzi payment" occurs when "[m]oney from the new investors is used directly to repay or pay interest to earlier investors, usually without any operation or revenue-producing activity other than the continual raising of new funds."  *Id.*

California DBO's Order and presently continue to solicit prospective Pool Participants for the Black Pools.  (*See* ECF No. 3-11 at 15 (Pool participants deposited funds for trading in the Black Pools at least as recently as January 29, 2020).)

The CFTC asserts Defendants have misappropriated the vast majority of the pool funds. Of the approximately $14.32 million Defendants received from Pool Participants during the Relevant Period, Defendants deposited only $10,000 into U.S. trading accounts in the name of the Black Pools.  (ECF No. 3 at 23; ECF No. 3-11 at 20–23.)  At least some of those funds were lost trading forex.  (*Id.*)  Financial Solution and Financial Tree, by and through Black, transferred approximately $254,280 overseas to possible binary options or forex trading firms but received back only approximately $59,239.  (*Id.*)  Thus, very little trading — and no profitable trading — occurred.

Instead, Defendants misappropriated approximately $4.94 million (approximately 34% of pool funds) to make Ponzi payments to other Pool Participants.  (ECF No. 3 at 23–24; ECF No. 3-11 at 19–20.)  Defendants misappropriated at least an additional $6.3 million for unauthorized personal or business expenses.  (ECF No. 3 at 24; ECF No. 3-11 at 15–19.)  For example, Glenn misappropriated at least $285,000 in "transfer fees" pursuant to his Paymaster Agreement with Black, which he then transferred to other bank accounts he owned/controlled and used for expenses related to his divorce and spousal support.  (*Id.*)  Black withdrew at least $367,000 in pool funds in cash, and spent additional pool funds on, among other things, personal travel, rent for his personal residence, legal fees, online gambling, multilevel marketing programs, food and dining expenses, and software and online advertising.  (ECF No. 3 at 24–25; ECF No. 3-11 at 17.) Financial Solution and Financial Tree transferred at least $3.98 million of pool funds to business and personal bank accounts owned by Defendant Mancuso, who later withdrew at least $1.3 million of those funds in cash and spent additional funds on items such as personal travel, limousine expenses, spa and haircare expenses, and home renovations.  (ECF No. 3 at 25; ECF No. 3-11 at 18–19.)  Financial Solution and Financial Tree also transferred at least $228,000 in pool funds to business and personal bank accounts owned/controlled by Tufo, who used the funds to pay for items such as automobile-related expenses, eating out, groceries, insurance premiums,

1    office expenses, utilities, and miscellaneous household expenses.  (ECF No. 3 at 25; ECF No. 3-

2    11 at 19.)

3          Financial Solution and/or the Glenn Law Firm also transferred over $1.8 million to Relief

4    Defendants Suisse Group (USA) LLC ("Suisse Group"), JMC Industries LLC ("JMC"), Landes

5    Capital Management, LLC ("Landes Capital"), Kingdom Trust LLC ("Kingdom"), Herbert

6    Caswell ("Casswell"), Anne Mancuso, and Tyler Mancuso (collectively, "Relief Defendants").

7    For example, Financial Solution transferred $500,000 in pool funds to Suisse Group, and

8    Glenn/the Glenn Law Firm transferred $300,000 in pool funds to JMC.  (*See* ECF No. 3 at 19–21,

9    41; ECF No. 3-11 at 9–10, 20–21.)  The CFTC asserts both Suisse Group and JMC were alter

10   egos of and controlled by Casswell, who comingled his personal funds with the Suisse Group and

11   JMC funds.  (*Id.*)  JMC later transferred $200,000 in pool funds to Landes Capital, and Suisse

12   Group later transferred over $150,000 to personal bank accounts owned by Casswell.  (ECF No. 3

13   at 19, 42; ECF No. 3-11 at 21–23.)  Mancuso also transferred at least $593,000 to his wife and

14   son, Anne and Tyler Mancuso.  (ECF No. 3 at 20–21; ECF No. 3-11 at 10–11, 18–19.)  Kingdom

15   received transfers of over $1 million in pool funds from Financial Solution, $25,000 from the

16   BBB Jabez Foundation (which Black controls), and $25,000 from Tyler Mancuso.  (ECF No. 3 at

17   20; ECF No. 3-11 at 17–18.)  According to CFTC, none of the Relief Defendants provided

18   legitimate services to the Black Pools or Pool Participants for the money they received.

19         To conceal the misappropriation of funds, Financial Solution, by and through Black,

20   created and issued false account statements that inflated and misrepresented trading returns and

21   the value of Pool Participants' interests in the Black Pools.  (ECF No. 3 at 21, 31; ECF No. 3-7 at

22   3; ECF No. 3-8 at 3–4, 16–66; ECF No. 3-9 at 3–4, 24–113; ECF No. 3-10 at 3, 11–19; ECF No.

23   3-11 at 4–7, 11–12, 17–19; ECF No. 3-14 at 14; ECF No. 3-15 at 5, 7–43.)  However, when Pool

24   Participants requested the return of their investment funds, Defendants made misrepresentations

25   and/or omitted material facts regarding their failure to do so in order to lull the Pool Participants.

26   (ECF No. 3 at 31; ECF No. 3-11 at 16–20.)  For example, Defendants sent letters blaming

27   delayed payments on "breach of contract and nonpayment with some of our banking sources."

28   (ECF No. 3 at 31–32; ECF No. 3-7 at 45.)  One Pool Participant was told "funds were delayed

because the European market had fluctuation and it was their summer vacations."  (ECF No. 3 at 33; ECF No. 3-15 at 5.)  In another instance, Defendants maintained "there was a legal issue as to why the funds did not transfer from Singapore to Hong Kong."  (ECF No. 3 at 33; ECF No. 3-9 at 19–21.)  In sum, Pool Participants received "one story after the next" from Defendants.  (*Id.*)  Nevertheless, Defendants continued to solicit and/or accept new pool funds, even after it was clear that Financial Solution and New Money were failing to repay existing Pool Participants.

In addition to the foregoing conduct, CFTC alleges Defendants were required to register with CFTC as commodity pool operators ("CPOs") or as associated persons ("APs") of a CPO but failed to do so.[5]  (ECF No. 3 at 38–39; ECF No. 3-11 at 11.)  Similarly, Defendants were obligated to determine whether any of the Pool Participants were eligible contract participants ("ECPs") as defined under the Act, yet Defendants failed to make this inquiry.  (ECF No. 3 at 38, ECF No. 3-7 at 2; ECF No. 3-8 at 2; ECF No. 3-9 at 2; ECF No. 3-10 at 2.)

