**FILED**

Dec 7, 2021

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

1   MICHAEL JACOBS and
    RUBY HANDLER JACOBS
2   *Un-named Parties Noticed for*
    *Kingdom Trust, LLC.*
3   800 Calle Divina NE
    Albuquerque, NM 87113
4   Tel: (505) 321-3044

5           **IN THE UNITED STATES DISTRICT COURT**
6           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

7
8   COMMODITY FUTURES TRADING
    COMMISSION,
9                          Plaintiff;

10  v.

11  FINANCIAL TREE dba FINANCIAL TREE
    TRUST; FINANCIAL SOLUTION GROUP dba        No. 2:20-cv-01184-TLN-AC
12  FINANCIAL SOLUTION GROUP TRUST;
13  NEW MONEY ADVISORS, LLC; THE LAW           NOTICE FROM NON-PARTIES
    FIRM OF JOHN GLENN, P.C.; JOHN D.          MICHAEL J. JACOBS AND RUBY
14  BLACK aka JOHN BARNES; CHRISTOPHER         HANDLER JACOBS ("ON BEHALF
    MANCUSO; JOSEPH TUFO; and JOHN P.          OF KINGDOM TRUST, LLC") IN
15  GLENN,                                     RESPONSE TO PLAINTIFF'S
16                                             DOCUMENTS ECF No. 125 and No.
                         Defendants;           88
17
18  SUISSE GROUP (USA) LLC; JMC
    INDUSTRIES LLC; LANDES CAPITAL
19  MANAGEMENT, LLC; KINGDOM TRUST
    LLC; HERBERT CASWELL; ANNE
20  MANCUSO; and TYLER MANCUSO,
21
                         Relief Defendants.
22

23
24          COMES NOW un-named non-parties Michael J. Jacobs and Ruby Handler Jacobs
25  ("hereinafter referred to as "the Jacobses"), who have been continually and incorrectly
26  characterized by the Commodity Futures Trading Commission ("CFTC") as officers of the now
27  defunct named Relief Defendant Kingdom Trust LLC. ("Kingdom"), hereby file this Notice to
28

the Court in opposition to CFTC's ECF No. 125 Motion for Issuance of an Order for Final Judgment By Default, Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief ("Motion") and Memorandum in Support Against ... Relief Defendant Kingdom Trust LLC ("Memorandum") (received on November 10, 2021), and CFTC's ECF No. 88 Plaintiff Commodity Futures Trading Commission's Response to Notice from Non-Parties Michael Jacobs and Ruby Handler Jacobs ("On Behalf of Kingdom Trust, LLC").

## **INTRODUCTION**

1.      The Jacobses file this instant Notice as a courtesy and the filing shall not be construed that they are agreeing to enter into this instant case, nor shall this Notice be considered an entry of appearance.   The Jacobses speaks for themselves as they are not authorized to represent nominal Kingdom in this instant action.   Kingdom does not have legal counsel as the Jacobses are unable to obtain services of counsel especially since Kingdom is a defunct[1] Wyoming company as of December 10, 2019. Following dissolution on December 9, 2017, Kingdom has not conducted any business and does not retain any assets.

2.      The Jacobses also file this Notice due to the fact that opposing counsel has continued to harass and threaten them personally although they are not named in this lawsuit. The Jacobses further claim that CFTC is in violation of Rule 403 regarding the prejudice brought forth with exhibits attached to their Response in ECF No. 88 concerning legal matters not involved with this case. In their attached affidavit hereto, the Jacobses address CFTC's "backstory" as referred to beginning at Line 16 on pg 2 of ECF No. 88 and by attached exhibits.

///

---

[1] Chapter 9 of Wyoming Limited Liability Company Act: 17-29-705 Administrative Forfeiture of authority and articles of organization.

## IMPROPER SERVICE OF THE COMPLAINT

3.    Proper service is accomplished under Rule 4 of the Federal Rules of Civil Procedure at (e)(2) "Serving an Individual Within a Judicial District of the United States by doing the following: (A) delivering a copy of the summons and of the complaint to the individual personally or (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there." Neither of the above occurred and therefore proper service was not effective. Therefore, the Jacobses aver that CFTC deliberately misled this Court by filing its ECF No. 18 stating "SUMMONS RETURNED EXECUTED."

4.    On or about July 8, 2020, the Jacobses found a large package at their doorstep from CFTC containing the Complaint (ECF No. 1), addressed to "Kingdom Trust c/o Michael Jacobs." Although this was not proper service without personal delivery, the Jacobses promptly returned the package to opposing counsel inscribed with "Refusal for Cause Without Dishonor" referencing UCC § 3-501 and § 2-207(2)(c); sent via Registered Mail No. RF 157 442 683 US. (*See* Exh 1). This package was received by CFTC on July 17, 2020 (*See* Exh. 2).

5.    An additional mailing via UPS was found from CFTC attorney Anthony Biagioli ("Mr. Biagioli") solely addressed to "Michael and Ruby Jacobs" (and not Kingdom Trust) on or about July 15, 2020 and the Jacobses promptly returned the letter to Mr. Biagioli inscribed with "Refusal for Cause Without Dishonor" referencing UCC § 3-501 and § 2-207(2)(c); sent via Registered Mail No. RF 157 442 414 U (*See* Exh. 3). This package was received by CFTC on July 22. 2020 (*See* Exh. 4).

6.    The Jacobses received another mailing from Mr. Biagioli via UPS on or about August 29, 2020, and the Jacobses promptly responded by facsimile to opposing counsel on

August 31, 2020 informing him that they refused to contract with him or the case without dishonor (ECF No. 75, Exh. 1). Mr. Biagioli did not inform the Court of these refusals.

7.     At that point in time, the Jacobses were unaware of the Court's Clerk Entry of Default (ECF No. 50) ("Entry") on or about August 5, 2020. Opposing Counsel did not make the Jacobses aware of the Entry neither in their August 28, 2020 letter nor other correspondence and telephone calls. The Jacobs first became aware of the Entry in CFTC's October 1, 2020 ECF No. 88, Line 7 on p 2. Moreover, as evidenced by the Jacobses previous Notices, and contrary to opposing counsel's claims, Kingdom or the Jacobses did "otherwise defend in this action" (ECF No. 125, p 5 line 19). Then Jacobses did connect with Mr. Biagioli to provide demanded documents that resulted in CFTC not filing a motion to compel. Mr. Biagioli filed his request for Clerk's Entry prior to arranging with the Jacobses for documents and upon satisfaction he did not withdraw the CFTC's default against Kingdom.

## HISTORICAL BACKGROUND

8.     Prior to the creation of Kingdom in late 2015, the Jacobses were involved with the Cities Uplift Program (the "CUP") – as created and organized by their mentor Sri Lankan Rienzie Mahesh Kumar Edwards[2] ("Edwards") – and offered by the Federal Reserve Bank ("FRB"). Michael Jacobs ("Mr. Jacobs") was authorized by the FRB to be "our Representative for the State of New Mexico"… "to develop the Cities and Indian Nation in New Mexico." (*See* Exh. 5). For this participation, the Jacobses could complete the funding of their planned entertainment district out of the proceeds which unfortunately did not happen.

---

[2] "Mastermind and architect" of the CUP scheme as identified in the case *United States v. Rienzie Edwards et al* 1:16-cr-00800-PGG. ("NY Case")

9.     In October 2015, at the behest of Edwards and the Jacobs' SEC/FINRA licensed financial advisor, Lawrence "Bob" Bellmore[3] ("Bellmore"), Kingdom was created followed several months later in March 2016 with a bank account to accept CUP investor funds which were then to be transferred to FRB approved Interest on Lawyer Trust Accounts ("IOLTA") held by FRB approved attorneys.   The Jacobses believed this was purely for the benefit of the investors in obtaining their returns from the CUP.   Moreover, Kingdom was also created to be the Jacobs' company for their entertainment, civic and humanitarian projects as evidenced by the June 14, 2016 contract between Kingdom and Spar Ystalyfera ("Spar") (*See* Exh. 6).   Prior to this, on May 22, 2015, Mr. Jacobs signed a contract with Edwards and Ho Fook Kee[4] ("F.K. Ho") for the raising of $14 million for his photographic galleries (*See* Exh. #7). The Jacobses were led to believe that some of the funds deposited in Kingdom were destined for the Jacobs' projects.

10.     In 2016 the Jacobses were completely unaware of the FRB's alleged Help the Homeless ("HTH") program. Furthermore, there was never a verbal or written contract nor any contact between Kingdom and any investors, only to act in concert with the FRB CUP at the direction of Edwards, his attorney Brian Pearce ("Pearce") and Edward's Shanghai associate Ho Mei Mei Trindy ("Trindy").

11.     The Jacobses were later informed and therefore believe that brokers James Wilson ("Mr. Wilson" in Tennessee), Nick Toliver ("Mr. Toliver" in California), Lawrence Lester ("Mr. Lester" in Washington) and/or Rachael Gendreau ("Ms. Gendreau" in Illinois) (collectively "Brokers") either solicited Defendant John D. Black and Relief Defendant Tyler Sean Mancuso

---

[3]  In court documents, Bellmore is referred to as the Manager of Kingdom Trust (See Exhibit 11, line 3).
[4]  Co-Defendant in NY Case.

("Defendants") or Defendants contacted them about investment programs for the funds they had in hand. Contracts most likely would have been provided by one or more of these Brokers to Defendants. It is the Jacobses belief that neither the Defendants nor the Brokers were aware that Edwards had created the HTH scheme to steal investor's money. It is also the Jacobses belief that the Defendants may have understood that the HTH program was legitimate.

12. At the time funds were being directly deposited into Kingdom (Mr. Jacobs was informed about the deposits after the fact and without prior warning), the Jacobses were told that the investors were clients of Edwards' Shanghai associate Trindy. No mention of the Brokers was made and the Jacobses were not informed of their involvement until the first week of December 2016 when Mr. Jacobs was contacted by Mr. Wilson.

13. The Jacobses were neither willfully involved nor knowingly aware that Kingdom was being used to gather funds for anything but legitimate purposes. The Jacobses aver they acted in good faith and with reasonable reliance upon the representations of many third parties such as Edwards and the FRB authorizations. Neither Kingdom nor the Jacobses received any documentation regarding contracts between the Defendants and either the CUP or the HTH programs.

14. All investor funds provided to Kingdom were near immediately transferred to IOLTA accounts by instruction of either Trindy, Pearce, Edwards, and the FRB. The Jacobses were informed by Edwards and Trindy that all funds received were for the CUP as they continued to be unaware of the HTH program.

15. With complete transparency, and in setting up the Kingdom account, Mr. Jacobs provided all the official documents regarding the CUP and the FRB, and his photographic galleries, to a Small Business Vice President at Bank of America ("BoA"), who approved Kingdom's

transactions. The account was further upgraded to *CashPro® Online Services,* that was overseen by a BoA Client Manager and monitored through BoA's Global Commercial Treasury and Fulfillment Department.  These individuals had the channels to verify the CUP and were aware of the reasons for the transfers (See Affidavit at 54).

16.   Moreover, in ECF No. 88 Exhibit 3 at page 4, the federal prosecution states that "there is no evidence that Jacobs and Handler-Jacobs directly solicited investors in the HTH scheme…"   Thus, the government confirms that the Jacobses never solicited any of the Defendants in this instant case.

