1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    COMMODITY FUTURES TRADING                No.  2:20-cv-01184 TLN AC
      COMMISSION,
12
                      Plaintiff,
13                                             FINDINGS AND RECOMMENDATIONS
            v.
14
      FINANCIAL TREE dba FINANCIAL
15    TREE TRUST, et al.,

16                    Defendants.

17

18          This matter is before the Court on plaintiff Commodity Futures Trading Commission's

19    ("CFTC" or "Commission") Motion for Issuance of an Order for Final Judgment of Default,

20    Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief

21    ("Motion") against Defendants Financial Tree ("Financial Tree"), Financial Solution Group

22    ("Financial Solution"), New Money Advisors, LLC ("New Money"), The Law Firm of John

23    Glenn, P.C. ("Glenn Law Firm"), John D. Black ("Black"), Christopher Mancuso ("Mancuso"),

24    Joseph Tufo ("Tufo"), and John P. Glenn ("Glenn," and together with the Glenn Law Firm, the

25    "Glenn Defendants") (collectively, "Defendants"); and Relief Defendants Suisse Group (USA)

26    LLC ("Suisse Group"), JMC Industries LLC ("JMC"), Landes Capital Management, LLC

27    ("Landes"), Kingdom Trust LLC ("Kingdom"), Herbert Caswell ("Caswell"), Anne Mancuso

28    ("Anne Mancuso"), and Tyler Mancuso ("Tyler Mancuso") (collectively, "Relief Defendants,"

                                              1

and together with Defendants, the "Parties").  Plaintiff asserts that other than the Black and the Glenn Defendants, who appeared in this action solely to litigate bankruptcy stay and/or default-related issues but ultimately defaulted (ECF Nos. 111, 122) the defendants have each failed to appear.

Defendants John Glenn and the Law Firm from John Glenn P.C. filed a notice of intent to default (ECF No. 109) and filed a statement of non-opposition to the pending motion (ECF No. 127).  Two non-parties, acting in pro se, filed a "notice" in response to the motion for default judgment, purportedly on behalf of defendant Kingdom Trust LLC.  ECF No. 128.

The undersigned issues findings and recommendations on this motion pursuant to Local Rule 302(c)(19).

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.  Procedural History

On June 15, 2020, the CFTC filed a Complaint charging the Defendants with violating Sections 4b(a)(2)(A)-(C), 4c(b), 4k(2), 4m(1), 4o(1)(A)-(B), and 2(c)(2)(C)(iii)(I)(cc) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6c(b), 6k(2), 6m(1), 6o(1)(A)-(B), and 2(c)(2)(C)(iii)(I)(cc) (2018), and Commission Regulations ("Regulations") 4.20(a)(1), (b)-(c), 4.21, 4.22, 5.2(b)(1)-(3), 5.3(a)(2), and 32.4, 17 C.F.R. §§ 4.20(a)(1), (b)-(c), 4.21, 4.22, 5.2(b)(1)-(3), 5.3(a)(2), and 32.4 (2021).  ECF No. 1.  In addition, the Complaint alleges that Relief Defendants, who were not charged with violating the Act or Regulations, received funds and assets from Defendants, to which Relief Defendants held no legitimate interest or entitlement and which were derived from Defendants' fraudulent and violative acts.  Id.  On July 2, 2020, the Court entered a Statutory Restraining Order ("SRO") against the Parties that, among other things, authorized the freezing of assets held in the name of or under the control or management of the Parties.  ECF No. 9.

On July 8, 2020 and, in the case of Mancuso, July 12, 2020, the CFTC properly effected service of the Summons and Complaint by personal service by private process server pursuant to Rule 4 of the Federal Rules of Civil Procedure ("FRCP") on Black (and, through Black, on Black's entities Financial Tree, Financial Solution, and New Money), Mancuso, Tufo, Landes

2

1  (through its principal, Justin Smith), Kingdom (through its principals, Michael and Ruby Handler

2  Jacobs), Anne Mancuso, and Tyler Mancuso.  ECF Nos. 13-22.  On July 22, 2020, the CFTC

3  properly effected service of the Summons and Complaint on JMC and Suisse Group.  On July 23,

4  2020, following repeated attempts to serve Caswell personally, the CFTC properly effected

5  service of the Summons and Complaint on Caswell via substitute service on Caswell's mother at

6  Caswell's usual place of abode and last known mailing address.  ECF No. 57 at 2 ¶¶ 2-3 & nn.1-2

7  (detailing completed service).

8       Other than Black and the Glenn Defendants—who appeared in this action solely to litigate

9  stay- and/or default-related issues but ultimately defaulted—the Parties have failed to appear.  All

10  Parties failed to file a responsive pleading or otherwise defend in this action, and the clerk has

11  entered default against all Parties pursuant to FRCP 55(a).  ECF Nos. 49-50, 58, 111, 122.  The

12  CFTC has moved this Court to grant final judgment by default against Defendants, order

13  permanent injunctive relief, impose restitution obligations, and impose civil monetary penalties.

14  The CFTC has further moved this Court to grant final judgment by default against Relief

15  Defendants and order disgorgement of ill-gotten funds to which they are not entitled.

16      B.  <u>Factual Allegations</u>

17       The following allegations are asserted in plaintiff's complaint unless otherwise specified.

18  ECF No. 1 at 6-54.  The court notes that plaintiff has submitted updated calculations regarding

19  the amount of funds returned to pool participants and aggregate pool participant losses; these

20  numbers differ from those described in the complaint and are substantiated by the declaration of

21  fraud examiner Elise Robinson (ECF No. 125-1) filed concurrently with the motion for default

22  judgment.  During the Relevant Period, pool participants contributed a total of $14,512,482.49 to

23  the Black Pools.  Defendants returned $4,370,307.18 to certain pool participants in the form of

24  Ponzi payments.  Pool participants suffered net losses of $10,495,328.38.  Of those losses,

25  $4,690,155.52 were suffered by pool participants whose contributions resulted in Tufo receiving a

26  commission.  Robinson Declaration ("Robinson Decl.," attached as Exhibit 1 to this Motion) ¶¶

27  9-11 & Ex. A.

28  ////

1       Plaintiff Commodity Futures Trading Commission is an independent federal regulatory

2  agency that is charged by Congress with administering and enforcing the Act, 7 U.S.C. §§ 1–26

3  (2018), and the Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2021).  Defendant

4  Financial Tree is a "Pure Trust Organization in Common Law" doing business as Financial Tree

5  and Financial Tree Trust.  In April 2014, John Black, Trustee, executed Financial Tree's Articles

6  of Trust. Financial Tree's mailing address is 13389 Folsom Boulevard, Suite 300-122, Folsom,

7  CA 95630—a UPS store.  Defendant Black is Financial Tree's Trustee.  From at least June 15,

8  2015 through at least the filing of the CFTC's Complaint on June 15, 2020 (the "Relevant

9  Period"), Financial Tree operated as a commodity pool operator ("CPO") by accepting and

10  receiving funds from members of the public ("pool participants") for participation in two

11  commodity pools—the Financial Tree Pool (the "FT Pool") and the Financial Solution Group

12  Pool (the "FSG Pool") (collectively, the "Black Pools").  In addition to operating as a CPO,

13  during the Relevant Period, Financial Tree also operated as a commodity pool itself—the FT

14  Pool—because it owned a trading account in its name that traded pool funds in forex.  Financial

15  Tree has never been registered with the Commission in any capacity.

16       Defendant Financial Solution is a "Pure Trust Organization in Common Law" formed in

17  April 2015 doing business as Financial Solution Group and Financial Solution Group Trust.

18  Financial Solution's mailing address is 13389 Folsom Boulevard, Suite 300-113, Folsom, CA

19  95630—the same UPS store that Financial Tree utilizes for its mailing address.  Defendant Black

20  is Financial Solution's Trustee.  During the Relevant Period, Financial Solution operated as a

21  CPO by soliciting, accepting, and receiving funds from pool participants for participation in the

22  Black Pools.  In addition to operating as a CPO, during the Relevant Period, Financial Solution

23  also operated as a commodity pool itself—the FSG Pool—because it owned a trading account in

24  its name that traded pool funds in forex.  Financial Solution has never been registered with the

25  Commission in any capacity.

26       Defendant New Money is a Nevada limited liability company formed in December 2017.

27  New Money's address is 1400 South Linda Street, Pahrump, Nevada 89048.  New Money's

28  Officers are Black and Financial Tree, which Black controls.  During the Relevant Period, New

Money operated as a CPO by soliciting funds from pool participants for participation in the Black Pools.  New Money has never been registered with the Commission in any capacity.

Defendant Glenn Law Firm is a Colorado law firm with its principal place of business at 155 East Boardwalk Drive, Suite 400, Fort Collins, CO 80525.  Glenn is the Managing Partner of the Glenn Law Firm.  During the Relevant Period, the Glenn Law Firm operated as a CPO by soliciting, accepting, and receiving funds from pool participants for participation in the Black Pools.  The Glenn Law Firm has never been registered with the Commission in any capacity.

Defendant Black is a resident of Folsom, California.  Black is also known as John Barnes.  Black created and controls Financial Tree, Financial Solution, and New Money.  During the Relevant Period, Black acted as an Associated Person ("AP") for CPOs Financial Tree, Financial Solution, and New Money by soliciting pool participants for participation in the Black Pools and supervising individuals so soliciting.  Black has never been registered with the Commission in any capacity.

Defendant Mancuso is a resident of Irvine, California.  During the Relevant Period, Mancuso acted as an AP for CPOs Financial Tree, Financial Solution, and New Money by soliciting pool participants for participation in the Black Pools.  Mancuso has never been registered with the Commission in any capacity.

Defendant Tufo is a resident of Antioch, California.  During the Relevant Period, Tufo acted as an AP for CPOs Financial Tree, Financial Solution, and New Money by soliciting pool participants for participation in the Black Pools.  Separate from this Complaint's allegations, in 1999, the Securities and Exchange Commission issued an order against Tufo relating to his role in the fraudulent offer and sale of securities to the public.  Similarly, in November 2015, Tufo pled guilty to criminal violations of the Alabama Securities Act for fraudulently soliciting investments in "no risk" gold trading programs where funds would purportedly be held in an attorney's trust account.  Tufo has never been registered with the Commission in any capacity.

Defendant Glenn is a resident of Fort Collins, Colorado.  During the Relevant Period, Glenn acted as an AP for CPOs Financial Tree, Financial Solution, New Money, and the Glenn Law Firm by soliciting at least one pool participant for participation in the Black Pools.  In

5

addition, Glenn was the Managing Partner of the Glenn Law Firm.  Glenn directed and controlled the Glenn Law Firm's actions in all relevant respects, including the Glenn Law Firm's activities as a CPO soliciting, receiving, and accepting funds from pool participants for participation in the Black Pools.  Glenn used his Glenn Law Firm email address to communicate with pool participants.  Glenn has never been registered with the Commission in any capacity.

Relief Defendant Landes is a Wyoming limited liability company with an address of 109 E. 17th Street #25, Cheyenne, Wyoming 82001.  In September 2016, JMC transferred $200,000 in pool funds to Landes.  Landes has no legitimate claim to pool funds and did not provide any services for the Black Pools or pool participants.

Relief Defendant Kingdom is a Wyoming limited liability company with an address of 2123 Pioneer Ave., Cheyenne, Wyoming 82001.  Between March and October 2016, Financial Solution transferred approximately $1,050,000 in pool funds to Kingdom.  On September 30, 2016, the BBB Jabez Foundation—which Black controls—transferred approximately $25,000 in pool funds to Kingdom.  On October 3, 2016, Tyler Mancuso transferred approximately $25,000 in pool funds to Kingdom.  Kingdom has no legitimate claim to pool funds and did not provide any services for the Black Pools or pool participants.

Relief Defendant Suisse Group is a Delaware limited liability company with an address of 1650 Margaret Street, Suite 302-326, Jacksonville, Florida 32209—a UPS store.  Caswell is the Director of and controls Suisse Group.  In June 2016, Financial Solution transferred $500,000 in pool funds to a Suisse Group bank account.  Suisse Group has no legitimate claim to pool funds and did not provide any services for the Black Pools or pool participants.

Relief Defendant JMC is a Delaware limited liability company with an address of 1650 Margaret Street, Suite 302-326, Jacksonville, Florida 32209—the same UPS store address as Suisse Group's.  During the Relevant Period, Caswell was the Managing Member of and controlled JMC until April 2019.  In September 2016, Glenn transferred $300,000 in pool funds from a Glenn Law Firm bank account to JMC.  JMC has no legitimate claim to pool funds and did not provide any services for the Black Pools or pool participants.