On June 15, 2020, CFTC filed a Complaint for Injunctive Relief, Civil Monetary Penalties, Restitution, Disgorgement and Other Equitable Relief against Defendants and Relief Defendants for various violations of the Act and Regulations.  (ECF No. 1.)  Specifically, the Complaint asserts six counts against Defendants for violations of the Act and Regulations: (1) Commodity Options Fraud, in violation of § 4c(b) of the Act (7 U.S.C. § 6c(b) (2018)), and Regulation 32.4 (17 C.F.R. § 32.4 (2019)); (2) Forex Fraud, in violation of § 4b(a)(2)(A)–(C) of the Act (7 U.S.C. § 6b(a)(2)(A)–(C) (2018)), and Regulation 5.2(b) (17 C.F.R. § 5.2(b) (2019)); (3) Fraud by CPOs and APs of CPOs, in violation of § 4o(1)(A)–(B) of the Act (7 U.S.C. § 6o(1)(A)–(B) (2018)); (4) Failure to Register with CFTC, in violation of §§ 2(c)(2)(C)(iii)(I)(cc), 4k(2), 4m(1) of the Act (7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2), 6m(1) (2018)), and Regulation 5.3(a)(2) (17 C.F.R. § 5.3(a)(2) (2019)); (5) Comingling of Funds and Failure to Operate Pools as Separate Entities and Properly Receive Pool Funds, in violation of Regulation 4.20(a)(1), (b)–(c)

---

[5]       Pursuant to the Act, an entity is required to be registered with CFTC as a CPO when it engages in business that is of the nature of a commodity pool and, in connection with that business, solicits, receives, or accepts pool funds from participants for the purpose of trading in commodity interests.  An individual acts as an AP of a CPO by, in his capacity as partner, officer, employee, consultant, or agent of the CPO, soliciting or supervising the solicitation of funds for participation in the CPO's pool.

1   (17 C.F.R. §§ 4.20(a)(1), (b)–(c) (2019)); and (6) Failure to Provide Pool Participants with

2   Disclosures and Other Required Documents, in violation of Regulations 4.21 and 4.22 (17 C.F.R.

3   §§ 4.21, 4.22 (2019)).  (ECF No. 1 at 38–54.)  The CFTC filed the instant Motion for SRO

4   concurrently with its Complaint.  (ECF No. 3.)

5          **II.**    **STANDARD OF LAW**

6        The CFTC is authorized by 7 U.S.C. § 13a-1 to institute an action in federal district court

7   whenever it appears violations of any provision of the Act have occurred.  This section also

8   provides that the district court may issue a permanent or temporary injunction against any person

9   who "has engaged, is engaging, or is about to engage in any act or practice constituting a

10   violation of any provision of this chapter or any rule, regulation, or order thereunder."  7 U.S.C.

11   §§ 13a-1(a)–(b); *see also U.S. CFTC v. Driver (Driver)*, 877 F. Supp. 2d 968, 981 (C.D. Cal.

12   2012), *aff'd sub nom. CFTC v. Driver*, 585 Fed. Appx. 366 (9th Cir. 2014).  The legal standards

13   applicable to temporary restraining orders are the same as those applicable to preliminary

14   injunctions.  *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839

15   n.7 (9th Cir. 2001).

16        "The injunctive relief contemplated in this portion of the Act is remedial in nature, and is

17   designed to prevent injury to the public and to deter future illegal conduct."  *U.S. CFTC v. Yu*

18   *(Yu)*, No. 12-CV-3921 YGR, 2012 WL 3283430, at *4 (N.D. Cal. Aug. 10, 2012).  Unlike private

19   actions, in actions for statutory injunctive relief, CFTC need not prove irreparable injury or the

20   inadequacy of other remedies as required in private injunctive suits.  *See Driver*, 877 F. Supp. 2d

21   at 981; *CFTC v. Hunt (Hunt)*, 591 F.2d 1211, 1220 (7th Cir. 1979); *Trailer Train Co. v. State Bd.*

22   *of Equalization*, 697 F.2d 860, 869 (9th Cir. 1983).  Rather, a *prima facie* showing that a violation

23   of the law has occurred and that "there is some reasonable likelihood of future violations" is

24   sufficient.  *Hunt*, 591 F.2d at 1220; s*ee also Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256,

25   1261 (9th Cir. 1989) (in cases involving statutory injunctions on the basis of past violations, party

26   moving for injunctive relief must show only that there is a "likelihood" of future violations);

27   *CFTC v. British Am. Commodity Options Corp.* (*British Am.*), 560 F.2d 135, 141–42 (2d Cir.

28   1977), *cert. denied*, 438 U.S. 905 (1978) ("well-established" that agency need only show

reasonable likelihood wrong will be repeated for injunctive relief); *CFTC v. J. S. Love & Assoc. Options, Ltd*., 422 F. Supp. 652, 661 (S.D.N.Y. 1976).

Finally, the Eastern District of California Local Rules impose additional requirements for a motion for a temporary restraining order.  First, the Court must consider whether the moving party has unnecessarily delayed in seeking injunctive relief.  *See* L.R. 231(b).  Second, the moving party must provide specific documents to the court in support of the requested temporary restraining order.  *See* L.R. 231(c).

**III.   ANALYSIS**

    A.   Procedural Requirements

As a preliminary matter, the Court finds CFTC has met the procedural requirements outlined in Local Rule 231(c) by providing nearly 900 pages of documents in support of its motion, which include the declarations of Elsie Robinson, an investigator for CFTC, and several Pool Participants who were allegedly defrauded by Defendants.  (ECF Nos. 3-7–3-15); E.D. Cal. L.R. 231(c).  The Court is also satisfied that CFTC has not unnecessarily delayed in seeking injunctive relief.  (ECF No. 3-1; ECF No. 3-16); E.D. Cal. L.R. 231(b).

Additionally, there is good cause to believe that notice to Defendants and Relief Defendants at this time would frustrate the emergency relief CFTC seeks by providing an incentive and opportunity to Defendants and Relief Defendants to dissipate Assets and/or destroy Records before CFTC obtains and serves the requested SRO.  (*See* ECF No. 3 at 70; ECF No. 3-16); Fed. R. Civ. P. 65(b)(1); *see also* 7 U.S.C. § 13a-1(a) (providing that a restraining order which freezes assets or prohibits destruction of records or refusal to permit CFTC to inspect records may be issued *ex parte*).  Therefore, submission of the Motion for SRO *ex parte* was warranted.

    B.   Jurisdiction/Venue

The CFTC's Motion is properly before this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes CFTC to seek injunctive and other relief in the proper district court of the United States against any person whenever it appears to CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any

1    provision of the Act or any rule, regulation, or order thereunder.  This Court also has jurisdiction

2    pursuant to 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018)

3    (district courts have original jurisdiction over civil actions commenced by the United States or by

4    any agency expressly authorized to sue by Act of Congress).