17.   Exhibit 3 at page 4 goes on to state that "[a]t the direction of Edwards, Jacobs and Handler-Jacobs[5] then transferred the funds to overseas bank accounts controlled by Edwards and kept a small portion, approximately 2-2.5%, for themselves." The "small portion" was a legitimate and reasonable expense as allowed by Edwards, his IOLTA attorneys Pearce (*See* Exh. 10) and Romesh Karaliyadda, who is Edwards' associate and Sri Lankan attorney. Entitled does not mean the fees were taken. At the time of the federal seizing of the Kingdom account in December 2016, the Jacobses had not taken all of their expenses. The Jacobses were not unjustly enriched as they lost their own funds as well.

18.   Kingdom was never the ultimate recipient of funds that were provided by this case's Defendants or any other investor. At the least, Kingdom was acting as a legitimate agent and the Jacobses as legitimate employees.  In CFTC's Exhibit 3 at pages 2-3, it states that Edwards, who "orchestrated" the CUP scheme, "obtained the lion's share of the more than $50 million in fraudulent proceeds."   Therefore, U.S. indicted and soon to be indicted in his home country

---

[5] Mr. Jacobs conducted all business of Kingdom and Mrs. Jacobs did not transfer any funds.

Edwards is the correct Relief Defendant as he is currently holding the funds as real property in Sri Lanka. The country of Sri Lanka does have an extradition treaty with the U.S. which has not been enforced.

19.   Kingdom does not claim ownership of the funds today as it never was given any authority or instructions to have such possessorship. In fact, Mr. Jacobs was specifically told by Trindy that Kingdom did not have proprietary rights to use any investor funds.

20.   As noted above, Kingdom is defunct, the bank accounts have already been seized and closed, and the Jacobses do not possess any of the alleged ill-gotten gains nor are they unjustly enriched.

## **ARGUMENT**

21.   Contrary to CFTC's contention that its Complaint is well-pleaded, the Jacobses argue in contradiction as this Notice evidences points of material dispute and contention. The CFTC has not established this Court has personal jurisdiction for Kingdom and venue is questioned.  If it arises, personal jurisdiction is certainly an issue concerning the Jacobses even though they are non-parties.  The Jacobses argue that they were not informed of ECF No. 50 and the Entry until months later.

22.     In a September 10, 2020 telephone call with Mr. Biagioli and CFTC Investigator Ms. Elsie Robinson ("Ms. Robinson") the threats against the Jacobses continued, and they were not informed of the Entry by Mr. Biagioli.  A dispute clearly continues. The Jacobses further argue that they provided demanded documents under duress on or about September 11, 2020, following Mr. Baglioni threats, even though they believed they were not bound to do so (*See* ¶ 7 above).

23.   The Jacobses again request that this Court take notice of the letter of its' Order Granting Statutory Restraining Order and Other Equitable Relief ("Order") (ECF No. 9) as Paragraph D on Page 25 wherein it states:

> "This Order is binding on Defendants and Relief Defendants as well as any person…[who] **is** acting in the capacity of an officer, agent, servant, employee…of Relief Defendants or is in **active** concert or participation with…Relief Defendants." (emphasis added)

The Jacobses are neither in any "capacity" as officers of the defunct company nor are in "active concert or participation" with any entity and thus do not fit within this court's description.

### *Eitel Factors Fail*

24.   The CFTC requests that this Court consider the factors set forth in *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986) to enter a default judgment for all parties. The Jacobses requests the consideration of the Court as to the factors as they relate specifically to Kingdom and the Jacobses. These factors include: (1) the possibility of prejudice to the plaintiff if the motion is denied; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the amount of money at stake; (5) the possibility of a dispute concerning any material facts; (6) whether default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

25.   As discuss hereinabove, the factors do not favor a CFTC ruling against Kingdom and by extension, the Jacobses.  In response: (1) CFTC will not be prejudiced if default judgment is not entered against Kingdom because there is no provable claim; (2) CFTC has not clearly made a claim against Kingdom as explained in this Notice; (3) CFTC has not shown that Kingdom has been "unjustifiably enriched by Defendants' violative conduct ....."; (4) CFTC wrongly equates disgorgement to penalties, improper receipt is challenged, and CFTC incorrectly asks for $1.25

million from Kingdom when they later asked for $1.1 million; (5) CFTC incorrectly states that there is no factual dispute with Kingdom; (6) Kingdom was not properly served (*See* ¶¶ 3-4 above); and (7) If necessary, a decision regarding Kingdom must be decided on the merits as there is a dispute and a default judgment would not be in the public interest or furtherance of justice.

### *Jurisdiction Not Established*

26.   Kingdom has not entered a general appearance, has not consented to the Court's jurisdiction of Kingdom and the subject matter in this action, has denied allegations in the complaint, has not waived any finding of facts and conclusions of law, and has not waived any rights to an appeal.  (See *SEC v. Falor*, Case No. 1:09-cv5644, US District Court Northern District of IL, Eastern Division (2013) (defining consent))

27.   The court's exercise of personal jurisdiction over a nonresident must comport both with California's long-arm statute and with federal constitutional requirements of due process. *Chan v. Soc'y Expeditions,* 39 F.3d 1398, 1404-05 (9th Cir. 1994). Plaintiff bears the burden of establishing that personal jurisdiction exists. *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002)(citation omitted).

> The jurisdictional inquiry [of personal jurisdiction] collapses into a single analysis of due process.  Absent traditional bases for personal jurisdiction (physical presence, domicile, or consent), due process requirements are satisfied when the defendant has "certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Helicopteros Nacionales de Columbia S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d (1984) (quotations omitted).  Personal jurisdiction may be general or specific. *Sher v. Johnson,* 911 F.2d 1357, 1361 (9th Cir. 1990) (citations omitted).

*Gordon v. Ascentive, LLC*, No. CV-05-5079-FVS, at *4 (E.D. Wash. Dec. 15, 2005).   Neither general nor specific personal jurisdiction applies to Kingdom or the Jacobses in this case.

28.  Moreover, the Supreme Court of the United States held that specific jurisdiction required an "*adequate* link" between the nonresident plaintiff's claims and the forum state of California. *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, No. 16-466 (U.S. June 19, 2017) (slip op., at 8) (emphasis added).  In so holding, the Court has effectively established, if not reaffirmed what was already implicitly required, a causation requirement between a plaintiff's claims and the defendant's in-state conduct.  Therefore, as neither Kingdom nor the Jacobses have had "in-state conduct," then this Court does not have personal jurisdiction.

29.  If the above is deemed correct, then this venue is improper specifically for Kingdom.

### *Kingdom Is Not Appropriately Named As Relief Defendant*

30.  At best, Kingdom was an unwitting intermediary.  CFTC's states in their ECF No. 88 Response at pg 3 line 15, that "The Complaint alleges that Kingdom (1) received pool funds [ill-gotten gains] and (2) did not provide any [legitimate] services for the Black Pools or pool participants. ECF No. l, ¶ 23. These [alleged] facts, **if proven**, are sufficient to establish relief defendant liability. Kingdom is thus a properly named Relief Defendant, and the relief requested in the Notice should be denied." (emphasis added).  The Jacobses aver that the CFTC has not proven these facts (*See* ¶ 35 below)

31.  According to *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998), "A relief defendant is a person who "**holds** the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute." *quoting SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991) and cited in *Sec. & Exch. Comm'n v. World Capital Mkt., Inc.*, 864 F.3d 996, 1004 (9th Cir. 2017). (emphasis added). As described hereinabove, there is a dispute of material facts and neither Kingdom nor the Jacobses **hold** the subject matter of the litigation in a subordinate or possessory capacity.

"the term [relief defendant] is broad enough to encompass persons who are **in possession of funds** to which they have no rightful claim, such as money that has been fraudulently transferred by the defendant in the underlying securities enforcement action." *SEC v. Ross* , 504 F.3d 1130, 1141 (9th Cir. 2007) (quoting *Colello* , 139 F.3d at 677 ) (emphasis added).

*World Capital Mkt., Inc.*, 864 F.3d 996, 1004.  The Jacobses state that they nor Kingdom are "in" possession of funds and that the funds themselves were not fraudulently transferred. The Defendants' funds provided to Kingdom for the Edwards' contracted program required the legitimate step of transmission to Kingdom on its journey to an FRB approved IOLTA account and as approved by BoA.

32.   Furthermore, and as the CFTC has been dutifully informed, the correct Relief Defendant is the program creator who is actually in possession of the funds, i.e., at-large Rienzie Mahesh Kumar Edwards, Indicted by the Southern District of New York.  Currently, Edwards is also under a criminal complaint in his home country and the Sri Lankan government has frozen Edwards' assets which include the subject matter of this action with reference to Kingdom (See ECF No. 75, Exh. D).  The Jacobses did provide the CFTC with the home address of Edwards, who is represented by his Sri Lankan legal team:

    a.  President's Counsel Romesh de Silva, Romesh de Silva Associates: #.79/14, Dr. C. W.W. Kannagara Mawatha, Columbo 07. Telephone number at the Law Commission of Sri Lanka where Mr. de Silva is Chairman: +94-11-2333884;

    b.  President's Counsel M.U.M. Ali Sabry (Sri Lanka Minister of Justice and member of Parliament), No. 05., 27th Lane, Colombo 03, alisabri_u@parliament.lk ; and

    c.  President's Counsel Jayantha Weerasinghe (Member of Sri Lanka Parliament and Prime Minister's counsel), No. 40/1, Lake Gardens, Rajagiriya, jayantha_w@parliament.lk .

**Ill-Gotten Gains and Unjust Enrichment Are Synonymous**

33.    In Section D of ECF No. 125, opposing counsel repeats this Court's finding at pg 13 line 20 that "CFTC has shown Relief Defendants have been unjustifiably enriched by Defendants violative conduct ...." ECF No. 33 at 14." The Jacobses contend that both they and Kingdom have not been unjustifiably enriched, but have been unjustly harmed by CFTC's unqualified, and unproven defamatory claims. At its writing of ECF 33, this Court was not aware of the relationship regarding Kingdom, the Defendants and Edwards. However, opposing counsel has been informed of what transpired and yet ignores the facts in its Motion as they continue to perpetrate a falsehood. It is incumbent on CFTC to prove without question that a relief defendant is appropriately named in the lawsuit. Evidence presented to opposing counsel and this Court shows that Kingdom is not properly joined.

> "However, a claim for unjust enrichment "describe[s] the theory underlying a claim that a defendant has been unjustly conferred a benefit 'through mistake, fraud, coercion, or request.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (quoting 55 Cal. Jur. 3d Restitution § 2).

*Kawczynski v. Kawczynski*, No. 18-cv-05709-NC, at *5 (N.D. Cal. June 17, 2019). Therefore, Kingdom was not "unjustly conferred a benefit" by any of the mentioned means, and without proof of ill-gotten gains, there cannot be unjustiable enrichment.

### Kingdom Did Not Receive Ill-Gotten Funds

34.    With regard to Kingdom, the CFTC misuses the term "ill-gotten gains" in that the Black's Law Dictionary definition of "gain" is profits; winnings increment of value[6].

35.    Based upon information provided by CFTC (ECF No. 1 ¶ 23) it appears that Kingdom did receive some funds from Defendants John D. Black and Relief Defendant Tyler

---

[6] *Gray v. Darlington*, 15 Wall. 65 21L. Ed. 45; *Thorn v. De Breteuil*, SO App Div. 405, 83 N.Y. Supp 840.

Sean Mancuso ("Mancuso") as further evidenced by requested documentation that has been provided to CFTC by Mr. Jacobs.

36.   CFTC failed to consider or provide proof of any of the Defendants', or Kingdom's *mens rea* at the time of the funds being provided to Kingdom. The Jacobses argue that at the time of that transfer the funds into Kingdom were not ill-gotten because of a "legitimate" brokered agreement between Defendants and Edwards et al were for specific returns on investment.