////

1         Relief Defendant Caswell is a resident of Jacksonville, Florida.  During the Relevant

2   Period, including in 2016 when Financial Solution and the Glenn Law Firm transferred funds to

3   Suisse Group and JMC, respectively, Caswell controlled both entities as the lone Director of

4   Suisse Group and the lone Managing Member of JMC, commingled his personal funds with

5   Suisse Group and JMC Funds, and transferred Suisse Group and JMC funds to apparent relatives

6   and acquaintances.  Suisse Group and JMC were the alter egos of Caswell.  In 2016, Suisse

7   Group and JMC transferred at least $150,187.33 in pool funds to bank accounts owned by

8   Caswell.  Caswell has no legitimate claim to pool funds and did not provide any services for the

9   Black Pools or pool participants.

10        Relief Defendant Anne Mancuso is a resident of Newport Beach, California.  Anne

11  Mancuso was Chris Mancuso's wife.  During the Relevant Period, Defendant Chris Mancuso

12  transferred at least $252,874.93 in pool funds to Anne Mancuso.  Anne Mancuso has no

13  legitimate claim to pool funds and did not provide any services for the Black Pools or pool

14  participants.

15        Relief Defendant Tyler Mancuso is a resident of San Diego, California.  Tyler Mancuso is

16  Chris Mancuso's son.  During the Relevant Period, Defendant Chris Mancuso transferred at least

17  $340,087.23 in pool funds to Tyler Mancuso.  Tyler Mancuso has no legitimate claim to pool

18  funds and did not provide any services for the Black Pools or pool participants.

19        Plaintiff alleges that Defendants created and operated a Ponzi scheme.  To operate the

20  fraudulent scheme, Black caused to be created, and controlled, three entities: Financial Tree,

21  Financial Solution, and New Money.  Black has used these entities to operate and control the

22  Black Pools (i.e., the FSG Pool and the FT Pool).  Financial Tree has served in three roles in

23  Defendants' fraud—as a CPO operating and controlling the Black Pools; as one of the Black

24  Pools itself (the FT Pool); and as an officer of New Money.  Similarly, Financial Solution has had

25  a dual role in Defendants' fraud—as a CPO operating and controlling the Black Pools; and as one

26  of the Black Pools itself (the FSG Pool).  Black is the only employee of the three entities.  And

27  the only business the three entities conducted was related to Defendants' fraud.

28  ////

1    Through Financial Solution and New Money, Black and other APs solicited funds from

2    pool participants for participation in the Black Pools, in which pool participant funds were

3    purportedly to be held in a protected account and used as collateral to secure separate lines of

4    credit to trade forex and binary options.  Pool participants could participate by entering into joint

5    venture agreements ("Agreements") with Financial Solution or New Money.  The Agreements,

6    however, did not direct pool participants to send funds directly to the Black Pools.  Instead, the

7    Agreements required pool participants to send funds to a Glenn Law Firm "attorney escrow

8    account," after which the Glenn Law Firm was to pass those funds along to the Black Pools.

9    In approximately August 2014, Mancuso contacted Glenn "to provide paymaster services

10   for Mr. Black and his companies based upon his various joint ventures with his clients."  Later

11   that month, Black (on behalf of Financial Tree) and Glenn (on behalf of the Glenn Law Firm)

12   signed a "Paymaster Agreement" providing that the Glenn Law Firm would accept funds from

13   third parties and disburse such funds to Financial Tree in exchange for a fee.  In practice, the only

14   service the Glenn Law Firm provided to the Black Pools was to accept and transfer pool funds.

15   There was no legitimate business reason for pool participants to wire funds to the Glenn Law

16   Firm, and for the Glenn Law Firm to then wire funds to Financial Tree (less Glenn's fee).  Pool

17   participants could have just as easily wired money directly to Financial Tree.  Black engaged the

18   Glenn Law Firm to provide a false veneer of safety and legitimacy to the Black Pools.  Glenn

19   used his position as an attorney and Managing Partner of the Glenn Law Firm to deceive pool

20   participants into believing that the Black Pools were legitimate and safe.

21   During the Relevant Period, 92 pool participants (Robinson Decl. n.2) deposited over

22   $14.32 million in the Black Pools through at least 134 total wire transfers to the Glenn Law

23   Firm's bank accounts.  In addition, at least five pool participants deposited at least $190,793.73

24   through at least six wire transfers directly to Financial Tree or Financial Solution.  Pool

25   participants deposited funds for trading in the Black Pools at least as early as January 2, 2015, and

26   at least as recently as January 29, 2020.  Specifically, on February 14, 2016, the FSG Pool, by and

27   through Black, opened a forex trading account at Trading Firm A, a registered futures

28   commission merchant ("FCM") and retail foreign exchange dealer ("RFED").  On March 18,

2016, Financial Solution transferred $5,000 into the FSG Pool's forex trading account at Trading Firm A.  No trading occurred in the account.  As of March 2020, the account was dormant.

Likewise, on July 6, 2016, the FT Pool, by and through Black, opened a forex (foreign exchange) trading account at Trading Firm B.  On July 7, 2016, Financial Tree transferred $5,000 into the account.  The account engaged in limited forex trading, generating net losses.  On May 7, 2018, the FT Pool, at Black's direction, transferred the remaining $2,554.79 from the account, which is no longer active.  In addition, during the Relevant Period, Financial Solution and Financial Tree, by and through Black and/or other employees or agents, transferred approximately $254,280 overseas to possible binary options and/or forex trading firms.  Financial Solution and Financial Tree received back only approximately $59,239.

Financial Solution and Financial Tree, by and through Black and/or other employees or agents, made payments totaling $4,370,307.18 (approximately 30% of pool funds) to certain pool participants during the Relevant Period.  Robinson Decl. ¶ 11.  These were Ponzi payments made from funds newly received from other pool participants.  Defendants also misappropriated funds to enrich themselves.  Of the approximately $14.5 million in pool funds, Defendants redirected approximately $6.3 million (approximately 43% of pool funds) to various Defendants' business or personal bank accounts.  Of the approximately $14.32 million transferred to the Glenn Law Firm's bank accounts in connection with the Black Pools, Glenn misappropriated at least approximately $285,438.24 by retaining such funds in those accounts and/or transferring such pool funds to other bank accounts Glenn owned and/or controlled.  Glenn had no legal right to these pool funds.  Glenn spent such funds on, among other things, expenses related to his divorce and spousal support.

Of the remaining pool funds that Glenn did not misappropriate for himself, Glenn transferred approximately $13.5 million to Financial Tree and Financial Solution; approximately $300,000 to Relief Defendant JMC; at least approximately $171,292.18 in apparent Ponzi payments to pool participants; and approximately $51,503.56 to an entity owned by Mancuso.  Upon receipt, Financial Tree, Financial Solution, and New Money did not deposit pool funds into fiduciary-protected, separate bank accounts, and did not use pool funds as collateral to obtain

9

lines of credit to trade binary options and forex on pool participants' behalf, as the Agreements promised.  Instead, during the Relevant Period, Financial Solution and Financial Tree, by and through Black and/or other employees or agents, transferred at least $1,809,117.56 of pool funds to business and personal bank accounts owned and/or controlled by Black.  Black withdrew in cash at least $367,408.57 in pool funds, and spent additional misappropriated funds on, among other things, personal travel, rent for his personal residence, legal fees, online gambling, multilevel marketing programs, food and dining expenses, and software and online advertising.  Similarly, during the Relevant Period, Financial Solution and Financial Tree, by and through Black and/or other employees or agents, made at least 238 payments totaling at least approximately $3,977,470.20 of pool funds to business and personal bank accounts owned and/or controlled by Mancuso.  Mancuso further misappropriated such funds, including by withdrawing at least approximately $1.3 million in cash, transferring at least approximately $593,000 to Relief Defendants Anne Mancuso and Tyler Mancuso, and spending additional such funds on, among other things, personal travel, limousine expenses, spa and haircare expenses, and home renovations.[1]

Likewise, during the Relevant Period, Financial Solution and Financial Tree, by and through Black and/or other employees or agents, made payments totaling at least approximately $228,000.01 in pool funds to business and personal bank accounts owned or controlled by, or affiliated with, Tufo.  Tufo further misappropriated pool funds by spending them on, among other things, automobile-related expenses, eating out, groceries, insurance premiums, office expenses, utilities, and miscellaneous household expenses.  During the Relevant Period, pool participants contributed a total of $14,512,482.49 to the Black Pools.  Defendants returned $4,370,307.18 to certain pool participants in the form of Ponzi payments.  Pool participants suffered net losses of $10,495,328.38.  Of those losses, $4,690,155.52 were suffered by pool participants whose contributions resulted in Tufo receiving a commission.

---

[1]  The updated financial information in these paragraphs is taken from plaintiff's proposed order, which is supported by the Robinson Declaration and the Motion for Default Judgment.  ECF No. 125-2 ¶¶ 33-41.

As set forth above, Financial Tree, Financial Solution, and New Money, by and through its employees or agents, misappropriated and dissipated the vast majority of pool funds received, including by transferring pool funds to Black, Mancuso, Tufo, and others.  However, as of July 2020, Financial Tree and Financial Solution owned trading accounts containing pool funds totaling $4,630.15, which the CFTC froze pursuant to the SRO issued by this Court (ECF No. 9).

Financial Solution, Black, and Mancuso Ignored a California Department of Business Oversight ("DBO") Desist and Refrain Order to Cease Their Unlawful Activities.

On April 27, 2018, the California DBO issued a Desist and Refrain Order to Financial Solution, Black, and Mancuso finding they unlawfully sold unregistered securities in California and made material misrepresentations or omissions to a pool participant in connection therewith. Financial Solution, Black, and Mancuso did not abide by the Desist and Refrain Order and continued soliciting for the Black Pools.  Defendants did not disclose to pool participants any of the above conduct, including that they had traded very few pool funds in binary options or forex, that they were using pool funds to pay personal expenses and make Ponzi payments instead of keeping funds in a separate fiduciary-protected account, and that the California DBO had issued a Desist and Refrain Order to Financial Solution, Black and Mancuso.  Instead, Defendants made material misrepresentations when soliciting pool participants to participate in the Black Pools. Financial Solution, by and through Black, issued false account statements to pool participants. Defendants also made material misrepresentations and/or omitted material facts to pool participants when they asked for their funds to be returned or otherwise inquired about the status of their deposits in the Black Pools, and Defendants did this while continuing to solicit and/or accept funds from new pool participants.

Defendants made material misrepresentations and omissions to prospective and actual pool participants, including in teleconference seminars, emails, and Agreements executed with pool participants.  Defendants' representations to pool participants downplayed the risk associated with the pools while promising monthly returns between 10-70%.  These fraudulent solicitations, as illustrated by the following representative examples, included, but were not limited to, material misrepresentations that:

1        a.   all pool funds would be protected in a "no risk" separate account by a
2            fiduciary-protected bank block and returned to pool participants on a schedule
3            prescribed by the Agreements;
4        b.   traders would secure separate lines of credit to trade binary options and/or
5            forex for the benefit of pool participants;
6        c.   pool participants would receive between 10% and 70% monthly returns on
7            their deposits as profits, depending on participation level;
8        d.   more than 85% of trades had been successful; and
9        e.   the Black Pools' activities were overseen by a "globally renowned and highly
10           respected fiduciary accounting firm."

The fraudulent solicitations also included, but were not limited to, the material omissions that:

      a.   the California DBO had issued a Desist & Refrain Order against Financial
          Solution, Black, and Mancuso;
      b.   Defendants would pay themselves and other Defendants approximately 43% of
          pool fund principal received, prior to trading any funds;
      c.   Defendants would make Ponzi payments to other pool participants using an
          additional approximately 34% of pool fund principal received, prior to trading any
          funds;
      d.   Defendants would improperly transfer pool fund principal to other third parties,
          prior to trading any funds;
      e.   Defendants would trade binary options and forex with, at most, 2% of pool fund
          principal received;
      f.   binary options and forex trading involves significant risk of trading losses;
      g.   Defendants had failed to return principal and deliver profits to other pool
          participants; and
      h.   at least as early as December 2016, Defendants were expressly communicating to
          existing pool participants that Defendants were struggling to make profitable
          trades (which, itself, was a misrepresentation because Defendants were not in fact

1     trading pool funds) and were not returning principal or delivering profits to pool

2     participants as promised.