5           Venue properly lies in this District pursuant to 7 U.S.C. § 13a-1(e), because Defendants

6    transacted business in this District, and certain of the acts and practices in violation of the Act and

7    Regulations occurred, are occurring, or are about to occur within this District, among other

8    places.  (*See* ECF No. 3 at 16–19.)

9                            C.    *Prima Facie* Case of Illegality

10          The CFTC contends Defendants committed fraud and misappropriated funds, failed to

11   properly register with CFTC as CPOs and APs of CPOs, comingled funds, and failed to provide

12   clients with specific disclosures and other required documents, in violation of multiple provisions

13   of the Act and Regulations.  The CFTC further alleges Relief Defendants have received and will

14   continue to receive funds, Assets, or other property obtained through Defendants' violative

15   conduct and have been unjustifiably enriched thereby.

16                        i.    *Derivative and Controlling Person Liability*

17          As an initial matter, the Court addresses derivative and controlling person liability.  One is

18   a controlling person when he or she has "the possession, direct or indirect, of the power to direct

19   or cause the direction of the management and policies of a person whether through the ownership

20   of voting securities, by contract, or otherwise."  *CFTC v. Capitol Equity FX, LLC (Capitol*

21   *Equity)*, No. EDCV 17-743 JGB (SKx), 2017 WL 9565340, at *4 (C.D. Cal. Jul. 31, 2017).

22   Under § 13(b) of the Act (7 U.S.C. § 13c(b)), a controlling person of an entity is liable for the

23   violations of that entity if the controlling person knowingly induced the violations, directly or

24   indirectly, or did not act in good faith.  *See CFTC v. R.J. Fitzgerald & Co. (R.J. Fitzgerald)*, 310

25   F.3d 1321, 1334 (11th Cir. 2002), *cert denied*, 543 U.S. 1034 (2004) ("A fundamental purpose of

26   Section 13[(b)] is to allow the [CFTC] to reach behind the corporate entity to the controlling

27   individuals of the corporation and to impose liability for violations of the Act directly on such

28   individuals as well as the corporation itself.").  Conversely, the act, omission, or failure of any

person acting for an entity within the scope of his employment or office shall be attributed to the entity, as well as the person.  *Id.* at 1335 (imposing liability on corporate entity because of acts of individuals); 7 U.S.C. § 2(a)(1)(B) (2018); 17 C.F.R. § 1.2 (2019).

Here, Black is liable for Financial Tree's, Financial Solution's, and New Money's violations described herein because he was the creator and controlling person of those entities. *R.J. Fitzgerald*, 310 F.3d at 1334–35 (defendant who was ultimate decision maker at firm was ultimately responsible for compliance with Act and Regulations); *Capitol Equity*, 2017 WL 9565340, at *4 (husband and wife who were president and sole owner, respectively, of relevant entities and had opened trading accounts in entities' names were controlling persons of those entities).  For the same reasons, Glenn is liable as a controlling person for the Glenn Law Firm's violations described herein because he is the founder, managing attorney, and only practitioner at the Glenn Law Firm.  *Id.*

Similarly, Financial Tree, Financial Solution, New Money, and the Glenn Law Firm are liable for the acts of their agents, i.e., Black, Mancuso, Tufo, and Glenn.  7 U.S.C. § 2(a)(1)(B) (2018); 17 C.F.R. § 1.2 (2019); *CFTC v. Am. Bullion Exch. ABEX Corp. (Am. Bullion)*, No. SACV10-1876-DOC (RNBx), 2014 WL 12603558, at *8 (C.D. Cal. Sept. 16, 2014).  For example, Black opened bank accounts as the sole signatory for Financial Tree, Financial Solution, and New Money.  (ECF No. 3 at 40–41; ECF No. 3-11 at 4–6.)  Black also signed pool agreements on behalf of Financial Solution and New Money.  (*Id.*)  Glenn signed the 2014 Paymaster Agreement with Financial Tree on behalf of the Glenn Law Firm and opened each of the Glenn Law Firm bank accounts to which Pool Participants contributed funds.  (ECF No. 3 at 41; ECF No. 3-11 at 7–8.)  Mancuso and Tufo both acted as APs for Financial Tree, Financial Solution, and New Money by soliciting Pool Participants for the Black Pools.  (ECF No. 3 at 18; ECF No. 3-7 at 1; ECF No. 3-8 at 1.)

Based on the foregoing, CFTC has sufficiently established a *prima facie* case that Defendants are derivatively liable for each other's misconduct.

/ / /

/ / /

*ii.*       *Violation of Antifraud Provisions of the Act and Regulations*

Sections 4b(a)(2)(A)–(C) of the Act (7 U.S.C. § 6b(a)(2)(A)–(C) (2018)) and corresponding Regulation 5.2(b) (17 C.F.R. § 5.2(b) (2019)) prohibit fraudulent activities "in connection with" commodity futures trading.  The CFTC need only prove three elements to establish its claims of fraud under §§ 4b(a)(2)(A)–(C): (1) the making of a misrepresentation, misleading statement, or deceptive omission; (2) scienter; and (3) materiality.  *Driver*, 877 F. Supp. 2d at 977; *R.J. Fitzgerald*, 310 F.3d at 1328.  Actionable misrepresentations include those made to customers when soliciting their funds.  *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 111 (2d Cir. 1986).

The antifraud provisions of § 4c(b) of the Act (7 U.S.C. § 6c(b) (2018)) apply to fraud in connection with commodity options trading, such that the same misrepresentations and omissions that violate § 4b in connection with futures trading also violate § 4c(b) and Regulation 32.4 (17 C.F.R. § 32.4 (2019)) in connection with options.  *See CFTC v. Rosenberg (Rosenberg)*, 85 F. Supp. 2d 424, 445 (D. N.J. 2000) (analyzing §§ 4b(a) and 4c(b) claims together).

Sections 4o(1)(A) and (B) of the Act (7 U.S.C. § 6o(1)(A)–(B) (2018)) make it unlawful for a commodity pool operator to engage in fraudulent activities in connection with commodity futures trading.  The elements of proof for § 4o(1) overlap with the elements of proof for § 4b(a).  *Driver*, 877 F.Supp.2d at 978–79 ("The same intentional or reckless misappropriations, misrepresentations, and omissions of material fact violative of section 4b of the Act . . . also violate section 4o(1)(A)–(B) of the Act").  Fraud as a commodity pool operator, however, does not require scienter.  *CFTC v. Savage*, 611 F.2d 270, 285 (9th Cir. 1979) ("[W]e hold that an action for injunctive relief by CFTC under section 4o(1) requires only that the violator have acted intentionally.  That is, he must have intended to employ the 'device, scheme, or artifice' but it is not necessary that he know that its result will be to defraud the client or prospective client.").