37.   The Jacobses argue that the CFTC has also failed to provide evidence that Kingdom received 'ill-gotten' funds. In ECF No. 1 at 13, CFTC specifically claims "Defendants Misappropriated the **Vast Majority** of Pool Funds" rather than **ALL** of Pool Funds.  CFTC only speaks about monies that Defendants paid to their personal and business accounts.  In the following Section C beginning at pg 16, notwithstanding the alleged solicitations beginning on June 15, 2015, the vast majority of funds taken by the Defendants appeared to have occurred after the last funds were transferred to Kingdom by Defendant Black on October 11. 2016[7].  Moreover, funds sent to Kingdom were indeed not "ill-gotten" because, at that time, they were to be used in a legitimate program for the benefit of the investors.  Sadly, Defendants and the Jacobses were not aware that Edwards had created a scheme to steal funds.

### *Kingdom Had a Legitimate Claim to the Funds at the Time of the Transfer*

38.   As elicited above, Kingdom has not had possession of any of the funds since 2016 and did have a legitimate claim at the time. Therefore Kingdom's claim was as an innocent receiver of the funds.

---

[7] In the State of California Felony Complaint against John D. Black (Mancuso et al) (Case No. 20FE011219) the alleged specific criminal offenses occurred between September 20, 2016 and January 12, 2020.

39.    According to *Securities Exchange Commi. v. Founding Partners Capital Mgmt. Co.*, No. 2:09-cv-229-FtM-29DNF (M.D. Fla. Dec. 1, 2011),   [t]he case law only requires an "ownership interest" or "legitimate claim" in the funds to preclude an entity from being a proper relief defendant. *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991); *Kimberlynn Ranch Creek*, 276 F.3d at 191; *SEC v. George,* 426 F.3d at 798 (6th Cir. 2005). This does not require possession of the full bundle of ownership.

40.    All transactions regarding Kingdom were approved and overseen by the FRB, BoA, Kingdom's SEC/FINRA money manager and the Jacobs' private attorney, Mr. Peter Staiti, Esq.

### Kingdom Did Not Accept Misappropriated Pool Funds

41.    In Section D of the Motion on page 16, footnote 6, CFTC falsely names the monies received by Kingdom as "misappropriated pool funds."  According to Black's Law Dictionary, 2nd Ed., misappropriation is defined as "[t]he intentional and illegal use of property or funds belonging to another person for one's own use or other unauthorized purpose. Therefore, misappropriate refers to the intentional, unlawful use of another party's property for purposes not authorized by the property's owner. The Jacobses are informed and therefore believe that Defendants intended to increase the value of investor's funds by contracting with a legitimate FRB program which promised excellent returns on said investment. This was not an illegal use of the funds and Defendants providing investor funds to the FRB program was in part, the intent of the investors to gain returns on their funds, with the investor's own consent.  The Jacobses have not been privy to the agreement and are unaware if a disclaimer of "risk" was  included.

### Disgorgement is Not Appropriate as Kingdom Did Not have Unjust Enrichment

42.    In *Liu v. SEC*, 140 S. Ct. 1936 (2020) the court found that there is no statutory authority for the SEC to obtain disgorgement in federal court actions. In fact, pursuant to 15

U.S.C. § 78u(d), the SEC may seek only civil monetary penalties and "equitable relief." Equitable relief against Kingdom is not appropriate in this instant case as it does not have ill-gotten funds or gains and does not possess the funds. Furthermore, an order against a relief defendant requires the district court to exercise its equitable powers. The Jacobses have provided arguments about the fairness of seeking this relief.

43. According to the Supreme Court in *Kokesh v. SEC*, 137 S.Ct. 1635 (2017), "Generally, disgorgement is a form of "[r]estitution measured by the defendant's wrongful gain." Restatement (Third) of Restitution and Unjust Enrichment § 51, Comment a, p. 204 (2010) (Restatement (Third)). Disgorgement requires that the defendant give up "those gains ... properly attributable to the defendant's interference with the claimant's legally protected rights." Kingdom did not have any wrongful gain to be disgorged.

44. In the CFTC Response, they state "[a] relief defendant must disgorge such funds even if the relief defendant no longer possesses the funds. See *World Capital Mkt.*, 864 F.3d at 1007." Doc 88 at pg 3). However, a further read of *World* states:

> "the term is broad enough to encompass persons who are **in** possession of funds to which they have no rightful claim, such as money that has been fraudulently transferred by the defendant in the underlying securities enforcement action." *SEC v. Ross*, 504 F.3d 1130, 1141 (9th Cir. 2007) (quoting *Colello* , 139 F.3d at 677 ) (emphasis added)

*World Capital Mkt., Inc.*, 864 F.3d 996, 1004 (9th Cir. 2017)

45. The Jacobses aver that Mr. Biagioli had and has full knowledge about their NY Case (as evidenced in their ECF No. 88) which clearly shows that the mastermind is Edwards and he in fact did plot to steal and did receive all of the stolen funds.

46.   As Kingdom is currently listed as a Relief Defendant, wrongdoers cannot be relief defendants, as the court noted in its own definition: "[T]he SEC may seek disgorgement from 'nominal' or 'relief' defendants who are not themselves accused of wrongdoing in a securities enforcement action where those persons or entities (1) have received ill-gotten funds, **and** (2) do not have a legitimate claim to those funds."[8] (emphasis added).  As noted hereinabove, (1) **and** (2) do not apply to Kingdom.

47.   As stated hereinabove, the Jacobses did not solicit nor contract with any of the Defendants or investors who provided funds to Kingdom. Therefore, Kingdom did not fraudulently obtain said funds

## **CONCLUSION**

48.   Mr. Biagioli has informed the Jacobses that with receipt of the requested documents and affidavit, they would have fully satisfied CFTC's production request *See* Exh. 13).

49.   CFTC has not proven without doubt that Kingdom received any alleged ill-gotten gains or has been unjustifiably enriched.

50.   Defendants did not misappropriate all of investor funds.

51.   CFTC has not proven that Kingdom did not have a legitimate purpose to receive the investor funds whereas the Jacobses have provided evidence that Kingdom did indeed provide a legitimate service.

52.   Kingdom has not been appropriately joined as a relief defendant.

---

[8] *SEC v. Amerifirst Funding*, 2008 WL 1959843 at *5 (quoting *SEC v. DCI Telecomms., Inc.*, 122 F. Supp. 2d 495, 502 (S.D.N.Y 2000))

53.     Therefore, if appropriate, the Jacobses requests that this Honorable Court of Equity should hold a Federal Rule of Civil Procedure 12(b)(1) proceeding to adjudicate to see "if the existence of jurisdiction turns on disputed factual issues, the district court may resolve those factual disputes itself." *Leite v. Crane Co.,* 749 F.3d 1117, 1121-22 (9th Cir. 2014).

Respectfully submitted this 6th Day of December 2021



_____

Michael Jacobs

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was sent via Federal Express with proper postage thereon on December 6, 2021 to this Court and emailed to the attorney listed below.

Mr. Anthony Biagioli
Commodity Futures Trading Commission
Enforcement Division
4900 Main Street, Suite 500
Kansas City, MO. 64112
Tel: (816) 960-7722

_____

Michael Jacobs

## Affidavit of Fact by Michael Jacobs and Ruby Handler Jacobs

Before me, the undersigned authority, personally appeared Michael Jacobs (hereinafter as "Michael") and Ruby Handler Jacobs (hereinafter as "Ruby"), who are duly sworn, deposed and say:

We, Michael Jacobs and Ruby Jacobs, swear that the information in our sworn statement is truthful to the best of our knowledge and understanding. We are over the age of 18 and sui juris.

1.      We are familiar with the proceeding in the U.S. District Court, Eastern District of California case no. 2:20-cv-01184-TLN-AC entitled *Commodity Futures Trading Commission v. Financial Tree dba Financial Tree Trust et al* (the "Complaint").

2.      We are un-named parties in the Complaint and have only been personally sought out by Commodity Futures Trading Commission ("CFTC") on their belief that we are officers of their Relief Defendant Kingdom Trust ("Kingdom"), a now defunct company, and are subject to disgorgement without adjudication.

3.      We are providing this affidavit under duress as a result of CFTC's Response to our Doc. 75 Notice ("Response") (Doc. 88) as counsel for CFTC continues to threaten, harass, and disparage us.

4.      We are proffering this affidavit as counsel for CFTC filed into this instant case irrelevant documents regarding our concluded criminal case[1] ("*U.S. v Edwards*") designed wholly to place us in bad light with this Court and/or jury.  We are also providing this affidavit

---

[1] *United States v. Edwards et al*, Case # 16-cr-008 ( SDNY 2016) ("*U.S. v Edwards*" or the "prosecution" or "NY Case"))

because we believe that the CFTC has violated Rule 403 in that their intention is to prejudice us before this Court and in any potential future proceedings.

5.      The Roman legal principle of *audiatur et altera pars* "listen to the other side" is considered a principle as fundamental justice in most legal systems. We were **never** given the opportunity to challenge any allegations made by the prosecution in the NY Case as we had incompetent court appointed counsel. Furthermore, and under duress, we pled to a false charge, "conspiracy to impersonate an officer[2] or employee of the United States.", i.e., an employee[3] of the Federal Reserve Bank ("FRB").

6.      We further hereby state that after the prosecution admitted to our defense counsel that they realized we were victims, all financial charges against us were dropped.

### THE NON-PARTIES

7.      Michael is an internationally acclaimed professional photojournalist and writer, with a 51-year career which has included photographing U.S. presidents (*with Secret Service clearance*) and heads of state, notables, captains of industry, religious leaders, Royalty and Hollywood celebrities. Michael, a disabled U.S. Navy veteran who served during the Vietnam War in Pacific Fleet Combat Camera Group, is also an award-winning globally published photographer, journalist, and motion picture director.

---

[2] "Officer of the United States": a position to which is delegated by legal authority a portion of the sovereign power of the federal government and that is 'continuing' in a federal office subject to the Constitution's Appointment Clause. A person who would hold such a position must be properly made an 'officer of the United States' by being appointed pursuant to the procedures specified in the Appointments Clause. *(2007 memorandum opinion by the U.S. Department of Justice Office of Legal Counsel).*

[3] The FRB is not a government agency and "FRB employees **are not** Government employees; instead, they are at-will employees. See *Scott* v. *Federal Reserve Bank of Kansas*, 406 F.3d at 536 (8th Cir. 2005); *James v. Fed. Reserve Bank of New York*, 471 F. Supp. 2d 226, 233 (E.D.N.Y. 2007)" *United States ex rel. Kraus v. Wells Fargo & Co.*, 11 Civ. 5457 (BMC), at *11 (E.D.N.Y. May 9, 2018)"

8.     Ruby, a former concert musician, had been involved in real estate development, acting, publishing, filmmaking and is an award-winning motion picture producer. Ruby had been in law enforcement for nearly 30 years: is Peace Officer Standards & Training ("P.O.S.T.") certified, was a former contract special deputy in the U.S. Marshal Service and owned-and-operated a private security company for 16 years licensed in both California and New Mexico.

## PRELUDE AND INTRODUCTION TO RIENZIE EDWARDS

9.     In 2009 we had an existing film production studio in Albuquerque with plans for an expansion development project that was designed as a destination venue to include a theme park. We had a well-received 400-page business plan and land selected with deposits. We were actively seeking legitimate project financing for the New Mexico and State of Alabama locations.

10.     On March 27, 2011 through claimed financial broker Lawrence Lester[4] ("Lester") we were first introduced to Sri Lankan financier Rienzie Mahesh Kumar Edwards[5] ("Edwards") who attended meetings for our entertainment district and film studio projects in Birmingham, Alabama and for funding a development in the City of Selma.  Due to Edwards' statements of financial commitment through one of his companies with Lester, Sirius San-Xing Financial Services, Ltd. ("Sirius"), an Alabama State Representative and other Alabama political officials signed documents to commence the projects.