3          For example, during the Relevant Period, Black advised Pool Participant B that he could

4     increase his return on deposits from 10% to 13% per month—but only if he deposited an

5     additional $25,000 in addition to his previously deposited $25,000.  Similarly, during the

6     Relevant Period, Mancuso circulated an email to prospective pool participants making similar

7     claims, adding "YOU WILL EARN A MINIMUM 10% on your money EVERY MONTH…

8     Funds must be wired to the Escrow Attorney here in the USA."  Mancuso promised escalating

9     monthly returns depending on the size of the deposit, up to 45% per month for deposits exceeding

10    $1 million.  On approximately June 13, 2015, a pool participant responded to Mancuso requesting

11    additional information regarding "the guarantee on your money."  Mancuso replied the next day,

12    "[i]n this program the funds are blocked and the trader uses his credit for the trade.  So no risk to

13    blocked funds."

14         Also during the Relevant Period, Tufo solicited potential pool participants by stating that

15    they could earn exorbitant returns (for example, $600,000 from a $100,000 deposit in 120 days);

16    and that the Black Pools were "foolproof" and "a sure thing."  Similarly, during the Relevant

17    Period, Glenn solicited potential pool participants, communicating, among other things, that

18    participating in the Black Pools would be a "good deal" for a pool participant and that Black and

19    Mancuso were "great guys."  On January 18, 2017, that pool participant transferred $100,000 to

20    the Glenn Law Firm.  Later that day, on a telephone call, Glenn told that pool participant that she

21    would receive the full amount promised in the Agreement.

22         In approximately June 2018, a pool participant spoke with Black, Mancuso, Tufo, and

23    others on a teleconference call.  Mancuso communicated that the pool participant's money would

24    be safe because "you're not paying us, you're paying an attorney."  Mancuso introduced Tufo as

25    the account manager who would be the pool participant's principal point of contact for the

26    opportunity.  Prior to the pool participant's deposit of $150,000 on approximately July 9, 2018,

27    Tufo communicated to the pool participant that Tufo knew many people who had successfully

28    deposited funds with Defendants, that the pool participant's money would be safe, and if the pool

13

1   participant ever wanted to cancel the Agreement, he could do so easily and would receive his

2   money back.

3        Throughout the Relevant Period, pool participants entered into Agreements with Financial

4   Solution or New Money, signed by Black, containing representations that pool funds would be

5   deposited in a bank account where they would be "blocked and thereby fully protected against

6   loss of principal at all times" and used only as collateral for trading binary options, forex, and

7   other products; that pool participants would receive 10% or higher monthly returns and/or loan

8   funding generated by trading profits; that activities would be monitored by a global accounting

9   firm; and that pool participants could withdraw all principal after a specified period of time.  The

10  Agreements directed pool participants to wire their funds to a Glenn Law Firm "attorney escrow"

11  bank account.

12       The above solicitations contained material misrepresentations and material omissions

13  because, among other things, Defendants did not have a historical 85% success rate trading; did

14  not segregate all pool funds in "no-risk" separate accounts protected by a Fiduciary-protected

15  bank block; did not return pool funds to pool participants on Agreement-prescribed schedules; did

16  not secure separate lines of credit to trade binary options and/or forex for the benefit of pool

17  participants; did not have an accounting firm overseeing trading activities; traded, at most, only a

18  small percentage of pool funds collected in binary options or forex; did not generate 10-70%

19  monthly returns or turn a $100,000 deposit into $600,000 in four months; and misappropriated the

20  vast majority of pool funds for unauthorized personal and business expenses and to make Ponzi

21  payments.

22       During the Relevant Period, Financial Solution, by and through Black and/or other

23  employees or agents, provided false account statements to pool participants purporting to reflect

24  monthly profits.  However, these account statements contained material misrepresentations.

25  Financial Solution had not, in fact, generated any profits at all for pool participants, as Financial

26  Solution had not engaged in any profitable trading using pool funds.  False account statements,

27  combined with Ponzi payments, in at least one case incentivized additional deposits by a pool

28  participant.

Despite making Ponzi payments to certain pool participants, Financial Solution and New Money failed to return principal plus profits as promised to most pool participants. When pool participants complained, Defendants made bogus excuses regarding Financial Solution's and New Money's failures to return pool funds, all while soliciting additional funds and/or accepting pool funds from those very same pool participants as well as new pool participants.

For example, in or about April of 2017, Mancuso and Black jointly sent a letter to pool participants falsely claiming that "funds are actually flowing" and promising imminent return of funds. Mancuso forwarded to pool participants a similar letter from Financial Solution (signed by Black) blaming "breach of contract and nonpayment from some of our previous banking sources" but claiming to have "hit the jackpot" with a new funding source and falsely promising repayment by the end of the month. In a separate instance, Mancuso falsely claimed to a pool participant that funds had arrived at a Bahamian bank, but storms and rain in the Bahamas had created connectivity issues delaying return of funds. In some cases, Mancuso communicated with pool participants over the course of multiple years offering a litany of fraudulent excuses and repeatedly falsely promising the imminent return of funds. Yet at the very same time—in some cases in the same communications that offered the fraudulent excuses—Black and Mancuso solicited additional funds from existing and new pool participants.

During the Relevant Period, a pool participant emailed Mancuso and others, noting "this matter has become exhausting, comical and nonsensical. It borders on criminal. Your last response that the matters would close in 15 days has per usual been nothing but . . . another lie. I am sick to my core of your damn lies." Mancuso replied claiming no one had lied to the pool participant, that funds would arrive within a month, and that Defendants were simply at the mercy of various banks. Also during the Relevant Period, another pool participant emailed Black and others, expressing frustration at receiving "one story after the next" from Black, including "that funds were delayed in August because the European market had fluctuation and it was their summer vacations" and that "there was a legal issue as to why the funds did not transfer from Singapore to Hong Kong." During the Relevant Period, after a pool participant confronted Mancuso regarding the Desist & Refrain Order from the California DBO, Mancuso claimed to the

1  pool participant that the Order "WAS RESOLVED SOME TIME AGO… A CURRENCY

2  PROGRAM THAT WAS NOT OUR SERVICE.  THIS CLIENT RECEIVED A REFUND BUT

3  SOMETIMES IT'S HARD TO REMOVE ADMINISTRATIVE PROCEEDINGS FROM THE

4  INTERNET…"

5       Like Black and Mancuso, Tufo knew of Financial Solution's and New Money's failure to

6  return pool funds and Black's and Mancuso's excuses for such failures.  For example, during the

7  Relevant Period, Tufo emailed pool participants, stating "I am so sorry for these never ending

8  excuses.  I've suggested several times that Chris and John sell everything they own to make you

9  whole . . . ."  While Tufo, on emails to pool participants responding to their complaints, claimed

10  to be frustrated regarding such failures and that he was attempting to help resolve them, Tufo

11  continued soliciting new pool participants—and receiving payments in the form of

12  commissions—while omitting information regarding such failures and excuses.

13       Glenn also made fraudulent statements to pool participants regarding their funds, received

14  extensive complaints from pool participants regarding Defendants' broken promises, and yet

15  continued to accept funds (and misappropriate his secret, unauthorized commissions) from new

16  pool participants as if the entire business was legitimate, while omitting that other pool

17  participants were complaining about their money.  For example, during the Relevant Period,

18  shortly after Financial Solution and New Money failed to deliver funds to a pool participant as the

19  Agreements promised, the pool participant called Glenn requesting an update on her funds.

20  Glenn, in his capacity as an attorney and as the Managing Partner of the Glenn Law Firm, told the

21  pool participant that he was in possession of the pool participant's money and would transfer the

22  $600,000 she was owed by the end of the week.  But these statements were false.  At no time

23  during the Relevant Period did Glenn or the Glenn Law Firm possess the $600,000 the pool

24  participant was owed under her Agreement.  Defendants never paid the pool participant.  When

25  the pool participant subsequently attempted to call Glenn, he did not answer his phone or return

26  her calls.

27       During the Relevant Period, Glenn, in his capacity as an attorney from his Glenn Law

28  Firm email address with his Glenn Law Firm signature block, emailed unspecified recipients

16

1    regarding a pool participant's deposit, claiming that he had been trying to resolve with Financial

2    Solution, Black, and Mancuso the issues returning funds.  In this communication, Glenn omitted

3    the material fact that Glenn, himself, had misappropriated a portion of the pool participant's

4    funds.  During the Relevant Period, the Colorado Supreme Court, Attorney Regulation Counsel

5    sent Glenn three separate bar complaints filed by individuals, including a pool participant,

6    regarding Glenn's role in the fraud.

7        Separately during the Relevant Period, pool participants repeatedly emailed Glenn

8    complaining that he was participating in a fraud.  For example, one pool participant emailed

9    Glenn stating Mancuso and Black "have absolutely no intention of returning our money."

10    Thereafter during the Relevant Period, that pool participant forwarded Glenn correspondence

11    regarding extensive delays, stating, "These are the kind of people you have supported transferring

12    our money into their accounts for personal gains . . . . There are more victims."  Again, during the

13    Relevant Period, Glenn forwarded the pool participant from his Glenn Law Firm email account

14    correspondence with Black and Mancuso asserting that the pool participant would be paid "by

15    month end."  Separately during the Relevant Period, another pool participant emailed Glenn,

16    expressing concern regarding Glenn's involvement and that Glenn's "participation lended

17    credibility to  . . . [Black's and Mancuso's] operation."  As Black, Mancuso, Tufo, and Glenn

18    made those communications, each, along with the remaining Defendants, continued to solicit

19    and/or accept new funds from new and existing pool participants, and each misappropriated

20    money from those pool participants, while omitting the material facts that Defendants had failed

21    to return funds as promised to other pool participants and were expressly communicating with

22    those pool participants regarding such failures.

23        During the Relevant Period, Financial Tree, Financial Solution, New Money, and the

24    Glenn Law Firm acted as CPOs by engaging in a business that is of the nature of a commodity

25    pool and, in connection with that business, soliciting, accepting, and/or receiving funds for the

26    Black Pools.  However, Financial Tree, Financial Solution, New Money, and the Glenn Law Firm

27    failed to register with the CFTC as CPOs.  During the Relevant Period, Black, Mancuso, Tufo,

28    and Glenn acted as APs of CPOs by soliciting funds for the Black Pools, but failed to register

1   with the CFTC as APs of CPOs.  Defendants Financial Tree and Financial Solution, while acting

2   as CPOs of the FT Pool and the FSG Pool, respectively, failed to operate the FT Pool and FSG

3   Pool as legal entities separate from those of the CPOs and commingled pool funds with non-pool

4   property by transferring pool funds into bank accounts controlled by Black, Mancuso, Tufo, and

5   others which contained non-pool funds.  Defendant Glenn Law Firm, while acting as CPO of the

6   Black Pools, received and accepted pool funds into the Glenn Law Firm's attorney trust bank

7   accounts, rather than accounts in the names of the Black Pools.  In addition, the Glenn Law Firm

8   commingled pool funds with non-pool property by accepting pool funds into bank accounts that

9   contained non-pool property.

10          Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm,

11   while acting as CPOs of the Black Pools, failed to provide pool disclosure documents, account

12   statements presented and computed in accordance with generally accepted accounting principles

13   and containing required information, and other documents required by Regulations 4.21 and 4.22,

14   17 C.F.R. §§ 4.21, 4.22 (2021), including but not limited to required cautionary statements, risk

15   disclosures, fees and expenses incurred by the Black Pools, past performance disclosures, a

16   statement that the CPO is required to provide all pool participants with monthly or quarterly

17   account statements, as well as an annual report containing financial statements certified by an

18   independent public accountant.

19          During the Relevant Period, Black was a controlling person for Financial Tree, Financial

20   Solution, and New Money.  Black is the lone Trustee of Financial Tree and Financial Solution.

21   Financial Tree's and Financial Solution's Articles of Trust list Black as Trustee having exclusive

22   control of Financial Tree and Financial Solution.  Black opened bank accounts for Financial Tree

23   and Financial Solution and was the sole signatory on these accounts (including the bank accounts

24   to which the Glenn Law Firm's bank accounts transferred funds). Black signed Agreements

25   between Financial Solution and pool participants.  Black did not act in good faith or knowingly

26   induced Financial Tree's and Financial Solution's fraudulent acts.