The CFTC asserts Defendants committed fraud in violation of the aforementioned antifraud provisions of the Act and the Regulations by making material misrepresentations and omissions to Pool Participants, issuing false account statements to Pool Participants, and misappropriating pool funds for personal use and to make Ponzi payments.

*a)  Fraud by Misrepresentations and Omissions*

First, CFTC's supporting documents make a *prima facie* showing that when soliciting funds from prospective Pool Participants, Defendants knowingly or recklessly made misrepresentations and omissions (via electronic mail, telephonic seminars, telephone calls, mailings, and websites), including but not limited to the following: (1) misrepresenting that pool funds would be held in a fiduciary-protected, separate bank account and used as collateral to establish lines of credit to trade binary options and/or forex on Pool Participants' behalf; (2) misrepresenting that the pools would yield 10–70% monthly returns; and (3) misrepresenting that more than 85% of Defendants' trades were successful.  (ECF No. 3 at 26–30; ECF No. 3-7 at 1–2, 4–9, 26–28; ECF No. 3-8 at 1–3, 5–15; ECF No. 3-9 at 1–3, 6–11; ECF No. 3-10 at 1–2, 5–10; ECF No. 3-11 at 11–12, 15, 17; ECF No. 3-13 at 138–143; ECF No. 3-14; ECF No. 3-15 at 1–6.) Further, Defendants knowingly made misrepresentations to existing Pool Participants by issuing false account statements that reflected non-existent gains and providing varied excuses for their failure to return funds requested by Pool Participants.  (ECF No. 3 at 26, 30–31; ECF No. 3-7 at 2–3, 10–25, 29–36, 39–52; ECF No. 3-8 at 2–4, 16–66; ECF No. 3-9 at 3–4, 24–113; ECF No. 3-10 at 2–3, 11–19; ECF No. 3-11 at 11–12, 16, 19–23; ECF No. 3-14 at 14; ECF No. 3-15 at 5.)

Similarly, CFTC's supporting documents make a *prima facie* showing that Defendants knowingly made material omissions to attract and retain Pool Participants, including but not limited to the following: (1) omitting that the California DBO previously issued a Desist and Refrain Order against Financial Solution, Black, and Mancuso for their actions in connection with the Black Pools; (2) omitting that Defendants would pay themselves approximately 43% of pool fund principal received prior to trading any funds; (3) omitting that purported profits or withdrawals of principal paid to some Pool Participants were in fact the principal deposits of other clients and were not generated by profitable trading activity; (4) omitting that no Defendant was registered with CFTC as required by the Act and Regulations; and (5) omitting from prospective Pool Participants that as early as December 2016, Defendants were communicating to existing Pool Participants that they were not returning principal or delivering profits as promised

/ / /

1    because they were struggling to make profitable trades.  (ECF No. 3 at 26–28, 30; ECF No. 3-7 at

2    2; ECF No. 3-8 at 2; ECF No. 3-9 at 3; ECF No. 3-10 at 2; ECF No. 3-11 at 13–23.)

3          The Court finds Defendants' false statements and failure to inform clients constitute

4    misrepresentations and omissions in violation of the Act.  *See, e.g.*, *R.J. Fitzgerald*, 310 F.3d at

5    1329, 1332–33 (misrepresentations included overemphasis of profit potential and downplayed

6    risk of loss, and failure to disclose that 95% of firm's clients lost money on transactions); *CFTC*

7    *v. Muller*, 570 F.2d 1296, 1300–01 (5th Cir. 1978) (failure to open trading account and issuance

8    of fictitious trade statements supported injunction); *CFTC v. Complete Devs. (Complete Devs.)*,

9    No. 4:10 CV 2287, 2014 WL 794181, at *17 (N.D. Ohio Feb. 26, 2014) (failure to disclose

10   details regarding commissions based on investments was actionable); *SEC v. Wang*, No. LA CV

11   13-07553 JAK (SSx), 2015 WL 12656906, at *17 (C.D. Cal. Aug. 18, 2015) (citing *United States*

12   *v. Brown*, 578 F.2d 1280, 1285 (9th Cir. 1978) (finding "activities tending to lull investors, either

13   to prevent discovery of fraud or to permit further fraudulent activities to progress unhindered,"

14   actionable.)

15         Second, as for the materiality requirement, "[a] statement [or omission] is material if it is

16   substantially likely that a reasonable investor would consider the matter important in making an

17   investment decision."  *Driver*, 877 F. Supp. 2d at 977 (citing *R.J. Fitzgerald*, 310 F.3d at 1332–

18   33).  Misrepresentations concerning the riskiness and profitability of an investment are material.

19   *Id.*  Similarly, misrepresentations that a pool is consistently profitable and employs loss-limiting

20   systems are material.  *Capitol Equity*, 2017 WL 9565340, at *4.  The location of investors'

21   money is also material.  *Am. Bullion*, 2014 WL 12603558, at *6; *see also Rosenberg*, 85 F. Supp.

22   2d at 447–48 (reporting erroneous account balances, issuing false monthly statements, and failure

23   to make trades in accordance with representations were material to investors) (collecting cases).

24   Additionally, facts regarding a firm or broker's trading experience and past success are material

25   factors which a reasonable investor would consider when deciding to invest.  *CFTC v.*

26   *Commonwealth Fin. Grp., Inc.*, 874 F. Supp. 1345, 1353–54 (S.D. Fla. 1994).

27         Here, the supporting documents establish a *prima facie* case that Defendants'

28   misrepresentations and omissions were material as a reasonable investor would consider them

1    important when deciding to invest.  Indeed, CFTC has submitted evidence indicating that

2    Defendants' misrepresentations and omissions caused Pool Participants to invest and remain

3    invested with Defendants.  (ECF No. 3 at 26, 30–31; ECF No. 3-7 at 2–3, 10–25, 29–36, 39–52;

4    ECF No. 3-8 at 2–4, 16–66; ECF No. 3-9 at 3–4, 24–113; ECF No. 3-10 at 2–3, 11–19; ECF No.

5    3-11 at 11–12, 16, 19–23; ECF No. 3-14 at 14; ECF No. 3-15 at 5.)

6           Third, proof of scienter need not establish "evil motive or an intent to injure," but merely

7    requires evidence that a defendant committed the alleged wrongful acts intentionally, or "that the

8    representations were made with a reckless disregard for their truth or falsity."  *Driver*, 877 F.

9    Supp. 2d at 977; *see also CFTC v. Noble Metals Int'l, Inc*., 67 F.3d 766, 774 (9th Cir. 1995)

10   (holding that scienter is established when defendants act intentionally or with "careless

11   disregard").  A defendant acts recklessly when, for example, he fails to conduct sufficient

12   diligence on an investment prior to soliciting customers for the investment.  *See Complete Devs.*,

13   2014 WL 794181, at *17.  Likewise, lulling activities can evidence scienter.  *See SEC v.