11.     With regard to his Indictment in _U.S. v. Edwards,_ Edwards is currently "at large" hiding in plain sight in his home country.  He was, however, recently arrested for violating Sri Lanka's Prevention of Money Laundering Act and is awaiting trial in Sri Lanka. We are informed and therefore believe that Edwards and his wife, Purnima Suranji Menike Jayakody

---

[4] Co-Defendant in _U.S. v Edwards_
[5] Co-Defendant and mastermind in _U.S. v Edwards_

Arachchilage Edwards ("Purni"), will be indicted shortly in Sri Lanka. The extradition treaty between the U.S. and Sri Lanka exists, but has not been enforced.

12.   After we were taken into custody on December 11, 2016, it became apparent that while in Alabama, Edwards had resolved to target us for inclusion into his nefarious scams because of our desire to obtain funding for our development projects.

13.   In an April 28, 2011 email to Michael, Edwards described himself as follows:

> "I am a Financial Engineer. I have served several Governments (including yours [USA]) and Large Corporations across the world in Engineering various transactions for raising funds for projects as well as balance of payment adjustments and working Capital Requirements. A Financial Engineers Job is to take assets that have a 'notional value' (but placing an 'economic value' -or dollar selling price- is very difficult) and structure it in such a way that liquid cash could be created against such assets. I was head of Private Banking in Barclays London for 6 years and then joined the Rothschilds to manage their investment banking arm and was subsequently introduced to Financial Engineering assignments. I have been a Financial Engineer for 20 years - which has now become my profession."

14.   In late July 2011, Edwards flew to Los Angeles to meet with our project development manager, a former Senior Vice President of Universal Studios who built their Florida destination venue; an award-winning Disney Imagineering landscape architect; and a Senior Vice President of Parsons, a large well-establish global construction company. Unbeknownst to us and our project partners, the Alabama project funding was moving forward with Edwards feigning to provide the financing.

15.   Unfortunately, neither the Birmingham nor Selma project funding materialized, and Edwards blamed the Alabama failure on his Sirius partner, Lester. As of 2012 we no longer had any dealings with Lester and neither spoke nor communicated with him again. We later discovered that it was Edwards' modus operandi to cause rifts between people for the purposes of his own control of the scheme.

16.    However, Edwards continued to pursue us claiming that he could put financing together for our own projects and therefore we kept in touch with him. Along with other professionals that were with our projects, we all believed him as he exhibited, in person, to be an individual of substance, culture and financial experience. The thought of him being a con man never entered into any one of our minds.

17.    We did have our SEC/FINRA licensed financial manager, Lawrence "Bob" Bellmore ("Bellmore"), perform a background check on Edwards and we were told that nothing negative arose.

18.    Edwards also had provided Michael with his resume containing two references and Michael contacted them both: the President of Sri Lanka Percy Mahendra "Mahinda" Rajapaksa and the Sri Lankan Chief Buddhist Priest Ven Thibbatuwawe Sumangala Thero ("Thero"). Michael was informed that Edwards was an honest and professional person, one to be trusted. We also personally met with Thero in Sri Lanka, and he was equally convincing.  He had told us that he was educated in the U.S. at New York's Columbia University.

19.    We only recently learned through a news article that Edwards had been arrested and deported from the United Kingdom in or about May 2006 for forging Canadian checks totaling approximately CAN$102 Million.  He was also accused of fraudulently selling a railroad to an African nation and defrauding a Malaysian entity. These criminal activities not being found in background checks was bewildering.

20.    To further his deception on or about August 5, 2012 Edwards arrived in Albuquerque, New Mexico for a locations tour to meet with our project partner, a PhD systems engineer and professor who graduated from the U.S. Naval Academy; our New Mexico family attorney; our Certified Commercial Investment Member (CCIM) realtor in Santa Fe; a former

Santa Fe city planner; the New Mexico regional president of BBVA Compass Bank; a Colliers International real estate broker; a New Mexico State representative and other political and business owners for our projects. At that point in time all of these people believed Edwards and found him credible, which added to our confidence in having him as our financier and we continued to work with him.

### THE CITIES UPLIFTMENT PROGRAM

21.   On or about April 12, 2013 Edwards introduced us to a new program, for which he said that he was the project manager, being offered by the Federal Reserve Bank New York ("FRB") "to finance projects in depressed cities inside the USA with the objective of creating jobs in a manner that such financing is not a burden on the Federal Budget or the general public." Edwards provided us with an officially signed letterhead document from the FRB identifying the program as the Cities Upliftment Program ("CUP"). Moreover, Edwards told us that investor funds would be protected by sovereign guarantees as well as being "guaranteed" by the U.S. government.

22.   Edwards told us that by agreeing to assist with this humanitarian program, we would be able to fund our own development projects in New Mexico, another Southeastern location, Malta, and England as well as our own humanitarian endeavors. Michael's initial focus at that time was on photo galleries commencing with London, UK, Santa Fe, New Mexico, Dubai and then Sri Lanka. (*See* Exh. 7)

23.   We were completely blindsided by Edwards when we learned that the brilliantly conceived CUP scheme was fraudulently conceived and executed by him, who was described as the mastermind and architect in court documents following our New York Federal Indictment.

24.    Edwards was assisted by co-defendants Lester, Ho Fook Kee ("FK Ho") and many others not included in the indictment. We had no knowledge of who co-defendant Rachel Gendreau ("Gendreau") was. We were targeted and preyed upon by these individuals and were purposefully used as pawns in their global con game.

25.    We only found out after the Indictment that the CUP was the vehicle Edwards used for his theft of millions of dollars from a combination of citizens from the U.S., Singapore and China. Edwards was also assisted by family members, including his wife Purni, and her sister, Deepthika Jayakody Arachchilage ("Dee"), who endeared themselves to us while referring to us as their "brother" and "sister."

26.    Two of the many other individuals who assisted in the ruse were Edwards' legal counselors, Sri Lankan Romesh Karalliyadde ("Karalliyadde") and Britton Brian Richard Mayes Pearce ("Pearce"), who posed as FRB approved attorneys with supporting documents supplied to us and our project team.

27.    In or about April 2013, we introduced Edwards to fellow New Mexican Frank Gallegos ("Gallegos"), who brought into CUP the Alamo Chapter of the Navajo Nation ("Alamo"). We were only "middle-men." In creating another rift by Edwards, Gallegos went behind our backs receiving over $106,000 in bribes from Edwards to aid in the providing of Alamo Sovereign Guarantees to investors. The president of the Alamo, Stanley Herrera, also received substantial bribes of near $150,000 from Edwards to sign the Guarantees. We were provided bank records in the _U.S. v Edwards_ case which support these claims.

28.    After the Alamo was brought into the program, Michael received an FRB document ("representation letter") on June 10, 2013 signed by Class A Director Richard L. Carrion Rexach ("Carrion Rexach") stating that Michael was "our  Representative for the State of New Mexico"

and the Alamo Chapter of the Navajo Nation followed by an FRB account establishment letter on June 28, 2013. (*See* Exh. 5)[6].  Michael was not an employee of the FRB nor was this ever stated to anyone.

29.   An Edwards' associate also posing as a Chartered Accountant, Mr. Martin Thorp ("Thorp") (mentioned in the representation letter at Exhibit B), then travelled to New Mexico on or about June 13, 2013 to meet with us and vouched that he had met with Carrion Rexach and FRB Chief Accounts Officer George Simpson[7] ("Simpson") in New York, knew about the CUP and was going to recommend it to his clients.

30.   In *U.S. v Edwards*, Michael saw evidence that Edwards bribed many people in efforts to promote his scheme and it became evident that Thorp was also paid by Edwards to lie to us in support of our belief in the legitimacy of the CUP.

31.   Michael also received in an email, directly from Simpson, a letter addressed to a prominent UK barrister confirming Michael's continuing authorization as the FRB's "Representative for the State of New Mexico." (*See* Exh. 8)

32.   Due to his naivete in finance, Michael created visual documents about the program to assist himself in understanding what was being offered.  He sent these to Edwards for review and approval to validate Michael's understanding of the program. Michael believed that  these documents were only for his use and not designed to be promulgated to Edwards', Lester's or other's potential investors. Furthermore, we never brought any investors into the CUP or into the 2016 Help the Homeless ("HTH") program.  Later, Michael found out that the documents were

---

[6]  This letter was not used to entice any potential investors. A copy of the document was kept at the offices of the Jacobs' private family attorney in New Mexico who believed that it was authentic. Edwards instructed Michael not to email the letter and potential investors would have had to contact the attorney for verification. Our attorney was never contacted.

[7]  Edwards told us that George Simpson was his FRB "handler" for the CUP and that they had worked together for 20 years. Edwards told Michael that Simpson was to be his "handler" as well, and Michael believed him to be authentic as Simpson and Michael had communications with each other.

used by Lester to solicit brokers and potential investors without Michael's knowledge, due to the former rift.

## SRI LANKA AND HONG KONG

33.   In October 2013, while we were visiting our grandchildren and staying at our son and wife's home near Boston, Massachusetts, Edwards called Michael on his cell phone and invited us to Sri Lanka for what was to be a two-week vacation. As we did not have disposable funds at the time, Edwards offered, and purchased one-way tickets while telling us he would pay for everything on the trip because of our friendship. While there, Edwards had us travel around Sri Lanka, staying at different residences and hotels. Dependent on Edwards, we ended up staying collectively in Sri Lanka for near four months. During this time, we had several unexpected business meetings arranged by Edwards.

34.   As it turned out, we were both misled and betrayed by Edwards, and today believe that we were invariably "kidnaped" as we were lured to Sri Lanka by his fraud… extrinsically, by misrepresentation and inducement. In other words we were both inveigled by this Svengali, while he continued to "hold us" and would not purchase return airline tickets.

35.   During this time period, Edwards surprised us when informed that we were to fly from Sri Lanka to Hong Kong for a November 11th meeting with a potential CUP investor. Michael believed his role would be as the authorized representative for the FRB, per the representation letter, to present the program with Edwards to the gentleman.

36.   On November 9th we were driven to the Colombo airport for an early morning flight to Hong Kong for a two-day stay at the Four Seasons Hotel. As usual we were given one-way tickets. That evening we had dinner with Edwards and his wife Purni.  He took possession of our passports as he needed them for the purchase of the return airline tickets, or so we were told.

37.   The next morning,  just prior to the investor meeting, Michael met with Edwards in the conference anteroom. Ruby was still dressing in their guest room and was not present. In the anteroom, Edwards placed a small pile of business cards on the table and said that Michael was authorized to be a "Michale Alix" ("Alix") at the meeting. This was a total surprise to Michael as he didn't know who Alix was. At that point Edwards showed Michael his "official" FRB identification card which looked like a military ID card with which Michael was familiar.

38.   Edwards told Michael that he would receive a similar card when he signed his commissions contract for his development funding at the FRB.  Edwards then told Michael that Simpson had authorized the use of the Alix card and then showed him Simpson's FRB business card[8]. To verify this and at Michael's request, Edwards then dialed Simpson's number on his cell phone and handed it to Michael. It was about 10:00 pm in New York.

39.   Michael spoke with a man who identified himself as Simpson and he specifically told him that Michael "was authorized to use the Alix name for CUP purposes because of certain unexplained circumstances. Michael was fully under the influence of Edwards, and as Simpson was his "handler," Michael was told that he should proceed as instructed.