27          During the Relevant Period, Glenn was a controlling person for the Glenn Law Firm.

28   Glenn is the Managing Partner of the Glenn Law Firm, whose website does not list other

1   attorneys as being members of the firm.  Glenn signed the August 25, 2014 "Paymaster

2   Agreement" with Financial Tree on behalf of the Glenn Law Firm.  Glenn opened bank accounts

3   for each Glenn Law Firm bank account to which pool participants contributed funds.  Glenn did

4   not act in good faith or knowingly induced the Glenn Law Firm's fraudulent acts.  Black,

5   Mancuso, Tufo, and Glenn Acted Within the Scope of Their Employment, Office, or Agency with

6   Financial Tree, Financial Solution, New Money, and/or the Glenn Law Firm.  Black, Mancuso,

7   Tufo, and Glenn committed the acts and omissions described above within the course and scope

8   of their employment, office, or agency with Financial Tree, Financial Solution, New Money,

9   and/or the Glenn Law Firm.

10        Suisse Group and JMC Were Alter Egos of Caswell.  When Financial Solution and the

11   Glenn Law Firm transferred a total of $800,000 to Suisse Group and JMC in June and September

12   2016, Caswell controlled both entities as the lone Director of Suisse Group and the lone

13   Managing Member of JMC.  Suisse Group and JMC share the same UPS store mailing address

14   and the same email address—ctkholdingsfund@gmail.com.  Caswell operated Suisse Group and

15   JMC to receive and dissipate ill-gotten funds for his personal benefit.

16        In the three months prior to receiving the $500,000 transfer from Financial Solution in

17   June 2016, the Suisse Group bank account that received the transfer maintained a balance of

18   $12.15 or lower.  After receiving the $500,000 transfer, within two days, Suisse Group transferred

19   approximately $55,000 to JMC (owned by Caswell), approximately $30,100 to a personal bank

20   account owned by Caswell, and additional funds to other entities and individuals.  Over the next

21   two days, Suisse Group transferred a total of approximately $415,000 to a TD Ameritrade

22   securities account in the name of JMC, which in turn funded a TD Ameritrade forex trading

23   account ("JMC Forex Account") in the same name.  After incurring approximately $50,000 in

24   trading losses, the JMC Forex Account transferred the remaining approximately $365,000 to JMC

25   from June to August 2016.  After dissipating the approximately $500,000 in pool funds, the

26   balance in the Suisse Group account that received those funds was, at its highest, approximately

27   $383.14, and closed in July 2016.

28   ////

1    After the JMC Forex Account transferred approximately $365,000 in pool funds to JMC

2    in July and August 2016, Caswell transferred approximately $88,087.33 to a checking account

3    Caswell controlled and otherwise dissipated the remaining funds on business and personal

4    expenses having nothing to do with the Black Pools.  Similarly, within one week of the Glenn

5    Law Firm transferring $300,000 to JMC in September 2016, Caswell transferred approximately

6    $200,000 to Landes; withdrew approximately $1,500 in cash from this account; transferred

7    approximately $32,000 to personal bank accounts owned by Caswell; transferred approximately

8    $68,350 to various individuals including another person with the last name "Caswell;" and made

9    payments from this account for massages, insurance premiums, and a mobile phone.  After

10    dissipating the pool funds, in 2016, the balance in that account was, at its highest, approximately

11    $155, and the account was overdrawn by December 2016.

## II.    CONCLUSIONS OF LAW

13    A.    <u>The CFTC Has Established Jurisdiction and Venue</u>

14    This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. §

15    13a-1 (2018), which provides that whenever it shall appear to the CFTC that any person has

16    engaged, is engaging, or is about to engage in any act or practice constituting a violation of any

17    provision of the Act or any rule, regulation, or order promulgated thereunder, the CFTC may

18    bring an action in the proper district court of the United States against such person to enjoin such

19    act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

20    <u>See also</u> 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018)

21    (jurisdiction over civil actions commenced by the United States or by any agency authorized to

22    sue by Act of Congress).

23    The Court has personal jurisdiction over the Parties because they transacted business

24    within this District and otherwise engaged in acts and practices in violation of the Act and

25    Regulations in this District, among other places.  Venue properly lies with this Court pursuant to

26    7 U.S.C. § 13a-1(e), because Parties reside or transact business in this jurisdiction and the acts

27    and practices in violation of the Act and Regulations occurred, are occurring or are about to occur

28    within this District, among other places.

1          B.          Default Judgment is Warranted Against All Defaulting Parties

2                  1.   Legal Standards

3          In accordance with Federal Rule of Civil Procedure 55, default may be entered against a

4   party against whom a judgment for affirmative relief is sought who fails to plead or otherwise

5   defend against the action.  See Fed. R. Civ. P. 55(a).  However, "[a] defendant's default does not

6   automatically entitle the plaintiff to a court-ordered judgment."  PepsiCo, Inc. v. Cal. Sec. Cans,

7   238 F.Supp.2d 1172, 1174 (C.D. Cal. 2002) (citing Draper v. Coombs, 792 F.2d 915, 924-25 (9th

8   Cir. 1986)); see Fed. R. Civ. P. 55(b) (governing the entry of default judgments).  Instead, the

9   decision to grant or deny an application for default judgment lies within the district court's sound

10  discretion.  Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980).  In making this

11  determination, the court may consider the following factors: (1) the possibility of prejudice to the

12  plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4)

13  the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts;

14  (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the

15  Federal Rules of Civil Procedure favoring decisions on the merits.  Eitel v. McCool, 782 F.2d

16  1470, 1471-72 (9th Cir. 1986).  Default judgments are ordinarily disfavored.  Id. at 1472.

17         As a general rule, once default is entered, well-pleaded factual allegations in the operative

18  complaint are taken as true, except for those allegations relating to damages.  TeleVideo Sys., Inc.

19  v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987) (per curiam) (citing Geddes v. United Fin.

20  Group, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam)); see also Fair Housing of Marin v.

21  Combs, 285 F.3d 899, 906 (9th Cir. 2002).  Although well-pleaded allegations in the complaint

22  are admitted by a defendant's failure to respond, "necessary facts not contained in the pleadings,

23  and claims which are legally insufficient, are not established by default."  Cripps v. Life Ins. Co.

24  of N. Am., 980 F.2d 1261, 1267 (9th Cir. 1992) (citing Danning v. Lavine, 572 F.2d 1386, 1388

25  (9th Cir. 1978)); accord DIRECTV, Inc. v. Huynh, 503 F.3d 847, 854 (9th Cir. 2007) ("[A]

26  defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law")

27  (citation and quotation marks omitted); Abney v. Alameida, 334 F.Supp.2d 1221, 1235 (S.D. Cal.

28  2004) ("[A] default judgment may not be entered on a legally insufficient claim.").  A party's

1    default conclusively establishes that party's liability, although it does not establish the amount of

2    damages.  Geddes, 559 F.2d at 560; cf. Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1414 (9th

3    Cir. 1990) (stating in the context of a default entered pursuant to Federal Rule of Civil Procedure

4    37 that the default conclusively established the liability of the defaulting party).

5           2.  Analysis

6                a.     Possibility of Prejudice to Plaintiff

7          Regarding the first Eitel factor, the CFTC will be prejudiced if default judgment is not

8    entered because it "will be deprived of the opportunity to obtain judicial resolution of its

9    claim[s]."  Sky Billiards, 2016 WL 6661175, at *5; see also Halsey v. Colonial Asset Mgmt., No.

10    5:13-cv-02025, 2014 WL 12601015, at *4 (C.D. Cal. July 17, 2014) (concluding plaintiff lacked

11    remedy in absence of default judgment where defendant failed to file responsive pleading).  The

12    CFTC has strong, congressionally mandated interests in enforcing the Act, obtaining restitution

13    and disgorgement for victims of fraud, and deterring future wrongdoing through penalties, among

14    other monetary relief.  Yet the Parties' refusal to appear and defend will continue to deprive the

15    CFTC of the opportunity to obtain judgment on the merits.  This factor thus supports a default

16    judgment.  See SEC v. Fortitude Grp., No. 16-50, 2017 WL 818604, at *2 (W.D. Pa. Feb. 10,

17    2017) (granting SEC's motion for default judgment because SEC would "be prejudiced by its

18    inability to effectively enforce federal securities laws" if motion were denied).

19                b.     Merits of Claims and Sufficiency of Complaint

20          The second and third Eitel factors also weigh in favor of default judgment.  The CFTC's

21    claims are meritorious and the allegations of the Complaint, accepted as true, are sufficient to

22    establish all defendants' liability.  Plaintiff brings six claims based on violations of the

23    Commodity Exchange Act ("the Act") and Commission Regulations ("Regulations"); each cause

24    of action is addressed individually below.  In this context, the court also evaluates the sufficiency

25    of the complaint's allegations to establish various principles of liability that pertain to the claims

26    collectively.

27    ////

28    ////

i. <u>Defendants Committed Commodity Option Fraud in Violation of 7 U.S.C.</u>

<u>§ 6c(b) (2018) and 17 C.F.R. § 32.4 (2021) (Count One)</u>

Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), provides, in relevant part, that "[n]o person shall offer to enter into, enter into or confirm the execution of any transaction involving any commodity . . . which is . . . an 'option' . . . . contrary to" CFTC Regulations.  Regulation 32.4, 17 C.F.R. § 32.4 (2021), provides:

> In or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person directly or indirectly: (a) To cheat or defraud or attempt to cheat or defraud any other person; (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or (c) To deceive or attempt to deceive any other person by any means whatsoever.

"Binary options" transactions are commodity option transactions under the Act and Regulations.  <u>See, e.g.</u>, <u>CFTC v. Vision Fin. Partners, LLC</u>, 190 F. Supp. 3d 1126, 1130 (S.D. Fla. 2016) (denying motion to dismiss; holding that binary options are commodity options within the meaning of 7 U.S.C. § 6c(b)).  Defendants' conduct occurred "[i]n or in connection with an offer to enter into, the entry into, or the confirmation of the execution of" binary options transactions.  Conduct so occurs when, inter alia, a defendant solicits individuals to trade binary options.  <u>See</u> <u>CFTC v. Vault Options, Ltd.</u>, No. 1:16-CV-01881, 2016 WL 5339716, at *2, *6 (N.D. Ill. July 20, 2016) (by "solicit[ing] . . . customers . . . to trade binary commodity options . . . [defendants] offered to enter into . . . binary option transactions").

To establish that Defendants violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4 through misrepresentations and omissions, the Commission must prove that (1) Defendants made misrepresentations or omissions; (2) the misrepresentations or omissions were material; and (3) Defendants acted with scienter.  <u>CFTC v. R.J. Fitzgerald & Co., Inc.</u>, 310 F.3d 1321, 1328 (11th Cir. 2002); <u>Am. Bullion</u>, 2014 WL 12603558, at *4.  Misappropriation and issuing false account statements also violates these provisions.  <u>See, e.g.</u>, <u>Am. Bullion</u>, 2014 WL 12603558, at *7 (holding misappropriation violated 7 U.S.C. § 6c(b)) and other anti-fraud provisions of the Act and related Regulations); <u>CFTC v. Weinberg</u>, 287 F. Supp. 2d 1100, 1107 (C.D. Cal. 2003)

1   (default order) (finding false and misleading statements as to amount and location of investors'

2   money violated 7 U.S.C. § 6c(b)).

3          By the conduct described herein, Defendants Financial Tree, Financial Solution, and New

4   Money (acting as a common enterprise) and Defendant Glenn Law Firm, by and through their

5   officers, employees, and agents, and Defendants Black, Mancuso, Tufo, and Glenn, in connection

6   with offers to enter into, entry into, or confirmation of the execution of commodity option

7   transactions, directly or indirectly, and knowingly or recklessly, violated 7 U.S.C. § 6c(b) and 17

8   C.F.R. § 32.4 by, among other things, misrepresenting and omitting material facts in soliciting

9   pool participants, misappropriating funds solicited for the Black Pools, and, in the case of

10  Financial Tree, Financial Solution, and New Money (acting as a common enterprise), by and

11  through their officers, employees, and agents, and Defendant Black, by making and disseminating

12  false account statements.