14   Holschuh,* 694 F.2d 130, 144 (7th Cir. 1982) ("The court was entitled to consider the lulling

15   activities because they were evidence of a scheme . . . and was relevant to the question of

16   intent.").

17          In the instant case, there is overwhelming evidence that Defendants' misrepresentations

18   were made intentionally and with knowledge of their falsity.  Defendants acted with requisite

19   scienter when they misrepresented that: (1) pool funds would be held in a fiduciary-protected,

20   separate bank account; (2) more than 85% of Defendants' trades were successful, yielding 10–

21   70% monthly returns; (3) the California DBO Desist and Refrain Order previously issued against

22   Financial Solution, Black, and Mancuso was "resolved some time ago … [relating to] a currency

23   program that was not our service" (ECF No. 3 at 33; ECF 3-9 at 4, 34–35); (4) the payments

24   Defendants made to select Pool Participants were withdrawals of principal or returns from

25   profitable trading; and (5) where Defendants were not returning principal or delivering profits as

26   promised, it was because they were struggling to make profitable trades.  (ECF No. 3 at 26–30;

27   ECF No. 3-7 at 1–2, 4–9, 26–28; ECF No. 3-8 at 1–2, 5–15; ECF No. 3-9 at 1–3, 6–11, 19–21;

28   / / /

1   ECF No. 3-10 at 1–2, 5–10; ECF No. 3-11 at 11–23; ECF No. 3-13 at 138–143; ECF No. 3-14;

2   ECF No. 3-15 at 1–6.)

3          In reality, the truth is that binary options and forex trading is incredibly risky with no

4   guaranteed returns.  *See R.J. Fitzgerald*, 310 F.3d at 1333.  Moreover, Defendants had actually

5   traded very few pool funds in binary options or forex, and the trades that were completed resulted

6   in significant losses of funds.  (*See* ECF No. 3 at 23, 28; ECF No. 3-7 at 2; ECF No. 3-8 at 2;

7   ECF No. 3-9 at 3; ECF No. 3-10 at 2; ECF No. 3-11 at 20, 22–23.)  Similarly, as soon as pool

8   funds were deposited in an account designated by the Glenn Law Firm, the pool funds were not

9   used for trading purposes, but rather were transferred to Defendants' personal and business

10   accounts to make Ponzi payments and fund Defendants' personal expenses.  (*See* ECF No. 3 at

11   23–25; ECF No. 3-11 at 13, 15–17, 18–23.)  Further, the California DBO Desist and Refrain

12   Order was issued against Financial Solution, Black, and Mancuso in connection with the Black

13   Pools, not some other financial service.  (*See* ECF No. 3 at 25; ECF No. 3-15 at 44–47.)  Finally,

14   Defendants continued to solicit new Pool Participants even while failing to return principal

15   investments or deliver profits to other Pool Participants, and even after the California DBO issued

16   a Desist and Refrain Order against Financial Solution, Black, and Mancuso in connection with the

17   Black Pools.  (*See* ECF No. 3-11 at 15 (Pool participants deposited funds for trading in the Black

18   Pools at least as recently as January 29, 2020).)

19          For the foregoing reasons, CFTC has made a *prima facie* case that Defendants made

20   fraudulent representations and omissions to prospective and existing Pool Participants in violation

21   of the Act and Regulations.

22                                      *b)  Fraud by Misappropriation*

23          "Soliciting or obtaining funds from investors for trading, then failing to trade the funds

24   while using them for personal and business expenses, is misappropriation."  *Driver*, 877 F. Supp.

25   2d at 978 (citing *CFTC v. Emerald Worldwide Holdings, Inc.*, No. CV03-8339AHM, 2005 WL

26   1130588, at *7 (C.D. Cal. Apr. 19, 2005)).  "Misappropriation or diversion of funds entrusted to

27   one for trading purposes is 'willful and blatant fraudulent activity' that clearly violates the Act."

28   *Id.* (quoting *CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1106 (C.D. Cal. 2003).)  Here, Defendants

1  violated the Act and Regulations by misappropriating pool funds intended for binary options and

2  forex contracts trading to instead make Ponzi payments to existing Pool Participants and to fund

3  Defendants' personal expenses.  (*See* ECF No. 3 at 23–25; ECF No. 3-11 at 13, 15–23.)

4          Based on the foregoing, the Court finds CFTC has amply demonstrated Defendants made

5  material misrepresentations and omissions in the course of soliciting investments from current

6  and prospective Pool Participants and misappropriated pool funds, in violation of the antifraud

7  provisions of the Act and Regulations, specifically, §§ 4b(a)(2)(A)–(C), 4c(b), and 4o(1)(A)–(B)

8  of the Act, and Regulation 5.2(b).  Accordingly, CFTC has made a *prima facie* showing that a

9  violation of the law has occurred.  *Driver*, 877 F. Supp. 2d at 981; *Hunt*, 591 F.2d at 1220; *Fed.*

10  *Election Comm'n*, 869 F.2d at 1261.  These violations, plus the reasonable likelihood of future

11  violations (as discussed herein), satisfy the requisite showing for issuance of a temporary SRO

12  freezing assets, prohibiting destruction of records, and prohibiting refusal to permit CFTC to

13  inspect records.  *See id.*; *Muller*, 570 F.2d at 1300; *see also* 7 U.S.C. § 13a-1(a)–(b) (permitting a

14  court to grant injunctive relief for violations of any provision of the Act or Regulations).

15                  *iii.*        *Remaining Counts and Violations of the Act and Regulations*

16          As previously discussed, the Court finds CFTC has made a *prima facie* showing that

17  Defendants violated the antifraud provisions of the Act and Regulations, and that such violations

18  support granting the temporary injunctive relief CFTC seeks.  In light of this finding, the Court

19  need not reach the remaining claims against Defendants for purposes of its analysis of CFTC's

20  motion for a temporary SRO.

21                  D.        Reasonable Likelihood of Future Violations

22          Determining the likelihood of future violations may involve consideration of past

23  unlawful conduct.  *CFTC v. Co Petro Mktg. Grp., Inc. (Co Petro)*, 502 F. Supp. 806, 818 (C.D.