40.   When Ruby arrived to attend the meeting, Edwards took her aside and told her that Simpson wanted Michael to use a different last name for this meeting.  Simpson was concerned that issues could be raised because we were fighting false claims in a New Mexico action (which were later dismissed).  This seemed logical to Ruby.

41.   The three of us then went into the actual conference room and waited for the potential investors. When investor Mr. Alexander Chang ("Mr. Chang") arrived, Edwards nodded approval, and we had a meeting for approximately one hour. We aver that Ruby was

---

[8]  Michael provided his defense attorney with Simpson's email address and asked that it be tracked. Nothing was done about this.

neither introduced as Michael's wife nor as an FRB employee, and did not speak at the meeting except for greetings.

42.   We then returned to Sri Lanka waiting for the investor's decision. We were left alone over the New Year holidays at one of Edwards' residences while we were told that Edwards and his wife had to take his sick mother to Singapore for medical treatment.  We found out later that this was yet another lie, and Edwards had returned to Hong Kong to sign forged papers with Mr. Chang for the CUP and then stole his money as well. And, Edwards was so convincing, as we found out later, that Mr. Chang had even agreed to be one of the official FRB attorneys.

43.   In the meantime, Edwards informed Michael and some of our personal  team members that Mr. Chang was not placing any funds into the CUP.  Again, we later found out that Mr. Chang had indeed invested his client's funds into CUP.

## THE CITIES UPIFTMENT PROGRAM CONTINUES

44.   Any of our involvement with Edwards was innocently designed to provide funding for our own projects which were focused on job creation. We were not interested in gross self-enrichment.  Our projects came first, and we would be paid accordingly with appropriate scheduled salaries as outlined in our business plan.  Ours was not a "get-rich-quick-scheme" and we live modestly.  It was our understanding that after a sum certain for the CUP had been raised by Edwards and his team of "brokers," we would then go to the FRB, sign a contract, receive United Nation issued passports, FRB identification cards and the commissions we received would be used for our projects.

45.   Had we known Edwards' programs were scams, we would not have worked with him nor would we have spent considerable amounts of our own funds to:

a. have Edwards meet with our development team members. (See ¶14 and 15 above)

b. travel to London to meet with a potential investor in our projects. The investor, an alleged client of Edwards and mistress of a Saudi prince, neither arrived for our meeting nor provided the funds.

c. organize with a real estate broker in Santa Fe and a real estate agent in London with the intent to purchase buildings for Michael's photo galleries.

d. travel to Hungary to discuss a deposit for a feature film. Edwards was supposed to meet us there to consummate the deal but did not arrive. In retrospect, we were fortunate this did not materialize as Edwards would have stolen the film company's money as well.

e. work with the Italian government's national public broadcasting company (RAI) to discuss funding and co-producing a feature film.

f. work with the country of Malta to build a film studio after receiving a funding commitment letter from Edwards.

g. have Michael use his highly valued Hollywood celebrity connections to raise money, through a horse-racing event, for new equipment at a Sri Lankan cancer center. We later found out that Edwards had purchased an ownership share of the Royal Turf Club with money that he had stolen.

h. have Edwards introduced to Gallegos and the Alamo.

i. sign several contracts with Edwards and his accomplices for our various projects.

j. allow Edwards and Lester to become involved with our New Mexico or our Alabama projects.

k. become involved with the purchase of a bank for our project funding, orchestrated by our financial manager Bellmore. We were flown to Dubai in August 2015 to meet with the investor.

46. According to Michael's sentencing submission ("sentencing submission") (See Response at Exhibit 3), the CUP and HTH schemes "were orchestrated by co-defendant Rienzie Edwards."

47. It is our understanding that Edwards and his cohorts devised the HTH scheme, without our knowledge, sometime during the first quarter of 2016. We were not aware of the

program and were only informed of its existence through evidence provided by the government during the pendency of *U.S. v. Edwards* (See ¶ 66 below).

48.   In February 2016 , we were flown to New York by Edwards and lodged in the Holiday Inn Hotel across the street from the FRB to await Edwards' arrival for the contract signing with Simpson. After three weeks we were told that there was additional work required and the contract signing would have to wait. We then returned to Albuquerque.

## KINGDOM TRUST ACCOUNT

49.   Per the sentencing submission for Michael, it states "(1) Jacobs acted largely at the direction of Edwards; (2) Jacobs did not fully understand the scope and structure of the fraudulent schemes; (3) did not organize the CUP or HTH scheme or exercise true decision-making authority; and (4) received a very small percentage of the fraudulent proceeds as the lion's share of which went to Edwards." (*See* Exh. 9)

50.   Thus, Michael was not a "major player" in these schemes which he did not become willingly nor knowingly involved.  This was contrary to the judge's openly prejudicial comments.

51.   Our SEC/FINRA financial manager Bellmore operated his own company called Trillion Capital, LLC ("TCLLC").  Kingdom was originally an account at a Pennsylvania Bank of America, set up and organized by Bellmore in or about January 2016, named Trillion Capital LLC/Kingdom Trust ("TCLLC/Kingdom"), and  designed to receive funds from Edwards' investor clients. Some of the initial funds were earmarked to be used in the purchase a U.S. bank which would, in turn, then be used for intake of CUP investor funds. Pearce was appointed by the FRB as CUP trustee for this account. (*See* Exh. 10 which we did not see until April 2016)

52.    At the eleventh hour, the funds for the bank purchase were not forthcoming. The Kingdom account at Bank of America ("BoA"), as referred to in this instant case, was suggested by Bellmore in or about November 2015 as a result of him being informed by Edwards of prospective funds arriving for the CUP to be specifically transferred to FRB authorized IOLTA accounts.

53.    We and our team were convinced this was a fully legitimate operation and we used our own personal funds to open the New Mexico Bank of America account at the direction of Bellmore. The first investor deposit did not arrive until in or about March 2016.  All transfers were to be made at the direction of Edwards, Karalliyadde, Pearce and a new accomplice in Shanghai named Ho Mei Mei Trindy ("Trindy"). Michael was not informed of the deposits until after the fact.

54.    In setting up the Kingdom account, Michael provided all the official documents regarding the CUP and the FRB to a Small Business Vice President at Bank of America, Danelle Brennan, who approved Kingdom's transactions. The account was further upgraded to *CashPro® Online Services,* that was overseen by a BoA Client Manager, Bill Lucy, and monitored through BoA's Global Commercial Treasury and Fulfillment Department, Jayna Leduc who was a Senior Client Fulfillment Analyst.  These individuals had the channels to verify the CUP and were aware of the reasons for the transfers.

55.    Moreover, Bellmore was described as the manager of Kingdom as evidenced by the government taped conversation with Lester and Gendreau. (*See* Exh. 11).  Prior to seeing this exhibit, we had no knowledge that Bellmore was working directly with Lester, Gendreau or even Edwards.

56.  Without informing us about the HTH program, Edwards told us that the investments were a new phase in the CUP, and we could again make arrangements to be in New York for our signing with the FRB.

57.  Trindy claimed that all of the investors providing funds to Kingdom were her personal clients – neither Michael nor Ruby had anything to do with soliciting any investors. Michael was later informed that now former associates James Wilson and Nick Toliver (the "brokers"), were the brokers who solicited the defendants in this instant case, along with Lester and Gendreau. The brokers were introduced by Michael to Edwards, and they began to work with Edwards behind our backs due another rift created by Edwards.  The brokers had not been in communication with Michael for more than a year due to Edwards' plan to keep us unaware of the existence of this scam.

58.  While Kingdom's bank account was in operation, we were informed and therefore believed that we were performing proper services to the clients of the CUP.  We neither had direct contact with any of the defendants or the investors nor did we solicit them.  We were satisfied that their investments were protected in IOLTA accounts and would yield the financial benefits as guaranteed by the FRB and Edwards and as approved by Bank of America

59.  With regard to the alleged memo line entry for a $1 million deposit by Defendant Black, as raised in the CFTC Response, Michael does not recall seeing any document that reflects this claim. (look for deposit)

## **INDICTMENT, INCARCERATION AND AFTERMATH**

60.  We were accused as accomplices under the same Indictment in _U.S. v. Edwards_. According to our court-appointed defense attorneys, the prosecution later realized and then admitted to them that we too were victims of Edwards.

61.   Michael asked his New York attorney for severance from the other defendants as the Indictment did not accurately specify with what actual crimes he was being charged. Michael's right to a fair trial was "compromised when evidence was admissible against only one defendant and is unfair to the other defendant(s)." Unfortunately, Michael's ineffective attorney never requested this action.

62.   We offered to cooperate and instructed our attorneys to inform the prosecution. However, the attorneys responded by telling us the government was not interested. We do not believe the government was ever told and therefore we were never given that opportunity. We were always very suspicious as to why the government would not be interested in additional information concerning Edwards and other unindicted parties involved.

63.   Following the approximately nine months for the prosecution to sort through tens of thousands of pages of evidence and having been held in custody during this time period, the Government would have owed us a considerable amount of money if the charges were dropped. Ruby was then released on a bond, which had previously been denied three times, and Michael continued to be held in custody. We assert that the charges should have been dropped when the prosecution realized we were victims.

64.   We did not have any funds to engage our own private attorneys. Had we been actually part of Edwards' ruse, we would have received and benefited in some manner from the misappropriated monies. Therefore, we did not have any other alternative but to be assigned court-appointed counsel. Neither of our attorneys provided anything but minimal representation and were ineffective at every level. We objected *ad infitinitum* against the accusations and conflicting sets of "facts" without our counsel either objecting or facilitating the correction of wrongful information.

65.   The two other co-defendants who had been apprehended in the NY Case, Lester and Gendreau, did use ill-gotten funds for their own private counsel and did solicit investors for both the CUP and the HTH programs.

66.   In the meantime, a Superseding Indictment was introduced adding three charges against the other NY Case defendants for the HTH program, but not against us. The prosecution then told our attorneys that they would drop all of the charges except one that they would pick. Michael, who was on multiple medications and still incarcerated, was heavily threatened to accept this offer.  If not, the prosecution told our attorneys that they would aggressively bring the case to trial with all the charges, even knowing that we were not guilty.  Thus, at the prosecution's selection, all but one charge was dropped, and they selected a false "conspiracy to impersonate an officer or employee of the United States." We hereby aver that we did not conspire with any scheme to impersonate or to steal money from anyone.

67.   In CFTC's Response at Exhibit 3, they refer to the sentencing submission which contained accusations, fabricated history and writings created prior to the all-but-one charge being dropped by the prosecution. Therefore, a good portion of information within the sentencing submission is inaccurate and leads the reader to the wrong conclusion. We requested of our counsel to correct these writings, but they never addressed any of our concerns.

68.   We never forged any documents although the sentencing submission makes a blanket unsubstantiated charge that "by which Jacobs and his co-defendants tricked victims into investing millions of dollars in the CUP scheme was the use of forged and counterfeit New York Fed documents and the impersonation of New York Fed officials." We have proof, and so did the prosecution, that there was never an opportunity taken by us to forge any documents as Edwards did that alone or with the assistance of named and un-named co-conspirators.  With regard to

"CUP marketing materials," Michael created outlines and charts of the CUP for his purposes to understand the concept only and not directly for soliciting purposes. Moreover, Michael neither created a document using FRB letterhead nor used the "official seal of the New York Fed."

69.    In the sentencing submission, we were falsely accused of assisting Edwards in the opening of "shell companies and bank accounts" to facilitate the CUP scheme. We refute this as we neither assisted Edwards with fraudulent shell companies nor the setting up of accounts to steal funds.  In the first example proffered by the prosecution, the fact is that Bellmore received money for Michael's photo galleries from FK Ho's client and forwarded the funds to our established bank account (since 2009) for filming and photography. At both Edwards and Dee's direction, the funds were transferred to the UK for the London gallery and subsequently stolen by Edwards and Dee.  Regarding the Kingdom example, see paragraph 52 supra. We relied upon Bellmore for financial advice.