13                    ii.   Defendants Committed Forex Fraud in Violation of 7 U.S.C. §

14                          6b(a)(2)(A)-(C) (2018) and 17 C.F.R. § 5.2(b) (2021) (Count Two)

15         7 U.S.C. § 6b(a)(2)(A)-(C) of the Act makes it unlawful

16            [f]or any person, in or in connection with any order to make, or the
              making of, any contract of sale of any commodity for future delivery,
17            or swap, that is made, or to be made, for or on behalf of, or with, any
              other person, other than on or subject to the rules of a designated
18            contract market—(A) to cheat or defraud or attempt to cheat or
              defraud the other person; (B) willfully to make or cause to be made
19            to the other person any false report or statement or willfully to enter
              or cause to be entered for the other person any false record; [or] (C)
20            willfully to deceive or attempt to deceive the other person by any
              means whatsoever in regard to any order or contract or the
21            disposition or execution of any order or contract, or in regard to any
              act of agency performed, with respect to any order or contract for, or,
22            in the case of paragraph (2), with the other person[.]

23         To show that Defendants violated 7 U.S.C. § 6b(a)(2) through misrepresentations and

24  omissions, the Commission must prove the same elements as those required to prove a violation

25  under 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.  See, e.g., Am. Bullion, 2014 WL 12603558, at *5

26  (citing CFTC v. Rosenberg, 85 F. Supp. 2d 424, 445 (D.N.J. 2000)).  The Complaint establishes

27  all three elements, for the reasons described above.  Likewise, the Complaint establishes

28  violations of 7 U.S.C. § 6b(a) through misappropriation and through issuing false account

1  statements, for the same reasons previously explained.

2  Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2021), provides, in relevant part:

3  "[i]t shall be unlawful for any person, by use of the mails or by any
   means or instrumentality of interstate commerce, directly or
4  indirectly, in or in connection with any retail forex transaction:

5  (1) To cheat or defraud or attempt to cheat or defraud any person; (2)
   Willfully to make or cause to be made to any person any false report
6  or statement or cause to be entered for any person any false record;
   or (3) Willfully to deceive or attempt to deceive any person by any
7  means whatsoever.

8

9  17 C.F.R. § 5.2(b) adds only one additional element not found in 7 U.S.C. § 6b(a)(2)(A)-

10  (C): that a defendant's conduct must involve "use of the mails or by any means or instrumentality

11  of interstate commerce."  Here, Defendants communicated with pool participants via email and

12  telephone, both instrumentalities of interstate commerce.  And much money was transferred to

13  bank accounts through wire transfers or other instrumentalities of interstate commerce.  Thus, the

14  Complaint establishes the additional required element.

15       iii.   Defendants Committed Fraud By Commodity Pool Operators ("CPOs")

16              and Associated Persons ("APs") of CPOs in Violation of 7 U.S.C. §

17              6o(1)(A)-(B) (2018) (Count Three)

18  Section 1a(10)(A) of the Act, 7 U.S.C. § 1a(10)(A) (2018), defines a "commodity pool" as

19  "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading

20  in commodity interests," including for the trading of futures, binary options, or forex.  7 U.S.C. §

21  1a(11)(A)(i) defines a CPO as

22  any person engaged in a business that is of the nature of a commodity
   pool, investment trust, syndicate, or similar form of enterprise, and
23  who, in connection therewith, solicits, accepts, or receives from
   others, funds, securities, or property, either directly or through capital
24  contributions, the sale of stock or other forms of securities, or
   otherwise, for the purpose of trading in commodity interests,
25  including any—(I) commodity for future delivery, security futures
   product, or swap; [or] (II) agreement, contract, or transaction
26  described in [S]ection 2(c)(2)(C)(i) [of the Act] or [S]ection
   2(c)(2)(D)(i) [of the Act.]

27

28

25

Pursuant to Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2021), and subject to certain exceptions not relevant here, any person who operates or solicits funds, securities, or property for a pooled investment vehicle and engages in retail forex transactions is defined as a retail forex CPO.  Pursuant to Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I) (2018), "[a]greements, contracts, or transactions" in retail forex and accounts or pooled investment vehicles in retail forex "shall be subject to . . . [7 U.S.C. §] 6o," except in circumstances not relevant here.

During the Relevant Period, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and Defendant Glenn Law Firm solicited, accepted, and/or received funds for the Black Pools, and thus acted as CPOs and retail forex CPOs, as defined by 7 U.S.C. § 1a(11) of the Act and 17 C.F.R. § 5.1(d)(1), respectively.  Regulation 1.3, 17 C.F.R. § 1.3 (2021), defines an AP of a CPO as:

> a natural person associated with: (3) A [CPO] as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]

Similarly, 17 C.F.R. § 5.1(d)(2) defines as an AP of a retail forex CPO any person associated with a retail forex CPO (as defined by 17 C.F.R. § 5.1(d)(1)) as:

> a partner, officer, employee, consultant or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves: (i) [t]he solicitation of funds, securities, or property for a participation in a pooled investment vehicle; or (ii) [t]he supervision of any person or persons so engaged[.]

During the Relevant Period, Defendants Black, Mancuso, Tufo, and Glenn were each associated with one or more of the above CPOs and retail forex CPOs as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds for the Black Pools, and/or the supervision of any person or persons so engaged.  Therefore, these Defendants were APs of a CPO as defined by Regulation 1.3 and APs of a retail forex CPO as defined by Regulation 5.1(d)(2).

26

Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2018), provides, in relevant part, that:

> [i]t shall be unlawful for a . . . [CPO or an AP of a CPO], by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—(A)    to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

Defendants violated 7 U.S.C. § 6o(1) by the same fraudulent misconduct described above. 7 U.S.C. § 6o(1) is a parallel statute to 7 U.S.C. § 6b of the Act—the same conduct that violates the latter can violate the former.  Am. Bullion, 2014 WL 12603558, at *5; Driver, 877 F. Supp. 2d at 978.  To prove a violation of 7 U.S.C. § 6o(1)(B), the Commission need not prove scienter—only that "the [violator] . . . intended to do what was done and its consequence is to defraud."  See CFTC v. Crombie, 914 F.3d 1208, 1215 (9th Cir. 2019) (citation omitted); CFTC v. Savage, 611 F.2d 270, 285 (9th Cir. 1978).

The only additional element set forth in 7 U.S.C. § 6o(1) is that Defendants' conduct must involve use of the mails or any means or instrumentality of interstate commerce, which it did as described above.  7 U.S.C. § 6o(1) of the Act applies to all CPOs and APs whether registered, required to be registered, or exempt from registration.  See Weinberg, 287 F. Supp. 2d at 1107-08 (so noting with respect to CPOs).

  iv.  <u>Defendants Failed to Properly Register with the Commission in Violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2), 6m(1) (2018) and 17 C.F.R. § 5.3(a)(2) (2021) (Count Four)</u>

Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018), provides that it is unlawful for a CPO, unless registered, "to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as a CPO."  Similarly, Section 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc), states that a person shall not operate or solicit funds for any pooled investment vehicle in connection with forex transactions, unless registered pursuant to Commission regulations.  Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2021), requires retail forex CPOs, as defined by 17 C.F.R. § 5.1(d)(1), to register as such with the Commission. Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2018) states that APs of CPOs who are soliciting for

27

1    participation in a pool must register with the Commission.  And, except in certain circumstances

2    not relevant here, 17 C.F.R. § 5.3(a)(2)(ii) requires those that meet the definition of an AP of a

3    retail forex CPO under Regulation 5.1(d)(2) to register as an AP of a CPO with the Commission.

4    See, e.g., Am. Bullion, 2014 WL 12603558, at *7 (finding defendants who should have registered

5    but failed to register as CPOs and APs violated the Act and Regulations).

6          For the reasons described above, Defendants Financial Tree, Financial Solution, and New

7    Money (acting as a common enterprise) and the Glenn Law Firm are CPOs, and Defendants

8    Black, Mancuso, Tufo, and Glenn are APs of CPOs.  Although required by the Act and

9    Regulations, they did not register with the Commission as such.  Defendants thus violated 7

10   U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2), 6m(1), and 17 C.F.R. § 5.3(a)(2)(i)-(ii).

11                       v.   Defendants Financial Tree, Financial Solution, and the Glenn Law Firm

12                            Failed to Operate Pools as Separate Entities and Commingled Pool Funds

13                            in Violation of 17 C.F.R. § 4.20(a)(1), (b)-(c) (2021) (Count Five)

14         Regulation 4.20(a)(1), 17 C.F.R. § 4.20(a)(1) (2021), requires a CPO, whether registered

15   or not, to operate its pool as a legal entity separate from that of the CPO.  See, e.g., Am. Bullion,

16   2014 WL 12603558, at *7 (finding CPOs violated 17 C.F.R. § 4.20(a)(1) and (b) when they failed

17   to operate pool as separate legal entity and received pool funds in a name other than that of the

18   pool).  17 C.F.R. § 4.20(c) prohibits a CPO, whether registered or not, from commingling the

19   property of any pool it operates with the property of any other person.  See, e.g., Capitol Equity

20   FX, 2017 WL 9565340, at *5 (holding that CPO violated 17 C.F.R. § 4.20(c) by commingling

21   pool funds with non-pool property).  Regulation 5.4, 17 C.F.R. § 5.4 (2021), states that Part 4 of

22   the Regulations, 17 C.F.R. pt. 4 (2021), applies to any person required to register as a CPO

23   pursuant to Part 5 of the Regulations, 17 C.F.R. pt. 5 (2021), relating to forex transactions.

24         During the Relevant Period, Financial Tree and Financial Solution violated Regulation

25   4.20(a)(1) by failing to operate the FT Pool and FSG Pool, respectively, as a legal entity separate

26   from that of the CPO.  Financial Tree and Financial Solution violated Regulation 4.20(c) by

27   transferring pool funds into bank accounts controlled by Black, Mancuso, Tufo, and others which

28   contained non-pool property.  During the Relevant Period, the Glenn Law Firm, while acting as

1    CPO for the Black Pools, violated Regulation 4.20(b) by failing to receive pool participants'

2    funds in the names of the Black Pools and violated Regulation 4.20(c) by accepting pool funds

3    into bank accounts containing non-pool property.

4                              vi.   Defendants Financial Tree, Financial Solution, New Money, and the Glenn

5                                    Law Firm Failed to Provide Pool Participants with Disclosure and Other

6                                    Required Documents in Violation of 17 C.F.R. §§ 4.21, 4.22 (2021) (Count

7                                    Six)

8           Regulation 5.4, 17 C.F.R. § 5.4 (2021), states that Part 4 of the Regulations, 17 C.F.R. pt.

9    4 (2021), applies to any person required to register as a CPO pursuant to Part 5 of the

10   Regulations, 17 C.F.R. pt. 5 (2021), relating to forex transactions.  Regulation 4.21(a)(1), 17

11   C.F.R. § 4.21(a)(1) (2021), provides that:

12                  each commodity pool operator registered or required to be registered
                    under the Act must deliver or cause to be delivered to a prospective
13                  participant in a pool that it operates or intends to operate a Disclosure
                    Document for the pool prepared in accordance with §§ 4.24 and 4.25
14                  by no later than the time it delivers to the prospective participant a
                    subscription agreement for the pool . . .
15

16          Regulation 4.22(a), (c), 17 C.F.R. § 4.22(a), (c) (2021), provides that:

17                  each commodity pool operator registered or required to be registered
                    under the Act must periodically distribute to each participant in each
18                  pool . . . an Account Statement, which shall be presented in the form
                    of a Statement of Operations and a Statement of Changes in Net
19                  Assets . . . [and which] must be presented and computed in
                    accordance with generally accepted accounting principles . . . . [and]
20                  must [also] distribute an Annual Report . . . .

21   See, e.g., Am. Bullion, 2014 WL 12603558, at *7 (finding CPOs violated Regulations 4.21 and

22   4.22 when they failed to provide a required disclosure document and account statements).

23          Defendants Financial Tree, Financial Solution, and New Money (acting as a common

24   enterprise) and the Glenn Law Firm failed to provide prospective pool participants with a pool

25   disclosure document in the form specified in Regulations 4.24 and 4.25.  Nor did these

26   Defendants provide accurate account statements presented and computed in accordance with

27   generally accepted accounting principles and containing required information, fees, and expenses

28   incurred by the Black Pools, or an annual report containing financial statements certified by an

1    independent public accountant.  Accordingly, Financial Tree, Financial Solution, New Money,

2    and the Glenn Law Firm violated 17 C.F.R. §§ 4.21, 4.22.