24  Cal. 1980), *aff'd*, 680 F.2d 573 (9th Cir. 1982); *Hunt*, 591 F.2d at 1220.  In drawing such an

25  inference from past violations, a court should look at the totality of the circumstances, including

26  the egregiousness of the defendant's actions, whether the violations were isolated or recurrent, the

27  degree of scienter involved, the sincerity of the defendant's assurances against future violations,

28  the defendant's recognition of his conduct's wrongfulness, and whether the circumstances

1  indicate that the defendant is in a position that makes future violations likely to occur.  *Driver*,

2  877 F. Supp. 2d at 981–82; *Co Petro*, 502 F. Supp. at 818; *Hunt*, 591 F.2d at 1220; *British Am.*,

3  560 F.2d at 142; *S.E.C. v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980); *see also CFTC v. S. Trust*

4  *Metals, Inc.(S. Trust Metals)*, 894 F.3d 1313, 1328 (11th Cir. 2018) ("A court need not make a

5  finding on every factor.").  In addition, "[w]hen the violation has been predicated upon systematic

6  wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future

7  conduct."  *Driver*, 877 F. Supp. 2d at 981; *Hunt*, 591 F.2d at 1220; *see also British Am.*, 560 F.2d

8  at 142 (because commodities trading is highly regulated and sensitive area of public trust, "any

9  circumstances that indicate the defendant might repeat or continue his activity in violation of the

10  registration requirements strongly favor entry of an injunction.")

11      Here, the misconduct, as alleged, was neither isolated nor accidental.  Defendants

12  allegedly engaged in a highly egregious and systematic violation of the Act and Regulations by

13  fraudulently soliciting and misappropriating over $14.32 million in investment funds from at least

14  91 Pool Participants over the past five years.  (ECF No. 3 at 12, 22–30; ECF No. 3-7 at 1–2, 4–9,

15  26–28; ECF No. 3-8 at 1–2, 5–15;  ECF No. 3-9 at 1–3, 6–11; ECF No. 3-10 at 1–2, 5–10; ECF

16  No. 3-11 at 11–23; ECF No. 3-13 at 138–143; ECF No. 3-14; ECF No. 3-15 at 1–6.)

17      Moreover, rather than admit any wrongdoing, Defendants took pains to conceal their

18  fraud, including by issuing monthly statements reflecting profits that never occurred, making

19  Ponzi payments to certain Pool Participants, and falsely assuring Pool Participants in order to lull

20  them and solicit additional payments.  (ECF No. 3 at 26, 30–31; ECF No. 3-7 at 2–3, 10–25, 29–

21  36, 39–52; ECF No. 3-8 at 3–4, 16–66; ECF No. 3-9 at 3–4, 24–113; ECF No. 3-10 at 2–3, 11–

22  19; ECF No. 3-11 at 11–23; ECF No. 3-14 at 14; ECF No. 3-15 at 5, 7–43; *see also, e.g.*, ECF

23  No. 3-7 at 45 (November 15, 2017 letter from Black and Mancuso blaming "breach of contract

24  and nonpayment from some of our previous banking sources" for nonpayment of funds to Pool

25  Participants, but also claiming to have "hit the jackpot" with a new funding source and promising

26  repayment by the end of the month); ECF No. 3-9 at 19–21 (Pool Participant was told his

27  payment in August was delayed "because the European market had fluctuation and it was their

28  summer vacations" and that "there was a legal issue as to why the funds did not transfer from

1    Singapore to Hong Kong.").)  These actions also detract from the sincerity of any assurances

2    against future wrongdoing Defendants may express.

3         Lastly, the Court agrees with CFTC that because Defendants are not registered as CPOs or

4    APs of CPOs, they are currently under no regulatory obligation to maintain Records (ECF No. 3

5    at 38–39, 69; ECF No. 3-11 at 11) and therefore may more easily evade CFTC's review.  This

6    supports a finding that Defendants are in a position that makes future violations likely to occur.

7    Indeed, the fact that Defendants have continued to solicit investments from existing and

8    prospective Pool Participants — *despite* the SEC charging Tufo in 1999 for defrauding investors

9    in a separate scheme, as well as Tufo pleading guilty to criminal violations of the Alabama

10   Securities Act in 2015 (ECF No. 3 at 18, 35; ECF No. 3-11 at 9; ECF No. 3-13 at 126–132);

11   *despite* the California DBO issuing a Desist and Refrain Order against Financial Solution, Black,

12   and Mancuso in April 2018, regarding their solicitations for the Black Pools (ECF No. 3 at 25–

13   26; ECF No. 3-11 at 12; ECF No. 3-15 at 45–47); and *despite* the Colorado Supreme Court's

14   Attorney Regulation Counsel issuing Glenn three separate bar complaints regarding his role in the

15   Black Pools fraud (ECF No. 3 at 36; ECF No. 3-15 at 49–54) — suggests Defendants will remain

16   undeterred from fraudulently soliciting funds from members of the public.  This, too, bolsters the

17   Court's finding that there is a likelihood of future wrongdoing.

18                        E.    Requested Relief

19        It has long been recognized that, "in an action brought to enforce the requirements of

20   remedial statutes such as this Act, a district court has broad discretion to fashion appropriate

21   relief."  *Muller*, 570 F.2d at 1300.  Indeed, "[t]he district court has inherent power as a court of

22   equity to order such temporary, ancillary relief in order to preserve the status quo so that an

23   ultimate decision for the [CFTC] could be effective."  *Id.* (citing *SEC v. Manor Nursing Centers,*

24   *Inc.*, 458 F.2d 1082, 1105–06 (2d Cir. 1972)).

25        Such ancillary relief may include an order to temporarily freeze the assets of a defendant,

26   prohibit the destruction or records, or prohibit a defendant from preventing CFTC access to his

27   records.  *See Yu*, 2012 WL 3283430, at *6–8 (granting *ex parte* SRO freezing the defendants'

28   assets and prohibiting the destruction of/prevention of CFTC access to the defendants' books and

1    records); *see also CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669, 678 (S.D.N.Y. 1979)

2    (order freezing assets "is often necessary to ensure that the assets will be available to compensate

3    public customers"); *U.S. CFTC v. Khara*, No. 15 CV 03497, 2015 WL 10849125, at *4 (S.D.N.Y.

4    May 5, 2015) (granting *ex parte* SRO requiring defendants to permit CFTC to inspect records).

5            Similarly, the Court may include an order to expedite discovery pursuant to Federal Rule

6    of Civil Procedure 26(d), for the purpose of allowing CFTC to determine the full extent of a

7    defendant's alleged wrongdoing, locate the defendant's other clients, other defendants, and relief

8    defendants, identify client funds, and clarify the sources of various funds in advance of the

9    hearing on the preliminary injunction. *Id.* at *5 (issuing *ex parte* temporary SRO expediting

10   discovery); *see also CFTC v. RFF GP, LLC*, No. 4:13-CV-382, 2013 WL 4083748, at *8 (E.D.