70.    Therefore, we later learned that Edwards' sister-in-law Dee stole one of our companies and registered it in her name in the United Kingdom (See Exh. 12).  In a previous Notice (ECF #83 at Exh. B), we provided an FRB letter that we had received authorizing Pearce to accept funds for the CUP into what turned out to be the shell companies' "IOLTA" accounts to receive the funds with the intent to steal. We had nothing to do with setting up these accounts nor controlling them.

71.    A claim in the sentencing submission that a "back story" was falsely created is patently untrue.  Michael had one contract with Edwards and an addendum with Edwards/FK Ho for $14 million, to fund his photo galleries and Michael was pursuing real estate in both Santa Fe and London (See ¶ 22 above and Exh. 7). The second contract was between Kingdom and Spar Ystalyfera to fund our many projects (See Exh. 6). We were led to believe that some of the

Kingdom deposits were destined for our projects. The prosecution had possession of these exhibits.

72.   Furthermore, the sentencing submission makes an unfounded summation in that the "losses were reasonably foreseeable to Jacobs…because the victims wired funds directly to accounts controlled by Jacobs and Handler-Jacobs." We aver that losses were neither foreseen nor envisioned in that we, our team and BoA believed the guaranteed program to be real and authentic, and that investors would realize the gains as outlined to us by the FRB. What did become apparent later was that Edwards told different people different stories.

73.   On one hand, in Section B (page 3) of the sentencing submission, the prosecution claims that we helped to facilitate the HTH program and incorrectly lumps us in with Edwards and other co-defendants, yet on the other hand, in the following paragraph on Page 3, the prosecution clearly states that there was no evidence that we solicited any of the HTH investors (including the defendants in this instant case). However, they sought to label us as participants who had knowledge of the scheme. We did not have any knowledge of the HTH program as the prosecution clearly knew when we were not included in the Superseding Indictment thereby creating conflicting statements.

74.   The NY Case prosecution falsely states that just Edwards directed the funds out of Kingdom although they did not have proof of this sort of communication. The transfers were mostly directed by un-indicted co-conspirators Trindy and Pearce.

75.   In CFTC's Response at Exhibit 6, opposing counsel parroted the NY Case judge stating "there is no dispute that [Ruby] helped [Michael] perpetrate a massive fraud. As the judge and the prosecution were not provided with any rebuttals by either of our attorneys, their opinions are uninformed. There is a continued exaggeration that is pervasive in what was

provided by the prosecution without a shred of proof. In Hong Kong Ruby did not introduce

herself.  It appears that Edwards could have done that prior to the meeting. The prosecution

makes a blanket accusation that Ruby was involved in the creation of heretofore unknown shell

companies. Ruby was never involved in the transfer of any funds as Michael alone did this on-

line.  Moreover, Ruby neither participated in the submitting of alleged "false information" to

banks, nor did she "volunteer to pose as an assistant using a false name."

76.   The sentencing submission states "[t]herefore "Jacobs and his co-defendants

simply stole the  investors' money." This again is conclusatory in that there are conflicting

theories and accusations in these writings.  We did not plan to steal any money, nor did we steal

any money, which the prosecution admits same, and there was not forfeiture in the NY Case.

77.   In Section C of the sentencing submission, Page 12 (*See* Exh. 9), we were limited in

restitution to the CUP and not the HTH program. The document states that "[w]hile the HTH

victims ' losses are appropriately considered relevant conduct [of the Jacobses] … the Second

Circuit has held that restitution is not permitted under the MVRA [Mandatory Victim Restitution

Act] for loss caused by such relevant conduct."  Restitution against us was incorrect as the

prosecution used numbers from the HTH program rather than CUP victims.  This instant case

only involves HTH investments.

78.   In conclusion, we again aver that Kingdom (a) neither had any profits nor "ill-

gotten gains"; (b) operated in the complete belief that services provided were lawful;  and (c) any

remaining Kingdom funds were seized by a NY Case previous court order as already noticed to

the Court.

**AFFIANTS FURTHER SAYETH NAUGHT**

Affiant Michael Jacobs, being first duly sworn, upon his oath, deposes and states that he has read *Affidavit of Michael Jacobs and Ruby Handler Jacobs* that he knows and understands the contents thereof, and that the same is true and correct to the best of his knowledge, information, and belief.

Dated: 12/06/2021

By: _____
Michael Jacobs
*All Rights Reserved*

_____
Notary Public   MY Commission # 1101278
My Commission expires: 04/05/2025

Affiant Ruby Handler Jacobs, being first duly sworn, upon his oath, deposes and states that she has read *Affidavit of Michael Jacobs and Ruby Handler Jacobs* that she knows and understands the contents thereof, and that the same is true and correct to the best of her knowledge, information, and belief.

Dated: 12/06/2021

By: Ruby Handler Jacobs
Ruby Handler Jacobs
*All Rights Reserved*

_____
Notary Public   MY COMMISSION #1101278
My Commission expires: 04/05/2025

Registered Mail #RF 157 442 683 US

EXHIBIT 1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

**COMMODITY FUTURES TRADING COMMISSION ,**

V.

**FINANCIAL TREE , ET AL. ,**

# SEALED

## SUMMONS IN A CIVIL CASE

CASE NO:  2:20-CV-01184-TLN-AC *SEALED*

TO:  **Herbert Caswell, JMC Industries LLC, Kingdom Trust LLC, Landes Capital Management, LLC, Anne Mancuso, Tyler Mancuso, Suise Group (USA) LLC**
Defendant's Address:

**Kingdom Trust**
   c/o Rudy Handler Jacobs
   800 NE Calle Divina
   Albuquerque, NM 87113

**YOU ARE HEREBY SUMMONED**

**Anthony Biagioli, GOVT**
**Commodity Futures Tr**
**4900 Main Street, Suite**
**Kansas City, MO 94112**

an answering the complaint which is
service of this summons on you, exclu.
default will be taken against you for the r
on the parties to this action must be filed with
of time after service.



... s after
so, judgment by
answer that you serve
a reasonable period

Refusal for cause Without Dishonor

UCC 3-501, 207 (a) (c)

**KEITH HOLLAND**

CLERK

**/s/  A. Benson**

(By) DEPUTY CLERK

EXHIBIT 2

# USPS Tracking®

FAQs >

Track Another Package  +

Get the free Informed Delivery® feature to receive automated notifications on your packages

**Learn More**

(https://reg.usps.com/xsell?
app=UspsTools&ref=homepageBanner&appURL=https%3A%2F%2Finformeddelivery.usps.com/box/pages/intro/st

**Tracking Number:** RF157442683US

Remove ✕

Your item was delivered to the front desk, reception area, or mail room at 10:45 am on July 17, 2020 in KANSAS CITY, MO 64112.

## ⊘ Delivered

July 17, 2020 at 10:45 am
Delivered, Front Desk/Reception/Mail Room
KANSAS CITY, MO 64112

**Get Updates** ⌄

Feedback

| Text & Email Updates | ⌄ |
|---|---|

| Tracking History | ⌄ |
|---|---|

| Product Information | ⌄ |
|---|---|

See Less ⌃

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X Lus 1217 C19   ☐ Agent ☐ Addressee<br>B. Received by (Printed Name)   C. Date of Delivery |
| 1. Article Addressed to:<br><br>*Anthony Biagioli, GOVT Commodity Futures Trading Commission 4900 Main Street, Suite 500 Kansas City, MO 94112* | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No |



| | 3. Service Type | |
|---|---|---|
| | ☐ Adult Signature | ☐ Priority Mail Express® |
| | ☐ Adult Signature Restricted Delivery | ☒ Registered Mail™ |
| | ☐ Certified Mail® | ☐ Registered Mail Restricted Delivery |
| | ☐ Certified Mail Restricted Delivery | ☐ Return Receipt for Merchandise |
| | ☐ Collect on Delivery | ☐ Signature Confirmation™ |
| | ☐ Collect on Delivery Restricted Delivery | ☐ Signature Confirmation Restricted Delivery |
| | ☐ Restricted Delivery | |

9590 9402 4007 8079 7849 36

RF 157 442 683 US

KF 101 442 683 US

(over $500)

PS Form 3811, July 2015 PSN 7530-02-000-9053     Domestic Return Receipt

---

**USPS TRACKING #**

9590 9402 4007 8079 7849 36

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

*KINGDOM TRUST*
*C/o Michael Jacobs*
*Ruby Handler Jacobs*
*800 Calle Divina NE*
*Albuquerque, New Mexico*
*[ 87113 ]*

# COMMODITY FUTURES TRADING COMMISSION

4900 Main Street, Suite 500, Kansas City, Missouri 64112
Telephone: (816) 960-7700
Facsimile: (816) 960-7751
www.cftc.gov

Division of
Enforcement

**ANTHONY BIAGIOLI**
TRIAL ATTORNEY
(816) 960-7722
abiagioli@cftc.gov

July 14, 2020

**VIA UPS Overnight**

Michael Jacobs
Ruby Jacobs
800 NE Calle Divina
Albuquerque, New Mexico 87113

*Re:*   **CFTC v. Financial Tree et al.**

Dear Mr. and Mrs. Jacobs:

The Court's statutory restraining [...]
Kingdom Trust LLC ("Kingdom") [...]
collection efforts.  We will need [...]
within the following windows

- Thursday, July 16
- Friday, July 17

In addition, as [...]  [...] der against
Kingdom.  The [...]  [...] unction for the
remainder of th[...]  [...] on Kingdom's behalf,
without prejudice [...]  [...]. If you are amenable, we
can send a draft for you[...]

Please contact me via pho[...]

[...]rely,

*Anthony C Biagioli*

Anthony Biagioli
Trial Attorney
Division of Enforcement

[Handwritten annotations: "Refused Without Dishonor", "RF 157 442 414 US", "Refused RF 157 442 414 US", "501, 207 (a) (c)", "501, 207 (a) (c)", "UCC"]

[Handwritten on USPS Certificate of Mailing label: "Michael Jacobs Ruby Jacobs C/o 800 Calle Divina NE Albuquerque New Mexico I 87113 - 1  Anthony Biagioli Commodity Futures Trading Commission 4900 Main Street Suite 500 Kansas City Missouri 64112"]

100% Recycled fiber
80% Post-Consumer

REGISTERED MAIL #RF 157 442 444 US

UPS Worldwide Express
UPS 2nd Day Air

ANTHONY BIAGIOLI
816-960-7722
FTC
1155 21ST NW ST
WASHINGTON DC 20581

0.0 LBS       LTR          1 OF 1

SHIP TO:
MICHAEL AND RUBY JACOBS
800 NE CALLE DIVINA
ALBUQUERQUE  NM 87113-1281

NM 871 9-01

UPS NEXT DAY AIR                      1

TRACKING #: 1Z A47 96A 13 9217 2745

BILLING: P/P

Refusal for Cause without Dishonor 3-501, d-207 (2)(c)

MICHAEL AND RUBY JACOBS
800 CALLE DIVINA NE
ALBUQUERQUE NM 87118

P.O. BOX
KRYB – 1083
8: TBROWN  7: 30E

International Shipping Notice — Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.

Serving you for more than 100 years
United Parcel Service.