3                    vii.   Defendants Black and Glenn Are Liable as Controlling Persons for the
                            Unlawful Conduct of the Entities They Controlled
4

5           Controlling persons are liable for violations of the entities they control under certain

6    circumstances.  Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018), states that a controlling person

7    of an entity is liable for the violations of that entity if the controlling person knowingly induced

8    the violations, directly or indirectly, or did not act in good faith.  "A fundamental purpose of

9    Section 13[(b)] is to allow the Commission to reach behind the corporate entity to the controlling

10   individuals of the corporation and to impose liability for violations of the Act directly on such

11   individuals as well as the corporation itself."  R.J. Fitzgerald, 310 F.3d at 1334 (citation omitted)

12   (defendant who was ultimate decision maker at firm, was ultimately responsible for compliance

13   with Act and Regulations, and reviewed and approved activities violating Act was controlling

14   person); see also Capitol Equity FX, 2017 WL 9565340, at *4 (noting that "one is a controlling

15   person when he or she has the possession, direct or indirect, of the power to direct or cause the

16   direction of the management and policies of a person . . . ." and holding that husband and wife

17   who were president and sole owner, respectively, of relevant entities and opened trading accounts

18   in entities' names were controlling persons of those entities); CFTC v. FX First, Inc., No. SACV

19   03-1454JVS (MLGx), 2007 WL 9711431, at *8–12 (C.D. Cal. Sept. 28, 2007) (applying 7 U.S.C.

20   § 13c(b) and finding controlling person liability).

21          Defendant Black was a controlling person of Financial Tree, Financial Solution, and New

22   Money during the Relevant Period.  Black caused the creation of Financial Tree, Financial

23   Solution, and New Money.  Black is the lone Trustee of Financial Tree and Financial Solution

24   and is the Managing Director of New Money.  Financial Tree's and Financial Solution's Articles

25   of Trust list Black as Trustee having exclusive control of Financial Tree and Financial Solution.

26   New Money's registration documents with the Nevada Secretary of State list Black and Financial

27   Tree (which Black controls) as New Money's two managers.  Black opened bank accounts for

28   Financial Tree, Financial Solution, and New Money and was the sole signatory on those accounts.

Black signed Agreements on behalf of Financial Solution and New Money.  Therefore, pursuant to 7 U.S.C. § 13c(b), Black is liable for all of Financial Tree's, Financial Solution's, and New Money's violations of the Act and Regulations as described in Counts 1 through 6 of the Complaint and above.

Defendant Glenn was a controlling person of the Glenn Law Firm during the Relevant Period.  Glenn is the Managing Partner of the Glenn Law Firm, whose website does not list other attorneys as being members of the firm.  Glenn signed the August 25, 2014 "Paymaster Agreement" with Financial Tree on behalf of the Glenn Law Firm.  Glenn opened bank accounts for each Glenn Law Firm bank account to which pool participants contributed funds.  Therefore, pursuant to 7 U.S.C. § 13c(b), Glenn is liable for all of the Glenn Law Firm's violations of the Act and Regulations as described in Counts 1 through 6 of the Complaint and above.

viii.   Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm Are Liable For the Acts of Their Agents Black, Mancuso, Tufo, and/or Glenn

Corporate entities can also be liable for the acts of individuals acting on their behalves. Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2020), state that the act, omission, or failure of any person acting for any entity within the scope of his employment or office shall be deemed the act, omission or failure of such entity, as well as of that person.  See R.J. Fitzgerald, 310 F.3d at 1335 (imposing liability on corporate entity because of acts of individuals); Am. Bullion, 2014 WL 12603558, at *8 (same).  During the Relevant Period, Defendants Black, Mancuso, Tufo, and Glenn were officers, employees, or agents of Financial Tree, Financial Solution, and New Money.  Likewise, Defendant Glenn was an officer, employee, or agent of the Glenn Law Firm.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Financial Tree, Financial Solution, New Money, and the Glenn Law Firm are liable for each of the acts, misrepresentations, omissions, and failures of those officers, employees, or agents done in the scope of their employment or office, as described in Counts 1 through 6 of the Complaint and above.

////

1               ix.   <u>Defendants Financial Tree, Financial Solution, and New Money Are Liable</u>

2                    <u>for the Acts of Each Other as a Common Enterprise</u>

3       When defendants act "[a]s a common enterprise," they may be held "jointly and severally

4 liable for the acts of the common scheme." <u>Am. Bullion</u>, 2014 WL 12603558, at *8 (citations

5 omitted); <u>see, e.g.</u>, <u>Noble Wealth</u>, 90 F. Supp. 2d at 691. When determining whether a common

6 enterprise exists, courts consider "a variety of factors, including: common control; the sharing of

7 office space and officers; whether business is transacted through a maze of interrelated

8 companies; unified advertising; and evidence which reveals that no real distinction existed

9 between the Corporate Defendants." <u>Am. Bullion</u>, 2014 WL 12603558, at *8 (internal citations

10 and quotations omitted) (finding two entities operated as a common enterprise because "[t]heir

11 principals are the same, their employees are the same and their customers are the same" and

12 "there is no meaningful distinction between the two entities"). Black formed, opened bank

13 accounts for, is the only employee associated with, and controls Financial Solution, New Money,

14 and Financial Tree. Financial Solution and Financial Tree share the same address—a UPS store

15 in Folsom, California. The only business Financial Solution, New Money, and Financial Tree

16 conducted was related to Defendants' fraud. These facts warrant treating Financial Tree,

17 Financial Solution, and New Money as a common enterprise, thus making each individual

18 company liable for the deceptive acts and practices of the other, as reflected in Counts 1 through

19 6 of the Complaint.

20                     x.   <u>Relief Defendants Are Liable for Disgorgement</u>

21       Each Relief Defendant received ill-gotten funds with no entitlement to those funds and is

22 thus liable for disgorgement. To support disgorgement against a relief defendant, the CFTC need

23 only demonstrate that the relief defendant received ill-gotten funds and does not have a legitimate

24 claim to those funds. <u>SEC v. World Capital Mkt., Inc.</u>, 864 F.3d 996, 1004 (9th Cir. 2017); <u>Am.</u>

25 <u>Bullion</u>, 2014 WL 12603558, at *8 (holding Relief Defendants who received over $1 million in

26 pool funds without providing legitimate services or having legitimate claim to those funds should

27 be required to disgorge such funds). The relief defendant must disgorge such funds even if the

28 relief defendant no longer possesses the funds. <u>See</u> <u>World Capital Mkt.</u>, 864 F.3d at 1007

1   ("ongoing possession of the funds is not required for disgorgement").  As the Complaint

2   describes, each Relief Defendant received pool funds, either directly from Defendants or through

3   other Relief Defendants.  The Relief Defendants have no legitimate claim to pool funds and did

4   not provide any services related to the Black Pools for pool participants.  The Relief Defendants

5   are thus required to disgorge the money they received.

6                    xi.   Relief Defendant Caswell Is Jointly and Severally Liable for Relief

7                          Defendants Suisse Group's and JMC's Disgorgement Obligations

8              Relief Defendant Caswell is jointly and severally liable for Relief Defendants Suisse

9   Group's and JMC's disgorgement obligations because Suisse Group and JMC were alter egos of

10  Caswell.  In the Ninth Circuit, an individual relief defendant may be held jointly and severally

11  liable for disgorgement of ill-gotten funds received by an entity relief defendant where the entity

12  is the alter ego of the individual.  See FTC v. Ivy Capital, Inc., 616 Fed. Appx. 360, 361 (9th Cir.

13  2015) (holding district court did not err in finding entity was alter ego of jointly and severally

14  liable individual where individual was 51% owner, entity funds were used to pay personal

15  expenses, and adherence to the corporate fiction would promote injustice).  Under California law,

16  to prove alter ego liability, (1) there must be "such unity of interest and ownership that the

17  separate personalities of the corporation and the individual no longer exist, and (2) that, if the acts

18  are treated as those of the corporation alone, an inequitable result will follow."  Associated

19  Vendors, Inc. v. Oakland Meat Co., 210 Cal. App. 2d 825, 837 (1962) (citations omitted)

20  (identifying factors supporting alter ego liability, including commingling and personal use of

21  corporate funds and other assets, undercapitalization of the corporate entity, the disregard of legal

22  formalities and failure to maintain an arms-length relationship among related entities, and use of

23  the same office locations and employment of the same employees).

24             Here, Caswell solely owned and controlled Suisse Group and JMC.  Both entities shared

25  the same UPS store mailing address and the same email address.  Caswell transferred corporate

26  funds to himself as well as apparent relatives and friends, made payments from corporate

27  accounts for personal expenses such as massages and mobile phones, transferred pool funds from

28  Suisse Group to JMC, and, for most of 2016, maintained almost zero funds, beyond pool funds, in

                                                    33

1  the bank accounts that received transfers from Defendants in 2016.  It appears Caswell utilized

2  Suisse Group and JMC not for legitimate business purposes, but to receive and immediately

3  dissipate ill-gotten pool funds.  It would be inequitable for Suisse Group and JMC to avoid

4  disgorging the $800,000 they collectively received simply because Caswell transferred the money

5  elsewhere.  Thus, Suisse Group, JMC, and Caswell are jointly and severally liable for

6  disgorgement of the $800,000 on an alter ego basis.

7                    c.       Sum of Money at Stake

8          The fourth Eitel factor, "the amount of money at stake in relation to the seriousness of the

9  defendant's conduct" weighs in favor of a default judgment.  PepsiCo, Inc. v. Los Potros Dist.

10  Ctr., LLC, No. CV-07-2425, 2008 WL 942283, at *3 (D. Ariz. Apr. 7, 2008).  Although the

11  amount of money at stake in this case is large, the restitution and civil monetary penalties the

12  CFTC seeks from Defendants, as well as the disgorgement the CFTC seeks from Relief

13  Defendants, are consistent with awards and penalties in similar enforcement actions.  See, e.g.,

14  CFTC v. Driver, 877 F. Supp. 2d 968, 981 (C.D. Cal. 2012) (awarding over $9.5 million in

15  restitution and a $31.8 million civil monetary penalty) aff'd 585 F. App'x 366 (9th Cir. 2014);

16  CFTC v. Am. Bullion Exch. ABEX, Corp. ("Am. Bullion"), No. SACV10-1876, 2014 WL

17  12603558, at *10-11 (C.D. Cal. Sept. 16, 2014) (entering default judgment for CFTC and

18  ordering defendants to pay a civil monetary penalty of triple the defendants' gain, which

19  exceeded $14 million, and ordering two relief defendants to disgorge $1.25 million and $110,600,

20  respectively, reflecting pool funds improperly received by those relief defendants); CFTC v.

21  Schiera, No. CV05 2660, 2006 WL 4586786, at *7, *9 (S.D. Cal. Dec. 11, 2006) (entering default

22  judgment and ordering defendants to disgorge $3 million and pay a $9 million civil monetary

23  penalty).

24          Moreover, Defendants' fraudulent conduct and registration violations constitute core

25  violations of the Act and Regulations which attack the integrity of the commodity markets.  The

26  CFTC's requested relief is therefore reasonable.  See Sky Billiards, 2016 WL 6661175, at *5

27  (entering default judgment and noting that the "award [was] consistent with other default

28  judgment awards in the context of [similar cases].").

34

1        d.     Possibility of Factual Disputes

2        The fifth <u>Eitel</u> Factor, the possibility of a dispute as to material facts, weighs in favor of a

3 default judgment. The Complaint details Defendants' fraudulent solicitations, misappropriation

4 of pool funds, and extensive efforts to conceal and prolong the scheme. The Complaint refers to,

5 and relies heavily on, documentary evidence such as emails and account statements reflecting

6 Defendants' communications and financial activities. Given this, the likelihood of a genuine

7 factual dispute on a material issue is exceedingly remote. <u>See also</u> <u>Sky Billiards</u>, 2016 WL

8 6661175, at *5 (recognizing that the defendant's failure to respond "supports the conclusion that

9 the possibility of a dispute as to the material facts is minimal").[2]

10        e.     Excusable Neglect

11        As to the sixth <u>Eitel</u> factor, there was no excusable neglect for the defaults because all

12 Parties were properly served with the Summons and Complaint in July and August 2020. <u>See</u>

13 <u>Halsey</u>, 2014 WL 12601015, at *4 (recognizing that proper service of process supports a finding

14 that default is not due to excusable neglect). Since that time, Black and the Glenn Defendants

15 appeared only to litigate matters related to stay and default, then ultimately chose to default. The

16 remaining, non-appearing Parties made no effort to appear and defend this lawsuit either pro se

17 (in the case of individual Parties) or through counsel (as permitted for individuals and required for

18 entity Parties). Notably, this Court explicitly placed the Parties on notice of the requirements

19 under E.D. Cal. L.R. 183(a) for entities to appear through counsel. <u>See, e.g.</u>, ECF Nos. 48, 96

20

21 ───────────────

[2] The court notes that non-parties Michael J. Jacobs and Ruby Handler Jacobs filed a "notice" with the court as a "courtesy" that purports to argue the facts of this case. ECF No. 128 at 1, 8. The Jacobses, who were officers of the "now defunct named Relief Defendant Kingdom Trust LLC" make clear that they "speak for themselves as they are not authorized to represent nominal Kingdom in this action." ECF No. 128 at 2. Their statements as non-parties do not alter the outcome of this <u>Eitel</u> factor because in the default judgment context, the court makes a determination based on the well-pleaded facts in the Complaint which, as discussed above, support default judgment against Relief Defendant Kingdom. Kingdom, the actual party to this case, has not raised any dispute as to material facts and is inarguably in default. ECF No. 50. The Court has previously explained that Michael Jacobs may not represent Kingdom in this matter. ECF No. 48. The Jacobses' notice is an attempt at an end-run around their inability to represent Kingdom and it does not alter the court's analysis with respect to the entry of default judgment.