11   Tex. Jul. 10, 2013) (same).

12           Here, CFTC requests an SRO freezing Assets, allowing for the inspection of Records, and

13   permitting expedited discovery in advance of any hearing on the preliminary injunction. The

14   Court is satisfied that such relief is appropriate here, given Defendants' solicitation of at least

15   $14.32 million from members of the public, nearly 77% of which has been misappropriated by

16   Defendants for personal expenses and Ponzi payments, and the reasonable likelihood that

17   Defendants will transfer or dissipate Assets or destroy or alter Records in the absence of an SRO.

18           In sum, the Court finds good cause exists to GRANT CFTC's *ex parte* Motion for

19   Statutory Restraining Order to freeze Assets, prohibit the destruction or alteration of Records, and

20   prohibit the denial of access to those Records because CFTC has made a *prima facie* showing that

21   Defendants violated the Act and Regulations, and there is a reasonable likelihood of future

22   violations.

23           **IV.    CONCLUSION**

24           For the foregoing reasons, CFTC's Motion for a Statutory Restraining Order and Other

25   Equitable Relief (ECF No. 2) is hereby GRANTED, as follows:

26                   A.      Asset Freeze Order Prohibiting the Withdrawal, Transfer, Removal,

27                           Dissipation, and Disposal of Assets

28           Defendants and Relief Defendants are immediately RESTRAINED AND ENJOINED,

1  except as otherwise ordered by this Court, from directly or indirectly withdrawing, transferring,

2  removing, dissipating, or otherwise disposing of any Assets, wherever located, including

3  Defendants' and Relief Defendants' Assets held outside the United States.  The Assets affected

4  by this Order shall include existing Assets and Assets acquired after the effective date of this

5  Order.

6                          **B.**       <u>Maintenance of and Access to All Records Relating to Business Activities,</u>

7                                    <u>Business, and Personal Finances</u>

8  Defendants and Relief Defendants are hereby RESTRAINED from directly or indirectly

9  destroying, altering, or disposing of, in any manner, any Records that relate or refer to the

10  business activities or business or personal finances of any Defendant or Relief Defendant.

11  Defendants and Relief Defendants are hereby ORDERED to immediately allow

12  representatives of CFTC to inspect any Records relating or referring to the business activities or

13  business or personal finances of Defendants and Relief Defendants, including but not limited to:

14  both hard-copy documents and ESI, wherever they may be situated and whether they are in the

15  possession, custody, or control of Defendants, Relief Defendants, or others.

16  When inspecting Records that are subject to this Order, including those contained on

17  computers and/or other electronic devices, CFTC should undertake reasonable measures to

18  prevent review of Defendants' or Relief Defendants' privileged communications and/or other

19  nonbusiness, nonfinancial materials by CFTC's attorneys and other staff who are part of the

20  litigation team in this matter.  Moreover, Defendants and Relief Defendants (or their counsel)

21  shall promptly contact CFTC's counsel to assert any claims of privilege or other legal objections

22  relating to the contents of any Records that are subject to this Order and promptly cooperate with

23  CFTC's counsel to develop reasonable protocols to isolate and prevent disclosure of claimed

24  privileged and/or other nonbusiness, nonfinancial materials to CFTC's attorneys and other staff

25  who are part of the litigation team in this matter.  However, nothing herein shall excuse

26  Defendants or Relief Defendants from full and immediate compliance with this Court's Order

27  permitting CFTC to inspect the books and Records which relate to Defendants' or Relief

28  Defendants' business activities and their business and personal finances.

To facilitate meaningful inspection and review, Defendants and Relief Defendants shall, absent a valid assertion of their respective rights against self-incrimination under the Fifth Amendment, promptly identify and provide CFTC's staff with the location of all Records relating or referring to the business activities and business and personal finances of Defendants and Relief Defendants, including the locations of relevant ESI, including but not limited to computers, external hard drives, mobile devices, cloud storage and services, email accounts, websites, and all accounts at any bank, financial institution, or brokerage firm (including any introducing broker or futures commission merchant) under the ownership, possession, custody, control, operation of, or accessible by, any Defendant or Relief Defendant.

To the extent in-person inspection and review is feasible in light of the COVID-19 pandemic, to ensure preservation and facilitate meaningful inspection and review, Defendants and Relief Defendants shall allow representatives of CFTC to make copies of documents and ESI on-site.  If on-site copying is not practicable, representatives may make such copies off-site.  After any such off-site copying, CFTC shall promptly return the original documents and devices upon which ESI is stored.

To the extent in-person inspection and review is not feasible in light of the COVID-19 pandemic, to further facilitate meaningful inspection and review, CFTC shall be allowed to take steps to inspect and copy such Records from an offsite location or remotely, as follows:

        *i.*      *Delivery*

        *a) Hard-Copy Documents*

The CFTC shall be allowed to inspect hard-copy documents by having any Defendant or Relief Defendant deliver hard-copy documents by mail, private carrier service, or email.  If by mail or private carrier service, CFTC will provide for the expense of delivery each way.  Once CFTC has collected and copied hard-copy documents, CFTC shall promptly return the original hard-copy documents.  If by email, Defendants and Relief Defendants shall electronically scan hard-copy documents and send the electronic scan to CFTC.  The scan should adhere to CFTC's Data Delivery Standards (*see* ECF No. 3-18), including but not limited to the requirements that

/ / /

22

black and white images must be 300 DPI Group IV single-page TIFF files, and color images must be produced in JPEG format.

*b) Electronic Equipment*

The CFTC shall be allowed to inspect ESI by having any Defendant or Relief Defendant deliver, by mail or private carrier service, electronic equipment containing ESI, including but not limited to, computers, external hard drives, and mobile devices. Defendants shall, absent a valid assertion of their respective rights against self-incrimination under the Fifth Amendment, promptly provide CFTC's staff with all usernames and passwords needed to access, forensically collect, and forensically copy Records relating or referring to the business activities or business or personal finances of the Defendants and Relief Defendants on their electronic equipment.

*ii.        Remotely*

*a) Cloud Storage or Service*

The CFTC shall be allowed to inspect by collecting and copying ESI in cloud storage or service, including but not limited to cloud email accounts, electronic files, websites, and software as a service. Defendants and Relief Defendants shall, absent a valid assertion of their respective rights against self-incrimination under the Fifth Amendment, promptly provide CFTC's staff with all usernames and passwords needed to access, collect, and copy Records relating or referring to the business activities or business or personal finances of the Defendants and Relief Defendants in cloud storage.

*b) Electronic Equipment*

The CFTC shall be allowed to inspect ESI by providing to any Defendant or Relief Defendant a device that will plug into Defendant's or Relief Defendant's electronic equipment containing ESI, including but not limited to, computers, external hard drives, and mobile devices, to facilitate the logical collection and copying of ESI. Defendants and Relief Defendants will execute that collection and copying consistent with CFTC's instructions. After the logical collection and copying, Defendants and Relief Defendants shall return and deliver the device back to CFTC. The CFTC will provide for the expense of delivery for each device each way. Defendants and Relief Defendants shall, absent a valid assertion of their respective rights against

self-incrimination under the Fifth Amendment, promptly provide CFTC's staff with all usernames and passwords needed to access, collect, and copy Records relating or referring to the business activities or business or personal finances of Defendants and Relief Defendants on their electronic equipment.