010195103 4/14 PKC Unified I

# USPS Tracking®

FAQs >

## Track Another Package ✛

Get the free Informed Delivery® feature to receive
automated notifications on your packages

**Learn More**

(https://reg.usps.com/xsell?
app=U psTools&ref=homepageBanner&appURL=https%3A%2F%2Finformeddelivery.usps.com/box/pages/intro/st

**Tracking Number:** RF157442414US

Remove ✕

Your item was delivered to the front desk, reception area, or mail room at 11:06 am on July 22, 2020 in KANSAS CITY, MO 64112.

## ✔ Delivered

July 22, 2020 at 11:06 am
Delivered, Front Desk/Reception/Mail Room
KANSAS CITY, MO 64112

**Get Updates** ⌄

---

| Text & Email Updates | ⌄ |
|---|---|

| Tracking History | ⌄ |
|---|---|

| Product Information | ⌄ |
|---|---|

**See Less** ⌃

Feedback



EXHIBIT
5

# FEDERAL RESERVE BANK *of* NEW YORK

33 LIBERTY STREET, NEW YORK, NY 10045-0001

**DOCUMENT NO 14/MJ/13**

10th June 2013

Mr. Michael Jacques Jacobs,
800 Calle Divina NE,
Albuquerque,
NM 87113.

Dear Sir,

## REPRESENTATION ARRANGEMENTS

This is to authorize you to conduct talks with Mr. Martin Thorp, who is currently being considered as a candidate to carry out freelance work for our organization. We also hereby confirm your continued relationship with us as our Representative for the State of New Mexico.

We wish you the very best of luck in your endeavors to develop the Cities and Indian Nations, in New Mexico, especially the Alamo Indian Nation and pledge our continued support for your work.

Yours truly,

Richard L. Carrión Rexach
Director (Class A)

. **RLCR/kf**

# PROJECT DEVELOPMENT AGREEMENT

*EXHIBIT 6*

*SEALED*

This Investment Agreement (the "Agreement") is effective from the date set out below;

**BETWEEN:**     **Kingdom Trust LLC** (hereinafter referred to as Party 1) located at:

7300, Yellowstone Road, Suite 10, Cheyenne WY 82009.

**AND:**     **Spar Ystalyfera** (hereinafter referred to as Party 2) located at:

47-49 Commercial Street, Ystalyfera, Swansea, SA9 2HS

Party 1 and Party 2 enter into this Agreement, herein after collectively referred to as the "The Parties" for Property Development Projects aimed at earning profits by investing into the Hospitality Industry, Real Estate and any other investment in and outside the United Kingdom.

Party 1 hereby certifies that he has no legal or other impediments to enter into this agreement.

**WITNESSETH:**

WHEREAS, the parties are desirous of executing a Project Development Agreement, under the laws of The United Kingdom and Great Britton, by execution of this Agreement for the purposes set forth herein and are desirous of fixing and defining between themselves their respective responsibilities, interests, and liabilities in connection with the Development of the afore mentioned Projects; and

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained, the Parties herein agree to constitute themselves as Party 1 and Party 2 for the purposes afore mentioned, and intending to be legally bound hereby, the parties hereto, after first being duly sworn, do covenant, agree and certify as follows:

## 1. DEFINITIONS

**"Affiliate"** shall refer to (i) any person directly or indirectly controlling, controlled by or under common control with another person, (ii) any person owning or controlling 10% or more of the outstanding voting securities of such other person, (iii) any officer, director or other partner of such person and (iv) if such other person is an officer, director, joint Venturer or partner, any business or entity for which such person acts in any such capacity.

**"Investors"** shall refer to Party 1 and any successor(s) as may be designated and admitted to the Venture.

**"Internal Revenue Code", "Code"** or **"I.R.C."** shall refer to the current and applicable Internal Revenue Code even though, Party 2 certifies that Profits resulting from the transactions are taxable in the country where the projects are located.

**"Net Profits "** means the income from the various Investments after Local Taxation and Depreciation.

**"Project"** shall refer to the projects undertaken by Party 2 into which the Investments are made by Party 1 as described in This agreement.

## 2. PARTY 1

Project Development Agreement

Party 1

Party 2

1. Party 1 warrants that he has no legal impediments to engage with Party 2 in Project Development transactions.

2. Party 1 warrants that his interest is only in Jointly Investing and Developing Projects in the Hospitality, and Real Estate Industries as discussed with Party 2 for the moment.

3. Party 1 warrants that any investment funds are clean and clear and legally earned.

3. **PARTY 2**

1. Party 2 warrants that he has no legal impediments to act as Joint Developer and to receive Party 1's investments and apply them in the Hospitality, and Real Estate Industries.

2. Party 2 is fully authorized to appoint Attorney's and Lawyers, to develop such projects or engage in any legal work that maybe necessary for the development or running of the project.

3. Party 2 has presented Joint Investment opportunities to Party 1 which Party 2 has accepted as viable.

4. Though Party 2 is authorized to sell dispose of such Projects Party 2 requires the approval of Party 1 in order to do so.

5. Party 2 will reinvest such Capital and profits in the event the original investments are liquidated or sold. Investments made in other regions will be remitted back to Party 1 in the event of liquidating such Investments.

4. **REMUNERATION**

1. Party 1 and Party 2 shall share any profits or losses from such Projects equally or Prorata to the Capital introduced by each party.

2. Party 1 has the right to leave his share of profits to accumulate in the Project company for reinvestment at a future date.

3. The Parties Have Retained Ernest and Young to monitor the usage of Investor funds and to prepare regular reports for the parties.

4. Ernest and Young will also estimate the taxes payable by the various projects.

5. **TERM**

The term of this agreement shall commence as of the date hereof and shall terminate in 10 (Ten) years from the date here of unless extended in writing. This agreement maybe dissolved upon the earliest to occur of:

(i)   The unanimous agreement to terminate by the parties
(ii)  The order of a court of competent jurisdiction proving beyond any reasonable doubt that the Parties have been involved in Drug Trafficking, Terrorism, smuggling of weapons or any other Criminal Act.
(iii) This agreement is renewable at the wish of both parties.

**Page 2 of 4**

Project Development Agreement

Party 1

Party 2

### 6. LOSSES

The Parties agree that any losses will be borne by the parties equally or Prorata to the Investments made into the projects by the parties.

### 7. INDEMNITIES

Party 2 hereby Indemnifies Party 1 that;

1. He will at all times protect the confidentiality of this transaction and will not show this contract to ANYBODY under any circumstances.

2. That he will not utilize profits earned from these transactions for Drugs, Weapons, Terrorism or any other criminal acts.

Party 2 also agrees that if it is proven in a court of law that Party 2 has breached confidentiality or that he has been involved in Drugs, Weapons, Terrorism or any other criminal acts, Party 1 has the right to confiscate all profits due to Party 2 and terminate this contract forthwith.

### 8. BANK ACCOUNTS

### 1. APPOINTMENTS DEPOSITS

Each Project will establish separate Bank account. Party 2 has the right to effect transfers between Project accounts in depending on the need for funds.

### 2. WITHDRAWALS

Party 2 has the authority to withdraw funds from Project Bank accounts to carry out Project Development activities or for day to day running of the projects. These expenses will be regularly reported by Ernest and Young.

### 3. MULTIPLE ACCOUNTS

Party 2 is allowed to maintain by itself or appoint lawyers to maintain Multiple Bank accounts on behalf of Projects undertaken by the Parties.

### 9. RESOLUTION OF DISPUTES

All disputes arising out of this Agreement between the Parties that is not resolvable by good faith negotiations by the same, shall be filed in a Court of Law in England or Wales.

### 10. OTHER PROVISIONS

This agreement constitutes the entire agreement of the parties and may not be altered, unless the same is agreed upon in writing signed and acknowledged by the parties. This agreement is binding upon the heirs, court appointed representatives, assigns, and successors of the parties.

### 11. Governing Law

This agreement shall be governed and construed by the laws of England and Wales.

IN WITNESS WHEREOF, each party to this agreement has caused it to be executed in original on the date indicated below.

**Page 8 of 4**

Project Development Agreement

Party 1.................

Party 2.................

PARTY 1

Michael Jacobs

Kingdom Trust LLC,
Passport #: 46935189

PARTY 2

Sivakumar Poologasundaram
Spar Ystalyfera
47-49 Commercial Street,
Ystalyfera,
Swansea,
SA9 2HS
Passport No 525778850

14 June 2016
Date

14 June 2016
Date

Project Development Agreement
Party 1

Party 2



# London

**SOUTH MOLTON STREET**
**LONDON W1**
**MAYFAIR**

EXHIBIT 7

Leasehold: £160,000 per annum

My Side of Starlight

Since 1969

KIETH MOON DIED

the Michael Jacobs
Photographic Collection

THE FUTURE HOME OF THE

**Michael Jacobs Photographic Collection**

ONE PHOTOGRAPHER
**45 YEARS OF EXTRAORDINARY IMAGERY**

LONDON IS A CROWN JEWEL IN THE WORLD OF ART, USUALLY RATING WITHIN THE TOP FIVE CITIES IN THE WORLD. THIS COMMERCIAL PROPERTY IS LOCATED WITHIN LONDON'S TRENDY WEST END, THE MAYFAIR DISTRICT. BUILT IN THE MID-18TH CENTURY, SOUTH MOLTON STREET IS LINED WITH FORMER GEORGIAN TERRACED HOUSES AND HAS BEEN TRANSFORMED INTO A PEDESTRIAN SHOPPING PRECINCT. THE 5000 SQ FT FIVE STOREY BUILDING, AND BASEMENT, INCLUDES A BALLROOM AND RESIDENTIAL FLATS ON THE UPPER FLOORS.

**Molton House:**  The 5000 sq ft building distributed over the basement, ground floor, first, second, third and fourth floors, has been recently closed and is currently vacant.





Molton House sits at the gateway of one of Mayfair's most fashionable streets and formerly housed a trendy members only four-floor club, restaurant and nightclub as well as a ballroom. The upper floors contain several flats that would accommodate the new owner while in London.  The listing agent's advert states: "Prime Mayfair building Lease for Sale – 19 Years Renewable Lease Remaining – Rent £160,000 per annum. Available with full vacant possession."

**Why choose Mayfair:**  Gone are the days when London's exclusive Mayfair postcode was reserved for retirees – now the west London zone has turned into a "resort" for 20- and 30-somethings, many of whom hail from overseas.

Nearly 60 per cent of people who live in Mayfair are aged under 44, with more than half of residences consisting of singletons. Typical household "profiles" say that the most common professions are bankers; wealth managers, commodity brokers, young business owners; advertising directors and students from ultra-wealthy families. More than 60 per cent of Mayfair residents come from overseas, up from 49 per cent in 2001. A large proportion of these are "staycation residents" who visit London just two or three times a year, with just 40 per cent fitting the "resident Anglophiles" category.

The findings of a new report by real estate agents claims the area should now be seen as "hip and cool" instead of the "staid and stuffy" view of the past.  The changing face of Mayfair is affecting the interior as well as the exterior – with new restaurants and bars popping up - as the younger population seeks contemporary furniture and artwork instead of old masters. (*Source: Wetherells*)



South Molton Street is located adjacent to Oxford Street, London's busiest shopping thoroughfare and at this junction lies the Bond Street Underground Station, which will benefit from the arrival of **Crossrail** services in 2018 and its influx of additional visitors to the area.  Within a few blocks are international auction houses such as Bonhams, Christies and Sothebys.

**THE MICHAEL JACOBS PHOTOGRAPHIC COLLECTION** is comprised of over two million images with all copyrights retained by, Michael, the creator.   Michael has been approached by several large photo agencies and has been told that he has the largest private collection of negatives, transparencies and prints owned by the photographer who captured them.