1  (rejecting efforts by Financial Tree, Financial Solution, New Money, and Kingdom to appear

2  through non-attorney principals).  Thus, the Parties' defaults cannot be excused.

3                    f.        Policy Favoring Merits Determinations

4          Finally, the seventh Eitel factor—the general preference for deciding cases on the

5  merits—does not counsel against a default judgment here because "[d]efendant[s'] failure to

6  answer Plaintiffs' Complaint makes a decision on the merits impractical, if not impossible."

7  PepsiCo, Inc. v. Cal. Sec. Cans, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) (noting that the on-

8  the-merits "preference, standing alone, is not dispositive") (citation omitted).  In addition,

9  countervailing interests outweigh any residual interest in preserving the remote potential for a

10  merits decision.  "[T]he CFTC is the statutory guardian entrusted with the enforcement of the

11  congressional scheme for safeguarding the public interest in commodity futures markets."  See

12  Stephen Bronte, Advisors, LLC v. CFTC, 90 F. App'x 251, 252 (9th Cir. 2004) (internal

13  quotations and citations omitted).  Absent a default judgment, the CFTC will likely be unable to

14  secure an order of restitution and disgorgement on behalf of defrauded pool participants, deter

15  misconduct through penalties, and protect the public through permanent injunctive relief.  This

16  weighs in favor of a default judgment.

17                    g.        Conclusion

18          For the reasons explained above, all Eitel factors weigh in favor of default judgment.

19  Accordingly, default judgment is appropriate in this case.  What remains is a determination of the

20  terms of relief.

21                    III.      RECOMMENDED TERMS OF JUDGMENT

22      A.  Permanent Injunction

23          The CFTC is authorized to seek, and the Court to impose, injunctive relief.  Section 6c of

24  the Act, 7 U.S.C. § 13a-1(a) (2018).  "The CFTC is entitled to a permanent injunction upon a

25  showing that a violation [of the Act or Regulations] has occurred and is likely to continue unless

26  enjoined."  Driver, 877 F. Supp. 2d at 981.  "Once a violation is demonstrated, the [CFTC] need

27  show only that there is some reasonable likelihood of future violations."  CFTC v. Wilson, No.

28  ////

36

11-cv-1651, 2011 WL 6398933, at *2 (S.D. Cal. Dec. 20, 2011) (quoting <u>CFTC v. Hunt</u>, 591 F.2d 1211, 1220 (7th Cir. 1979)).

The well-pleaded facts of the CFTC's Complaint, and the evidence submitted through declarations, establish a long-standing pattern of sophisticated unlawful conduct.  In light of these facts, the undersigned finds it highly likely that Defendants will be repeat violators of the Act and Regulations unless permanently restrained and enjoined by the Court.  Defendants' repetitive prior misconduct—fraudulently soliciting over ninety pool participants over five years, misappropriating their money, and offering bogus excuses for failure to return funds—is highly suggestive of future violations.  So too is Defendants' disregard of the California DBO's Desist & Refrain Order against Black, Mancuso, and Financial Solution in April 2018 and repeated complaints from pool participants to that Defendants were defrauding them.  Mancuso continued falsely promising disbursement of funds to pool participants and discouraging cooperation with the CFTC at least as recently as August 2020—well after being served with the SRO entered by this Court.  And Tufo is a recidivist—he has been charged civilly and criminally with two prior fraudulent schemes.  Defendants have shown no signs of stopping their fraud.

Based upon and in connection with the foregoing conduct, pursuant to 7 U.S.C. § 13a-1, Defendants should be permanently restrained, enjoined and prohibited from directly or indirectly engaging in conduct in violation of Sections 4b(a)(2)(A), (C), 4c(b), 4k(2), 4m(1), 4o(1)(A)-(B), and 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. §§ 6b(a)(2)(A), (C), 6c(b), 6k(2), 6m(1), 6o(1)(A)-(B), and 2(c)(2)(C)(iii)(I)(cc) (2018), and Regulations 5.2(b)(1)-(3), 5.3(a)(2), and 32.4, 17 C.F.R. §§ 5.2(b)(1)-(3), 5.3(a)(2), and 32.4 (2021), including:

a.    Cheating or defrauding, or attempting to cheat or defraud, any other person; or deceiving, or attempting to deceive, any other person by any means whatsoever; in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction;

b.    in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, (i) cheating or defrauding, or attempting to cheat or defraud, any other

person; or (ii) willfully deceiving or attempting to deceive any other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or with the other person;

      c.     acting as a CPO or an AP of a CPO and employing any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant; or

      d.     acting as a CPO or an AP of a CPO without being registered with the CFTC.

Based upon and in connection with the foregoing conduct, pursuant to 7 U.S.C. § 13a-1, Defendants Financial Tree, Financial Solution, New Money, and Black should also be permanently restrained, enjoined, and prohibited from directly or indirectly engaging in conduct in violation of 7 U.S.C. § 6b(a)(2)(B), including willfully making or causing to be made to any other person any false report or statement or willfully entering or causing to be entered for the other person any false record, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person.

Based upon and in connection with the foregoing conduct, pursuant to 7 U.S.C. § 13a-1, Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, and Glenn should also be permanently restrained, enjoined and prohibited from directly or indirectly engaging in conduct in violation of 7 U.S.C. § 6b(a)(2)(B) and 17 C.F.R. §§ 4.20(a)(1), (b)-(c), 4.21, and 4.22, including failing to properly operate any commodity pool in compliance with the Act and Regulations, including but not limited to 17 C.F.R. §§ 4.20(a)(1), (b)-(c), 4.21, and 4.22.

Defendants should also be permanently restrained, enjoined and prohibited from directly or indirectly:

      a.     Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

////

b.      Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)), for their own personal account or for any account in which they have a direct or indirect interest;

c.      Having any commodity interests traded on their behalves;

d.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

e.      Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

f.      Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and/or

g.      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

B.  Restitution

The CFTC is authorized to seek, and the Court to impose, equitable remedies for violations of the Act and Regulations, including "restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses)."  7 U.S.C. § 13a-1(d)(3)(A). Restitution exists to "restore the status quo" and reflects "the difference between what defendants obtained and the amount customers received back . . . ."  Driver, 877 F. Supp. 2d at 981; see also CFTC v. Leighton, No. 2:12-cv-04012, 2013 WL 4101874, at *9 (C.D. Cal. July 8, 2013).

Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, Mancuso, and Glenn should be ordered to pay, jointly and severally, restitution in the amount of $10,495,328.38 ("General Restitution Obligation"), representing net pool participant losses.  See Robinson Decl. ¶ 11 (describing losses).  If the General Restitution Obligation is not paid immediately, post-judgment interest should accrue on the General Restitution Obligation

39

1   beginning on the date of entry of this Order and shall be determined by using the Treasury Bill

2   rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2018).

3        Defendant Tufo should be ordered to pay, jointly and severally with the remaining

4   Defendants, restitution in the amount of $4,690,155.52 ("Tufo Restitution Obligation," and

5   together with the General Restitution Obligation [of which the Tufo Restitution Obligation is a

6   subset], the "Restitution Obligations"), representing total losses by pool participants Tufo

7   fraudulently solicited.  See Robinson Decl. ¶ 11.  If the Tufo Restitution Obligation is not paid

8   immediately, post-judgment interest should accrue on the Tufo Restitution Obligation beginning

9   on the date of entry of this Order and shall be determined by using the Treasury Bill rate

10  prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2018).

11       Defendants Black, Mancuso, and Tufo are currently defendants in a criminal action

12  charging them, in part, for the misconduct that is at issue in this matter.  See The People of the

13  State of California v. Christopher J. Mancuso, John D. Black, and Joseph P. Tufo, Case No. 20-

14  FE-011219 (Superior Court of the State of California, County of Sacramento, filed July 22, 2020)

15  (with respect to Black, the "Black Criminal Action;" with respect to Mancuso, the "Mancuso

16  Criminal Action;" and with respect to Tufo, the "Tufo Criminal Action").  For amounts disbursed

17  to pool participants as a result of satisfaction of any restitution ordered (1) in the Black Criminal

18  Action or the Mancuso Criminal Action, Defendants should receive a dollar-for-dollar credit

19  against the General Restitution Obligation; or (2) in the Tufo Criminal Action, Defendants should

20  receive a dollar-for-dollar credit against both Restitution Obligations.  Within ten days of

21  disbursement in the Criminal Action to pool participants, Mancuso and Tufo should be ordered to

22  transmit, under a cover letter that identifies the name and docket number of this proceeding, to the

23  Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155

24  21st Street, NW, Washington, D.C. 20581, and the Office of Administration, National Futures

25  Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, copies of the form

26  of payment to those pool participants; with a copy to Charles Marvine, Deputy Director,

27  Commodity Futures Trading Commission, 2600 Grand Boulevard, Suite 210, Kansas City, MO

28  64108.

To effect payment of the Restitution Obligations and the distribution of any restitution payments to pool participants, the Court should appoint the National Futures Association ("NFA") as Monitor ("Monitor").  The Monitor should be directed to receive restitution payments from Defendants and make distributions as set forth below.  Because the Monitor will be acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud. Defendants should be ordered to make payments of their Restitution Obligations, and any post-judgment interest payments, under this Order to the Monitor in the name "Financial Tree Restitution Fund" and directed to send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendant(s) and the name and docket number of this proceeding.  Defendants should be further ordered as follows:  If payment by electronic funds transfer is chosen, Defendants shall contact Daniel Driscoll or his successor at 312-781-1300 or at the address above to receive payment instructions and shall fully comply with those instructions.  Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581; with a copy to Charles Marvine, Deputy Director, Commodity Futures Trading Commission, 2600 Grand Boulevard, Suite 210, Kansas City, MO 64108.

It should be further ordered as follows: The Restitution Obligations shall be partially satisfied by applying amounts currently frozen in conjunction with this lawsuit.  See ECF No. 9 at 2 n.1, 20-21, 24-25 (SRO prohibiting the Parties from transferring, removing, dissipating, and disposing of their assets and prohibiting financial institutions and others who hold, control, or maintain custody of any of the Parties' assets from permitting the Parties to dispose of those assets); ECF No. 33 at 18-19 (Preliminary Injunction extending asset freeze until further order of the Court).  All Assets, as defined in the SRO (ECF No. 9 at 2 n.1), currently frozen ("Frozen Assets") shall be applied toward any restitution award the Court may order, with the exception of

1  the Glenn Defendants' Frozen Assets.[3]  Financial Institutions and others who hold or control

2  Frozen Assets shall transfer Frozen Assets to the Monitor within three days of receiving actual

3  notice of this Order, including notice via electronic mail.  Transfers of Tufo's Frozen Assets shall

4  reduce both Restitution Obligations by the amount transferred.  Transfers of any other Frozen

5  Assets shall reduce the General Restitution Obligation by the amount transferred.  Transfers to the

6  Monitor shall follow the procedure prescribed above.

7      It should be further ordered as follows:  The Monitor shall oversee the Restitution

8  Obligations and shall have the discretion to determine the manner of distribution of such funds in

9  an equitable fashion to pool participants identified by the CFTC or may defer distribution until

10  such time as the Monitor deems appropriate.  In the event that the amount of Restitution

11  Obligations payments to the Monitor are of a de minimis nature such that the Monitor determines

12  that the administrative cost of making a distribution to eligible pool participants is impractical, the

13  Monitor may, in its discretion, treat such restitution payments as civil monetary penalty

14  payments, which the Monitor shall forward to the CFTC following the instructions for civil

15  monetary penalty payments set forth below.