C. Notice to Financial Institutions and Others that Hold or Control Assets or Records

To ensure the effectiveness of the Asset freeze and pending further order of this Court, any financial or brokerage institution, business entity, or person that receives actual notice of this Order and holds, controls, or maintains custody of any account or Asset or other property owned by, held for the benefit of, or otherwise under the control of any Defendant or Relief Defendant, shall not, in active concert or participation with Defendants or Relief Defendants, permit Defendants or Relief Defendants or other persons to withdraw, transfer, remove, dissipate, or otherwise dispose of any of Defendants' or Relief Defendants' Assets, except as directed by further order of the Court.

Any financial or brokerage institution, business entity, or person that receives actual notice of this Order by personal service or otherwise shall not, in active concert or participation with any Defendant or Relief Defendant, directly or indirectly destroy, alter, or dispose of in any manner, any Records relating to the business activities and business and personal finances of any Defendant or Relief Defendant.

Furthermore, any such financial or brokerage institution, business entity, or person that receives actual notice of this Order and holds, controls, or maintains custody of any account or Asset titled in the name of, held for the benefit of, or otherwise under the control of any Defendants and Relief Defendants, or has held, controlled, or maintained custody of any such account or Asset of any Defendants or Relief Defendants at any time since **June 15, 2015**, shall not, in active concert or participation with Defendants or Relief Defendants, deny a request by CFTC to inspect all Records pertaining to every account or Asset owned, controlled, managed, or held by, on behalf of, or for the benefit of Defendants or Relief Defendants, including, but not limited to, originals or copies of account applications, account statements, signature cards,

checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.  As an alternative to allowing inspection of Records, a financial or brokerage institution, business entity, or other person may provide copies of Records requested by CFTC.

D.     Persons Bound By this Order

This Order is binding on Defendants and Relief Defendants, as well as any person who receives actual notice of this Order by personal service or otherwise and is acting in the capacity of an officer, agent, servant, employee, or attorney of Defendants or Relief Defendants, or is in active concert or participation with Defendants or Relief Defendants.

E.     Service of Order and Assistance of United States Marshals Service and/or Other Law Enforcement Personnel

Copies of this Order may be served by any means, including via email, facsimile transmission, certified mail, or UPS, upon any financial institution or other entity or person that may have possession, custody, or control of any Records or Assets of any Defendant or Relief Defendant, or that may be subject to any provision of this Order.

The Court specially appoints the following persons or agencies to effect service: Margaret Aisenbrey, Clemon Ashley, J. Alison Auxter, Anthony Biagioli, Jennifer Chapin, Lauren Fulks, Rachel Hayes, Rebecca Jelinek, Jeff Le Riche, Charles Marvine, Jo Mettenburg, Christopher Reed, Elsie Robinson, Thomas Simek, Allison Sizemore, Nicholas Sloey, Brett Shanks, and Stephen Turley, and representatives of the United States Marshals Service, the Federal Bureau of Investigation ("FBI"), and California state or local law enforcement personnel.

The Court further authorizes the United States Marshals Service, the FBI, and California state or local law enforcement personnel to: (a) accompany and assist representatives of CFTC in the service and execution of the Summons, Complaint, and this Order on the Defendants and Relief Defendants; and (b) help maintain lawful order while representatives of CFTC inspect Records as provided in this Order.  Nothing in this Order shall limit in any way any other lawful activities undertaken by the FBI with respect to Defendants or Relief Defendants in connection with any other proceeding.

F.      Service on CFTC

Defendants and Relief Defendants shall comply with all filing and service rules, as set forth in Federal Rule of Civil Procedure 5 and Local Rules 133 and 135.  To the extent conventional service of any documents on CFTC is appropriate under the rules, such service shall be effected by delivering a copy to **Jo E. Mettenburg, Chief Trial Attorney, Division of Enforcement, Commodity Futures Trading Commission, 4900 Main Street, Suite 500, Kansas City, Missouri 64112**, by e-mail, personal delivery, or courier service (such as Federal Express or United Parcel Service) only.

G.      Order to Show Cause on Preliminary Injunction and Expedited Discovery

Defendants and Relief Defendants are ordered to show cause in writing not later than July 10, 2020, as to why an Order for Preliminary Injunction should not be granted pending the remainder of this litigation.  Such briefing shall be filed and served by the aforementioned date. The CFTC may file and serve a reply not later than July 17, 2020.

The CFTC's additional request for expedited discovery is also GRANTED.  In advance of CFTC's deadline to file and serve reply briefing in support of an order granting a preliminary injunction, the parties may conduct expedited discovery, and the prohibition upon discovery before the early meeting of counsel pursuant to Rule 26(f), in accordance with Rule 26(d), is removed.  Specifically, CFTC may take depositions of Defendants John Black, Chris Mancuso, Joseph Tufo, and John Glenn, and Relief Defendants Herbert Caswell, Anne Mancuso, and Tyler Mancuso, subject to two calendar days' notice pursuant to Rule 30(a); that notice may be given personally, by facsimile, or by electronic mail; and, if necessary, any deposition may last more than seven hours but no more than eight hours in one day, and no more than two days.

H.      Waiver of Bond Requirement

As an agency of the United States of America, and pursuant to 7 U.S.C. § 13a-1(b) (2018) and Federal Rule of Civil Procedure 65(c), CFTC is not required to post a security bond in this matter.

I.      Rights of Affected Parties

Pursuant to Local Rule 231(c)(8) and Federal Rule of Civil Procedure 65(b), any party

26

1  affected by this Order shall have the right to apply to the Court for modification or dissolution on

2  two (2) days' notice or such shorter notice as the Court may allow.

3           J.        Force and Effect

4           In light of the voluminous briefing and supporting documents submitted by CFTC in

5  support of its Motion for SRO, the Court finds good cause exists to extend the expiration deadline

6  of the SRO to permit sufficient briefing and consideration of the issues.  Fed. R. Civ. P.  65(b)(2)

7  (permitting district court to extend expiration deadline of temporary restraining order for good

8  cause).  Accordingly, the SRO shall remain in effect for 28 days, or until an order on CFTC's

9  request for preliminary injunction issues, whichever is sooner.  This Court retains jurisdiction of

10  this matter for all purposes.

11          IT IS SO ORDERED.

12  DATED:  July 2, 2020

13                                                 _____
                                                   Troy L. Nunley
14                                                 United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27