London-born to British parents, Michael has had great fortune in seeing the world as only a "gypsy" can.  In fact, that was his nickname as a Combat Camera photojournalist in the U.S. Navy during the Vietnam War. In the mid 1970s Michael returned to London and plied the sidewalks of Fleet Street working generally as a freelance ("casual casual") news photographer for the national newspapers and magazines. When 1980 arrived, at the insistence of several Fleet Street picture editors who wanted first hand Hollywood photos, Michael moved to Hollywood and excelled in snapping Tinseltown. Now he is coming back home with his collection... and the rest will be photojournalistic history.







CANYON
ROAD

THE FUTURE HOME OF THE

**Michael Jacobs Photographic Collection**

ONE PHOTOGRAPHER
**45 YEARS OF EXTRAORDINARY IMAGING**
THIS IS A CROWN JEWEL OF COMMERCIAL PROPERTY IN SANTA FE,
HISTORICALLY AT THE APEX OF THE WORLD'S ART CITIES.
CANYON ROAD IS THE HOME TO ART IN SANTA FE. THE THREE
BUILDING COMPOUND ALSO INCLUDES A LARGE REAR PATIO AND
PARKING FOR 20 CARS.

US$4,650,000

My Side of
Starlight



# FEDERAL RESERVE BANK of NEW YORK

33 LIBERTY STREET, NEW YORK, NY 10045-0001

**DOCUMENT NO 28/MJ/13**

24th July 2013

The Rt Hon Sir Desmond de Silva PC QC,
Argent Chambers,
5 Bell Yard,
London WC2A 2JR,
United Kingdom.

Dear Sir,

## REPRESENTATION AND ESCROW ARRANGEMENTS

This is to confirm Mr. Michael Jacques Jacobs, of 800 Calle Divina NE, Albuquerque, NM 87113 is authorized to conduct talks with potential investors in the Cities Upliftment Program Phase III. We also hereby confirm his continued relationship with us as our Representative for the State of New Mexico.

We wish you, in your position as the Account Signatory and Escrow agent for Icarus Rising LLC account No 034793113128 at our affiliate Bank Pan Asia Bank, Colombo Sri Lanka, and Mr. Jacobs in his position as our Representative for the State of New Mexico the very best of luck in your endeavors to develop the Cities and Indian Nations, in the State of New Mexico and pledge our continued support for your joint work in this regard.

Yours truly,

Richard L. Carrión Rexach
Director (Class A)

RLCR/lm

T  212.720.5000    F  212.720.6767    E  general.info@ny.frb.org  |  W  www.newyorkfed.org

at a BOP facility, and do not mitigate Jacobs's culpability to a degree not already encompassed by the Guidelines calculation, they do not support the significantly below-Guidelines sentence that Jacobs requests.

To the extent that Jacobs argues that a downward variance is warranted by his lesser role in the offense because he acted largely at the direction of Edwards, this factor was also already taken into account by the minor role adjustment, pursuant to U.S.S.G. § 3B1.2(b), to which the Government agreed as part of the plea agreement. (PSR ¶ 65). Section 3B1.2(b) of the Guidelines provides for a two-level decrease in offense level where the defendant was a "minor participant" in the criminal activity. Here, Jacobs was determined to be a minor participant in the CUP and HTH schemes, particularly in comparison to Edwards, given that (1) Jacobs acted largely at the direction of Edwards, (2) did not fully understand the scope and structure of the fraudulent schemes, (3) did not organize the CUP or HTH scheme or exercise true decision-making authority, and (4) received a very small percentage of the fraudulent proceeds, the lion's share of which went to Edwards. Because the minor role adjustment adequately accounts for the fact that Jacobs's lesser culpability, no further downward variance below the Guidelines range is warranted.

### C. Restitution

The Government requests that, pursuant to the Mandatory Victim Restitution Act ("MVRA"), *see* 18 U.S.C. § 3663A, the Court enter an Order of Restitution directing Jacobs to pay $13 million in restitution to the eight victims of the CUP fraud scheme whose losses were reasonably foreseeable to Jacobs. *See* 18 U.S.C. § 3663A(a)(1). Because a "victim" under the MVRA is limited to a "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered," *id.* § 3663A(a)(2), the Government does not seek restitution from Jacobs for the victims of the HTH scheme. Jacobs pleaded guilty to Count Five

11



FEDERAL RESERVE BANK of NEW YORK

33 LIBERTY STREET, NEW YORK, NY 10045-0001

OUR REF: S⬛⬛⬛⬛⬛

29ᵗʰ January 2015

Mr. Brian Pearce,
946 Great Plain Avenue,
Suite 125,
Needham, MA 02492-3030,
United States of America.

Dear Sir,

**APPOINTMENT AS TRUSTEE FOR CUP 2015/2016 MIDDLE EAST/AFRICA**

We are happy to advise that you have been appointed trustee for Middle East and Africa for Cities Upliftment Program 2015 as well as 2016. A trust account has been established for you to receive funds and produce proof of funds for the above program.

| BANK: | Bank of America |
|---|---|
| ADDRESS: | 625 W. Deklab Pike, Suite 100 King of Prussia, PA 19406 |
| BANK OFFICER: | ⬛⬛⬛ |
| BANK OFFICER PHONE (MAIN): | ⬛⬛⬛ |
| ACCOUNT NAME: | TCLLC Kingdom Trust |
| ACCOUNT SIGNATORY: | Brian Pearce |
| ACCOUNT NUMBER: | ⬛⬛⬛ |
| DEPOSIT AMOUNT: | ⬛⬛⬛ |
| BANK SWIFT BIC: | BOFAUS3N |
| BANK SWIFT WITH EUROCLEAR PARTICIPANT CODE: | BOFAUS3N 91782 |
| | |
| *If needed* | |
| BANK IBAN (wire): FEDWIRE | 026009593 |

Your specific duties are as follows;

(a). You are hereby appointed our agent and custodian to hold and refund investment funds deposited with you, back to the Investor's originating bank account on first demand or completion of the program.

(b) You are prohibited from disbursing funds to any Individual, party, institution, authority, corporation or Government, other than to the originating account of the Investor.



DOCUMENT REGISTRATION NO ⬛⬛⬛⬛⬛      Page 1/1

T 2⬛⬛⬛⬛⬛⬛⬛⬛⬛fed.org



**UNCLASSIFIED**

File Number: 318B-LA-5331072-INV29
Disc Number: 1D1 02292016_125608

| | | |
|---|---|---|
| 1 | TJ: | I'd like to talk Mr. Bellmore who's on the account that I'm sending my money to. |
| 2 | | |
| 3 | LL: | **Mr. Bellmore is only---is only the Manager of the---of the Kingdom Trust account** |
| 4 | | that has been established for this. Mr. Bellmore does not have anything to do with |
| 5 | | this other than the fact that [UI]; it is Mr. Pearce who is the Trustee who is signing |
| 6 | | your contract as Trustee. |
| 7 | | |
| 8 | R LNU: | Why don't you call Kingdom Trust and ask them what they do in order [UI] |
| 9 | | |
| 10 | LL: | [OV] No, no, no [OV] |
| 11 | | |
| 12 | R LNU: | [OV] to take care of [UI] |
| 13 | | |
| 14 | LL: | [OV] they want...Kingdom---Kingdom Trust won't talk to him either. |
| 15 | | |
| 16 | R LNU: | But I'm saying, he can call there and ask him how they do their D.D., how they |
| 17 | | do their compliance and obtain their trust account. |
| 18 | | |
| 19 | LL: | No, uh, Rachel. |
| 20 | | |
| 21 | R LNU: | [OV] but we know. |
| 22 | | |
| 23 | LL: | [OV] Rachel, Rachel, you're just...you're...that's not gonna work. |
| 24 | | |
| 25 | TJ: | [OV] [OV] |
| 26 | | |
| 27 | LL: | [OV] Okay? This transaction is "highly confidential"; it..     it even says in the |
| 28 | | transactional document [OV] |
| 29 | | |
| 30 | [Background noise] | |
| 31 | | |
| 32 | LL: | [OV] that Mr. ▮▮▮▮ got; that "he may not disclose this document to anyone |
| 33 | | unless a quartered by a court". |
| 34 | | |
| 35 | [Background noise] | |
| 36 | | |
| 37 | LL: | That is how confidential it is and they mean it! Now, if---if...uh---uh...I...I'm |
| 38 | | lost. I thought you were in...you were suppose to be paid tomorrow. Now---now |
| 39 | | you're tellin' me you can't do it because you need to talk to a Trustee when you |
| 40 | | know you're protected by the law and I don't understand that; and I wish---I wish |
| 41 | | you had [OV] |
| 42 | | |
| 43 | TJ: | [OV] Well, being protected---being [OV] |
| 44 | | |

8
**UNCLASSIFIED**

001308

EXHIBIT
12

## Domain Information for Shopper ID 93471539

STOLEN

| | |
|---|---|
| Shopper ID: | 93471539 |
| Domain Name: | MFFC.CO |
| Registrar: | GoDaddy.com, LLC |
| Status: | Active |
| Name Servers: | |
| Auto Renew: | |
| Renew Period: | |

### Registrant Contact

| | |
|---|---|
| Name: | Deepthika Jayakody |
| Company: | |
| Email: | d.jayakody@outlook.com |
| Address 1: | 1 Moxon House |
| Address 2: | Moxon Street |
| City: | London |
| State/Province: | N/A |
| Postal Code: | W1U 4EY |
| Country: | United Kingdom |
| Phone: | +44.7904615256 |
| Fax: | |
| Modify Time: | 11/17/2014 7:23:41 AM |

### Technical Contact

| | |
|---|---|
| Name: | Deepthika Jayakody |
| Company: | |
| Email: | d.jayakody@outlook.com |
| Address 1: | 1 Moxon House |
| Address 2: | Moxon Street |
| City: | London |
| State/Province: | N/A |
| Postal Code: | W1U 4EY |
| Country: | United Kingdom |
| Phone: | +44.7904615256 |
| Fax: | |
| Modify Time: | 11/17/2014 7:23:41 AM |

### Administrative Contact

| | |
|---|---|
| Name: | Deepthika Jayakody |
| Company: | |
| Email: | d.jayakody@outlook.com |
| Address 1: | 1 Moxon House |
| Address 2: | Moxon Street |
| City: | London |
| State/Province: | N/A |
| Postal Code: | W1U 4EY |
| Country: | United Kingdom |
| Phone: | +44.7904615256 |
| Fax: | |
| Modify Time: | 11/17/2014 7:23:41 AM |

### Billing Contact

| | |
|---|---|
| Name: | Deepthika Jayakody |
| Company: | |
| Email: | d.jayakody@outlook.com |
| Address 1: | 1 Moxon House |
| Address 2: | Moxon Street |
| City: | London |
| State/Province: | N/A |
| Postal Code: | W1U 4EY |
| Country: | United Kingdom |
| Phone: | +44.7904615256 |
| Fax: | |
| Modify Time: | 11/17/2014 7:23:41 AM |

015586

 Gmail

 EXHIBIT 13

## Kingdom Trust - Discussion with CFTC

**Biagioli, Anthony** <ABiagioli@cftc.gov>                                           Tue, Sep 8, 2020 at 5:32 AM
To: Michael Jacobs <michael.mjphoto@gmail.com>
Cc: "Robinson, Elsie" <ERobinson@cftc.gov>

Mr. Jacobs,


We omitted Kingdom, and you and Mrs. Jacobs, from the motion for contempt based on your representation that you would timely provide the requested information, as required by the Preliminary Injunction. Please provide the information discussed below **by the end of the day today, Tuesday September 8**. As discussed, our goal is to avoid filing a contempt motion, and we have sought to be as accommodating as possible to avoid doing so. Please let me know as early as possible today if there are any issues. Thank you in advance. Kind regards,

[Quoted text hidden]