16      Defendants should be ordered to cooperate with the Monitor as appropriate to provide

17  such information as the Monitor deems necessary and appropriate to identify pool participants to

18  whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of

19  any Restitution Obligations payments.  Defendants should be ordered to execute any documents

20  necessary to release funds that they have in any repository, bank, investment or other financial

21  institution, wherever located, in order to make partial or total payment toward the Restitution

22  Obligations.

23

---

24  [3]  On January 6, 2021, Glenn filed for bankruptcy in the United States Bankruptcy Court for the
District of Colorado ("Bankruptcy Court") (Case No. 21-10051-KHT).  As a result, there is an

25  automatic stay in place pursuant to 11 U.S.C. § 362(a) (2018) prohibiting the CFTC from
obtaining an order transferring the Glenn Defendants' assets.  See, e.g., SEC v. Miller, 808 F.3d

26  623, 630-35 (2d Cir. 2015).  In the event the automatic stay is lifted without disposing of Glenn's
Frozen Assets, or the CFTC is granted an order to lift the automatic stay for the purpose of

27  transferring or collecting Glenn's Frozen Assets, any such assets shall be transferred and applied

28  to the General Restitution Obligation pursuant to this paragraph.

It should be ordered that the Monitor shall provide the CFTC at the beginning of each calendar year with a report detailing the disbursement of funds to pool participants during the previous year.  The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the CFTC recipients specified above.

It should be further ordered as follows.  The amounts payable to each pool participant shall not limit the ability of any pool participant to prove that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any pool participant that exist under state or common law.  Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each pool participant who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendants to ensure continued compliance with any provision of this Order and to hold Defendants in contempt for any violations of any provision of this Order.

It should be ordered that, to the extent that any funds accrue to the U.S. Treasury for satisfaction of the Restitution Obligations, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

C. Disgorgement

To support disgorgement against a relief defendant, the CFTC need only demonstrate that the relief defendant received ill-gotten funds and does not have a legitimate claim to those funds. SEC v. World Capital Mkt., Inc., 864 F.3d 996, 1004 (9th Cir. 2017); Am. Bullion, 2014 WL 12603558, at *8 (holding Relief Defendants who received over $1 million in pool funds without providing legitimate services or having legitimate claim to those funds should be required to disgorge such funds).  The CFTC has so demonstrated with respect to Relief Defendants.  Relief Defendants Caswell, Suisse Group, and JMC shall pay, jointly and severally, disgorgement in the amount of eight hundred thousand dollars ($800,000) ("Caswell Disgorgement Obligation"), representing ill-gotten funds for which they did not provide legitimate services and to which they do not have a legitimate claim.

////

Accordingly, it is recommended that the following language be adopted:

Relief Defendant Landes shall pay disgorgement in the amount of two hundred thousand dollars ($200,000) ("Landes Disgorgement Obligation"), representing ill-gotten funds for which Landes did not provide legitimate services and to which Landes does not have a legitimate claim.

Relief Defendant Kingdom shall pay disgorgement in the amount of one million, one hundred thousand dollars ($1,100,000) ("Kingdom Disgorgement Obligation"), representing ill-gotten funds for which Kingdom did not provide legitimate services and to which Kingdom does not have a legitimate claim.

Relief Defendant Anne Mancuso shall pay disgorgement in the amount of two hundred and fifty-two thousand, eight hundred and seventy-four dollars and ninety-three cents ($252,874.93) ("Anne Mancuso Disgorgement Obligation"), representing ill-gotten funds for which Anne Mancuso did not provide legitimate services and to which she does not have a legitimate claim.

Relief Defendant Tyler Mancuso shall pay disgorgement in the amount of three hundred forty thousand, eighty-seven dollars and twenty-three cents ($340,087.23) ("Tyler Mancuso Disgorgement Obligation," and together with the Caswell Disgorgement Obligation, Landes Disgorgement Obligation, Kingdom Disgorgement Obligation, and Anne Mancuso Disgorgement Obligation, the "Disgorgement Obligations"), representing ill-gotten funds for which Tyler Mancuso did not provide legitimate services and to which he does not have a legitimate claim.

If the Disgorgement Obligations are not paid immediately, then post-judgment interest shall accrue on the Disgorgement Obligations beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2018). The Relief Defendants shall pay their respective Disgorgement Obligations and any post-judgment interest to the Monitor for satisfaction of the General Restitution Obligation pursuant to the procedure set forth in above, resulting in a dollar-for-dollar credit against the applicable Restitution Obligation(s) as well as the applicable Disgorgement Obligation(s). To the extent the General Restitution Obligation has been satisfied at the time of a payment made, the payment will simply result in a credit against the applicable Disgorgement Obligation(s), and the Monitor shall transfer such funds exceeding the applicable Restitution Obligation to the CFTC. If funds are to be transferred other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

Commodity Futures Trading Commission
Division of Enforcement
C/O ESC/AMK-326; HQ RM 265

6500 S. MacArthur Blvd.
Oklahoma City, OK 73169
9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, the Monitor shall contact the email address above to receive payment instructions.  To the extent any Relief Defendant's Frozen Assets are utilized to satisfy the General Restitution Obligation described above, that Relief Defendant's Disgorgement Obligation shall be reduced by the amount of that payment.

D. <u>Civil Monetary Penalty</u>

Under 7 U.S.C. § 13a-1(d)(1), and Regulation 143.8(a)(4)(ii)(D), 17 C.F.R. § 143.8(a)(4)(ii)(D) (2021), the CFTC is authorized to seek a civil monetary penalty equal to the higher of triple Defendants' monetary gain from each violation of the Act or Regulations, or $187,432 per violation.  The Court may "fashion a civil monetary penalty appropriate to the gravity of the offense and sufficient to act as a deterrent."  <u>CFTC v. Trimble</u>, No. 11–cv–02887, 2013 WL 317576, at *9 (D. Colo. Jan. 28, 2013) (citing <u>Miller v. CFTC</u>, 197 F.3d 1227, 1236 (9th Cir. 1999)).

Based on Defendants' intentional and egregious conduct, civil monetary penalties reflecting three times the monetary net gain to each are appropriate.  This penalty is authorized by 7 U.S.C. § 13a-1(d)(1)(A).  Accordingly, the following language should be adopted:

Defendants Black, Financial Tree, Financial Solution, and New Money shall pay, jointly and severally, a civil monetary penalty ("CMP") in the amount of five million, four hundred forty-one thousand, two hundred forty-three dollars and thirteen cents ($5,441,243.13) ("Black and Black Entities CMP Obligation"), representing three times Black's gains of $1,809,117.56 and Financial Tree's, Financial Solution's, and New Money's gains of $4,630.15 received in connection with the violations described herein.

Defendant Mancuso shall pay a CMP in the amount of twelve million, one hundred forty-six thousand, nine hundred twenty-one dollars and twenty-eight cents ($12,146,921.28) ("Mancuso CMP Obligation"), representing three times Mancuso's gains received in connection with the violations described herein.

Defendant Tufo shall pay a CMP in the amount of six hundred eighty-four thousand dollars and three cents ($684,000.03) ("Tufo CMP Obligation"), representing three times Tufo's gains received in

connection with the violations described herein.

Defendants Glenn and the Glenn Law Firm shall pay, jointly and severally, a CMP in the amount of eight hundred fifty-six thousand, three hundred fourteen dollars and seventy-two cents ($856,314.72) ("Glenn Defendants CMP Obligation," and together with the Black and Black Entities CMP Obligation, the Mancuso CMP Obligation, and the Tufo CMP Obligation, the "CMP Obligations"), representing three times the Glenn Defendants' gains received in connection with the violations described herein.

If the CMP Obligations are not paid immediately, then post-judgment interest shall accrue on the CMP Obligations beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2018).  Defendants shall pay their CMP Obligations and any post-judgment interest by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> C/O ESC/AMK-326; HQ RM 265
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> 9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact the email address above to receive payment instructions and shall fully comply with those instructions.  Defendants shall accompany payment of their respective CMP Obligations with a cover letter that identifies the paying Defendant(s) and the name and docket number of this proceeding.  Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the CFTC recipients specified above.

E.  Provisions Related to Monetary Relief

The undersigned recommends adoption of the following additional language related to monetary relief:

Partial Satisfaction:  Acceptance by the CFTC or the Monitor of any partial payment of the Parties' Restitution Obligations, Disgorgement Obligations, or CMP Obligations shall not be deemed a waiver of the Parties' obligation to make further payments pursuant to this Order, or a waiver of the CFTC's right to seek to compel payment of any remaining balance.

46

**Asset Freeze**:  On July 2, 2020 the court entered an asset freeze order prohibiting the transfer, removal, dissipation and disposal of Frozen Assets ("Asset Freeze Order").  See ECF No. 9 (July 2, 2020 SRO); ECF No. 33 (July 28, 2020 Preliminary Injunction extending asset freeze).  The Monitor shall ensure that all of Parties' Frozen Assets are collected and applied toward the Restitution Obligations, set out above.  See Driver, 877 F. Supp. 2d at 981 (applying amounts in bank accounts and futures trading account and frozen by SRO toward restitution obligation).  Once the Monitor completes the collection process and notifies the CFTC recipients described above accordingly, the Asset Freeze Order as applied to the Parties only shall be deemed lifted pursuant to the terms of this Order.

F.  Cooperation

The Parties should be ordered to cooperate fully and expeditiously with the CFTC, including the CFTC's Division of Enforcement, in this action, and in any current or future CFTC investigation or action related thereto.  The Parties should also be ordered to cooperate in any investigation, civil litigation, or administrative matter related to, or arising from, this action.

G.  Miscellaneous Provisions

The undersigned recommends adoption of the following miscellaneous provisions, which are necessary to effectuate the judgment:

**Notice**:  Unless otherwise specifically required herein, notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

Notice to CFTC:

> Charles Marvine
> Deputy Director, Division of Enforcement
> Commodity Futures Trading Commission
> 2600 Grand Boulevard, Suite 210
> Kansas City, MO  64108
> 816-960-7743

All such notices to the CFTC shall reference the name and docket number of this action.

Notice to Defendants and Relief Defendants:

> John D. Black
> Financial Tree
> Financial Solution Group
> New Money Advisors, LLC
> 128 Silberhorn Drive

47

1                   Folsom, CA 95630

Christopher Mancuso

2                   34 Statehouse Place

Irvine, CA 92602

Joseph Tufo

4631 Shetland Way,

Antioch, CA 94531

John P. Glenn

The Law Firm of John Glenn P.C.

1400 Orange Court

Fort Collins, CO 80525

Herbert Caswell

Suisse Group (USA) LLC

JMC Industries LLC

9626 Scadlocke Road

Jacksonville, FL 32208

Kingdom Trust LLC

c/o Michael Jacobs and Ruby Handler Jacobs

800 NE Calle Davina

Albuquerque, New Mexico 87113

Landes Capital Management, LLC

/o Justin Smith

1346 Iroquois Ave.

Cleveland, Ohio 44124

Anne Mancuso

290 Ambroise

Newport Coast, CA 92657

Tyler Mancuso

290 Ambroise

Newport Coast, CA 92657

Notice to NFA:

Daniel Driscoll, Executive Vice President, COO

National Futures Association

300 S. Riverside Plaza, Suite 1800

Chicago, IL 60606-3447

All such notices to the NFA shall reference the name and docket number of this action.

48

Change of Address/Phone:  Until such time as the Parties satisfy in full their Restitution Obligations, Disgorgement Obligations, and CMP Obligations as set forth in this Order, each Party shall provide written notice to the Commission by certified mail of any change to the Party's telephone number and mailing address within ten calendar days of the change.

Invalidation:  If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by a Party to modify or for relief from the terms of this Order.

Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Order shall be binding upon the Parties, upon any person under the authority or control of any of the Parties, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with the Parties.

## IV.     RECOMMENDATION

Based on the foregoing, the undersigned recommends as follows:

1. Plaintiff's November 4, 2021 motion for default judgment, (ECF No. 126) be granted;

2. The court enter judgment in plaintiff's favor and order the relief described above in the language specified;

3. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Id.; see also Local Rule 304(b).  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed with the court and served on all parties within fourteen days after service of the objections.  Local Rule 304(d).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.

////

49

1    Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57

2    (9th Cir. 1991).

3    DATED: January 3, 2022

4                                          ALLISON CLAIRE

5                                          ALLISON CLAIRE
                                           UNITED STATES MAGISTRATE JUDGE